**22-1873**

𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

CYNTEC COMPANY, LTD.,

*Plaintiff-Appellee,*

v.

CHILISIN ELECTRONICS CORP.; CHILISIN AMERICA LTD.,

*Defendants-Appellants.*

*Appeal from the United States District Court, Northern District of California*
*Case No. 4:18-cv-00939-PJH*

**CORRECTED BRIEF FOR APPELLANTS**

**CHILISIN ELECTRONICS CORP. and CHILISIN AMERICA LTD.**

Jonathan Lamberson
Henry Huang
Hallie Kiernan
WHITE & CASE LLP
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA 94306
(650) 213-0300 (telephone)
(650) 213-8158 (facsimile)
lamberson@whitecase.com
henry.huang@whitecase.com
hallie.kiernan@whitecase.com

*Counsel for Appellants*
*Chilisin Electronics Corp. and Chilisin America Ltd.*

# INDEPENDENT CLAIMS

U.S. Patent No. 8,922,312

1. An electronic device, comprising:

a first magnetic powder;

a second magnetic powder, wherein the mean particle diameter of the first magnetic powder is larger than the mean particle diameter of the second magnetic powder, the Vicker's Hardness of the first magnetic powder is greater than the Vicker's Hardness of the second magnetic powder by a first hardness difference, and the first magnetic powder mixes with the second magnetic powder; and

a conducting wire buried in the mixture of the first magnetic powder and the second magnetic powder, wherein the conducting wire comprises an insulating encapsulant and a conducting metal encapsulated by the insulated encapsulant;

wherein by means of the first hardness difference of the first magnetic powder and the second magnetic powder, the mixture of the first magnetic powder and the second magnetic powder and the conducting wire buried therein are combined to form an integral magnetic body at a temperature lower than the melting point of the insulating encapsulant.

U.S. Patent No. 9,481,037

1. A method for manufacturing an electronic device, the method comprising:

providing an insulated conducting wire;

forming a mixture with the insulated conducting wire buried therein, wherein the mixture comprises: a first magnetic powder and a second magnetic powder, wherein the mean particle diameter of the first magnetic powder is larger than the mean particle diameter of the second magnetic powder, and the Vicker's Hardness of the first magnetic powder is greater than the Vicker's Hardness of the second magnetic powder by a first hardness difference; and

performing a molding process on the insulated conducting wire and the mixture, wherein by means of the first hardness difference of the first magnetic powder and the second magnetic powder, the mixture and the insulated conducting wire buried therein are combined to form an integral magnetic body at a temperature lower than the melting point of the insulated conducting wire.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 22-1873 |
| **Short Case Caption** | Cyntec Company, Ltd. v. Chilisin Electronics Corp. |
| **Filing Party/Entity** | Chilisin Electronics Corp. and Chilisin America Ltd. |

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box.** Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/21/2022

Signature: /s/ Jonathan Lamberson

Name: Jonathan Lamberson

FORM 9. Certificate of Interest

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Chilisin Electronics Corp. | | YAGEO Corp. |
| Chilisin America Ltd. | | YAGEO Corp. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable        ☑   Additional pages attached

| | | |
|---|---|---|
| Yuhan Wang<br>White & Case LLP | Anna Maria Targowska<br>Steptoe and Johnson LLP | Chien-Ting Kuo<br>Steptoe and Johnson LLP |
| Daniel F. Gelwicks<br>Steptoe and Johnson LLP | Daniel Justin Weinberg<br>Freitas Angell and Weinberg LLP | Fan Yang<br>White & Case LLP (no longer with firm) |
| Jamie L. Lucia<br>Steptoe and Johnson LLP | Jing Hong Cherng<br>Freitas Angell and Weinberg LLP | John Lloyd Abramic<br>Steptoe and Johnson LLP |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐   None/Not Applicable        ☐   Additional pages attached

| | | |
|---|---|---|
| USPTO App. No. 90/015006 | USPTO App. No. 90/015007 | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable        ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

Case No. 22-1873
Short Case Caption: Cyntec Company, Ltd. v. Chilisin Electronics Corp.
Filing Party/Entity: Chilisin Electronics Corp. and Chilisin America Ltd.

**4. Legal Representatives (Continued).**

| John M. Caracappa Steptoe & Johnson LLP | Katherine Dorothy Cappaert Steptoe & Johnson LLP | Katherine H. Johnson Steptoe & Johnson LLP |
|---|---|---|
| Rachel B. Kinney Freitas Angell Weinberg LLP | Robert E. Freitas Freitas Angell Weinberg LLP | |

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ......................................................................... v

TABLE OF AUTHORITIES ................................................................ vii

STATEMENT OF RELATED CASES ................................................. xi

STATEMENT OF JURISDICTION ........................................................ 1

ISSUES PRESENTED .......................................................................... 2

INTRODUCTION ................................................................................. 3

STATEMENT OF THE CASE ............................................................... 6

I.      THE TECHNOLOGY: MIXED-POWDER MOLDED CHOKES ............... 6

II.     THE ASSERTED PATENTS: POWDERS THAT DIFFER IN SIZE
        AND HARDNESS ........................................................................ 8

III.    THE PROSECUTION HISTORY .................................................. 12

IV.     THE DISTRICT COURT PROCEEDINGS .................................... 13

        A.      Claim Construction and Infringement ............................. 13

        B.      Invalidity .................................................................... 18

        C.      Damages ..................................................................... 22

SUMMARY OF ARGUMENT .............................................................. 25

ARGUMENT ..................................................................................... 27

I.      STANDARD OF REVIEW ........................................................... 27

II.    CHILISIN IS ENTITLED TO JUDGMENT OF NON-
       INFRINGEMENT ........................................................................28

       A.    The Claims Require Lower Formation Temperature Due To A
             Hardness Difference...........................................................28

       B.    Cyntec Has No Evidence of Infringement Under the Proper
             Claim Construction ............................................................34

       C.    Even Under the District Court's Construction, Reversal is
             Appropriate........................................................................38

III.   CHILISIN IS ENTITLED TO A JURY TRIAL ON OBVIOUSNESS........42

       A.    The Prior Art Teaches the Claimed Size and Hardness Ranges .........43

       B.    JMOL of Validity Was Improperly Granted.......................................46

IV.    THE DAMAGES VERDICT SHOULD BE VACATED............................49

       A.    The District Court Erred in Refusing to Exclude Cyntec's
             Importation Calculations ....................................................50

       B.    Cyntec's Lost Profits are Speculative .................................54

       C.    The District Court Erred in Refusing to Grant JMOL of No Lost
             Profits ...............................................................................59

CONCLUSION ...................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Abbott Labs. v. Sandoz, Inc.*,
    556 F.3d 1282 (Fed. Cir. 2009) (en banc) ........................................... 30

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*,
    580 F.3d 1340 (Fed. Cir. 2009) ........................................................... 31

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................ 49

*ArcelorMittal Atlantique et Lorraine v. AK Steel Corp.*,
    908 F.3d 1267 (Fed. Cir. 2018) ........................................................... 30

*Atl. Thermoplastics Co. v. Faytex Corp.*,
    970 F.2d 834 (Fed. Cir. 1992) ............................................................. 47

*BIC Leisure Prods. v. Windsurfing Int'l*,
    1 F.3d 1214 (Fed. Cir. 1993) ......................................................... 50, 60

*Biogen MA Inc. v. EMD Serono, Inc.*,
    976 F.3d 1326 (Fed. Cir. 2020) ...................................................... 33, 47

*Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C.*,
    482 F.3d 1347 (Fed. Cir. 2007) ........................................................... 28

*CollegeNet, Inc. v. ApplyYourself, Inc.*,
    418 F.3d 1225 (Fed. Cir. 2005) ........................................................... 27

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ............................................................................ 51

*Drinkwine v. Federated Publications, Inc.*,
    780 F.2d 735 (9th Cir. 1985) ............................................................... 49

*DSU Med. Corp. v. JMS Co.*,
    471 F.3d 1293 (Fed. Cir. 2006) ...................................................... 27, 59

*EEOC v. Go Daddy Software, Inc.*,
    581 F.3d 951 (9th Cir. 2009) ............................................................... 59

*Eon Corp. IP Holdings v. Silver Spring Networks*,
815 F.3d 1314 (Fed. Cir. 2016) ....................................................27, 38

*Gen. Elec. v. Wabash Appliance*,
304 U.S. 364 (1938)..........................................................................48

*Genentech, Inc. v. Amgen, Inc.*,
289 F.3d 761 (Fed. Cir. 2002) ........................................................28

*Genentech, Inc. v. Hospira, Inc.*,
946 F.3d 1333 (Fed. Cir. 2020) ......................................................47

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
185 F.3d 1341 (Fed. Cir. 1999) ..................................................49, 50

*Herschler v. Gateway Products*,
1995 U.S. App. LEXIS 40363 (Fed. Cir. Jul. 14, 1995) (unpublished) .......38, 39

*Hoffer v. Microsoft Corp.*,
405 F.3d 1326 (Fed. Cir. 2005) ......................................................33

*Hospira, Inc. v. Fresenius Kabi USA, LLC*,
946 F.3d 1322 (Fed. Cir. 2020) ......................................................46

*Imaginal Systematic, LLC v. Leggett & Platt, Inc.*,
805 F.3d 1102 (Fed. Cir. 2015) ......................................................29

*In re Clay*,
966 F.2d 656 (Fed. Cir. 1992) ........................................................47

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) ......................................................29

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)..........................................................................48

*Lucent Techs., Inc. v. Gateway, Inc.*,
543 F.3d 710 (Fed. Cir. 2008) ........................................................27

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
851 F.3d 1275 (Fed. Cir. 2017) ..............................................54, 56, 58

*Micro Chem., Inc. v. Lextron, Inc.*,
   317 F.3d 1387 (Fed. Cir. 2003) ........................................................28

*Orion IP, LLC v. Hyundai Motor Am.*,
   605 F.3d 967 (Fed. Cir. 2010) ..........................................................59

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   711 F.3d 1348 (Fed. Cir. 2013) ...........................................50, 52, 53

*Prima Tek II, L.L.C. v. Polypap*,
   318 F.3d 1143 (Fed. Cir. 2003) ................................................39, 46

*Rite Hite Corp. v. Kelley Co.*,
   56 F.3d 1538 (Fed. Cir. 1995) ..........................................................27

*SmithKline Beecham Corp. v. Apotex Corp.*,
   403 F.3d 1331 (Fed. Cir. 2005) ........................................................46

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
   883 F.2d 1573 (Fed. Cir. 1989) ........................................................54

*Transweb, LLC v. 3M Innovative Props. Co.*,
   812 F.3d 1295 (Fed. Cir. 2016) ........................................................49

*W. Union Co. v. MoneyGram Payment Sys.*,
   626 F.3d 1361 (Fed. Cir. 2010) ................................................41, 59

*z4 Techs., Inc. v. Microsoft Corp.*,
   507 F.3d 1340 (Fed. Cir. 2007) ................................................37, 40

## FEDERAL STATUTES

28 U.S.C. § 1295(a)(1)....................................................................1, 6

28 U.S.C. § 1331 ..................................................................................1

28 U.S.C. § 1338..................................................................................1

35 U.S.C. § 112, ¶ 2 ..........................................................................29

## FEDERAL RULES

Federal Rule of Appellate Procedure 32(a)(5)......................................1

Federal Rule of Appellate Procedure 32(a)(6)............................................1

Federal Rule of Appellate Procedure 32(a)(7)(B) ....................................1

Federal Rule of Appellate Procedure 32(f)...............................................1

Federal Rule of Civil Procedure 50 ...................................................41, 59

Federal Rule of Civil Procedure 50(a) .......................................40, 49, 60

Federal Rule of Civil Procedure 59 ...................................................21, 23

Federal Rule of Evidence 702 .................................................................51

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Appellants Chilisin Electronics Corp. and Chilisin America Ltd. states:

1.      No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court; and

2.      The following matters may directly affect or be directly affected by this Court's decision in the pending appeal: USPTO App. No. 90/015,006; USPTO App. No. 90/015,017.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338. The district court entered a judgment following a jury verdict on September 24, 2021. *See* Appx10828-10834. Both parties then filed post-trial motions, which the district court resolved in a May 6, 2022 order. *See* Appx1-28. The district court entered an amended judgment following its ruling on post-trial motions on May 6, 2022, and a permanent injunction on May 24, 2022. *See* Appx29; Appx30-33. Chilisin timely appealed on May 31, 2022. *See* Dkt. No. 1. This Court therefore has jurisdiction under 28 U.S.C. § 1295(a)(1).

## ISSUES PRESENTED

Whether the judgment awarding Cyntec over $5 million in damages should be reversed or at least vacated where:

(1) The district court erroneously held that Chilisin's accused products infringe based on a claim construction that improperly expands the scope of the asserted claims beyond their plain meaning;

(2) The district court erroneously entered judgment as a matter of law of no obviousness during trial, without sending the issue to the jury, despite the presence of multiple fact disputes and competing expert testimony;

(3) The district court erroneously refused to exclude Cyntec's importation calculations, which were untethered from the products actually at issue in the case; and

(4) The district court erroneously refused to grant judgment as a matter of law of no entitlement to lost profits damages, where Cyntec was unable to establish such damages with reasonable certainty.

**INTRODUCTION**

The award to Cyntec in this case of over $5 million in damages rests on errors in determining infringement, validity, and damages.

On infringement, the asserted claims include two critical limitations. First, the accused products must be formed at a temperature lower than the melting point of insulated wire. Second, that lower formation temperature must arise "by means of" (because of) a difference in hardness between two magnetic powders. If the lower formation temperature used to form the accused products was caused by other factors, such as the size differences between the magnetic powders or the preferences of the manufacturer, there can be no infringement. The district court ignored the claim language, finding infringement can occur if hardness has "an impact" (any impact) on formation temperature, even if that impact is minor or trivial. This construction ignores the intrinsic record. Under a proper construction, there can be no infringement because Cyntec has no evidence hardness differences in the accused products impacted their formation temperature. Correcting the district court's erroneous construction results in judgment in favor of Chilisin, resolving this appeal entirely.

On invalidity, the district court erred in taking the issue of obviousness away from the jury. At trial, Chilisin and its expert presented a *prima facie* case of obviousness based on a combination of two prior art references: Nakamura and

Shafer.  Shafer discloses creating an inductor with a wound coil buried in a mixture of two magnetic powders.  Nakamura teaches combining two magnetic powders with the specific size and hardness characteristics recited in the asserted patents.  In directing a verdict for Cyntec, the district court ignored this evidence.  Specifically, the district court said it was granting judgment in Cyntec's favor because Shafer purportedly does not disclose the hardness or size of its magnetic powders.  That holding ignores Chilisin's secondary reference, Nakamura, which unquestionably discloses these properties.  Because Chilisin presented a *prima facie* case on obviousness, the jury should have resolved this dispute, and the district court's ruling directing a verdict for Cyntec was reversible error.  If this Court does not reverse on liability, a new trial on obviousness is warranted.

On damages, the district court abused its discretion in allowing Cyntec to present a flawed lost profits theory.  Cyntec attempted to determine how many accused products were imported into the United States by Chilisin's direct and indirect customers, but this estimation was impossible because Cyntec took no discovery from customers and therefore had no idea which end products actually contained accused Chilisin chokes.  The data Cyntec ultimately relied on had nothing to do with the accused products; instead, Cyntec used sales data that included irrelevant products such as software and warranty services.  Chilisin moved to

exclude this flawed theory before trial, and the district court's refusal to grant that motion was an abuse of discretion.

The district court further erred in refusing to grant judgment of no lost profits damages. At trial, Cyntec relied on a market share theory of lost profits, but its theory failed to accurately recreate the "but for" marketplace. Specifically, Cyntec said it would have made sales to 27 Chilisin customers in amounts equal to its market share, yet Cyntec presented no actual evidence of its market share for any of those 27 customers. Instead of focusing on the customers and products in its but-for market, Cyntec relied on data for the wrong customers, the wrong products, and the wrong time period. Entitlement to lost profits is reviewed without deference, and here Cyntec's failure to prove its lost profits with reasonable certainty requires a judgment in Chilisin's favor. At the very least, if the Court does not enter judgment on liability, the damages award must be vacated.

**STATEMENT OF THE CASE**

## I.     <u>The Technology</u>: Mixed-Powder Molded Chokes

This case relates to a specific type of inductor referred to as a "choke." Inductors are electrical components that store energy in a magnetic field when an electrical current flows through a conducting wire wound in the shape of a coil. *See* Appx9650-9651 at 325:10-326:1. Chokes are a specific type of inductor used to eliminate unwanted signals in a circuit, for example by allowing lower-frequency signals to pass through while blocking higher frequency signals. Appx9449 at 142:14-17; Appx9651 at 326:7-22. All modern electronic devices use chokes. Appx9652 at 327:2-9.

This case involves molded chokes, a specific type of choke. Molded chokes are constructed by placing a coiled conducting wire inside a mold. That mold is then filled with one or more magnetic powders, along with an adhesive to bind the powders together. Appx100 at 1:35-43. The powders are typically made of iron or an iron alloy. *See id.*; Appx101 at 4:52-56; Appx9562-9563 at 237:9-238:7; Appx9674-9675 at 349:18-350:6. The mold is compressed, and the choke is heated to solidify the adhesive. Appx100 at 1:40-42; Appx102 at 5:67-6:5, 6:58-65.

Figure 2C of the asserted patents shows a side-view of such a choke, with the wound conducting wire shown as element 120 and the magnetic body shown as

6

element 110.  Appx89, Appx102 at 5:52-55.  Particles of the magnetic powders within the magnetic body are shown as elements 112 and 114.  Appx102 at 5:58-61.



The magnetic powders in a choke have certain properties.  Two properties are relevant in this appeal.  First, the particles of the powder have a size.  More precisely, the particles have a range of sizes.  For example, one of the accused powders had particles with a minimum size of 7.5μm,[1] a maximum size of 60μm, and an average or mean particle size ranging between 21.4μm and 27.4μm.  Appx15255 ("MEAN

---

[1] A micrometer (μm) is one one-millionth of a meter.  It is also commonly referred to as a "micron."

DIAMETER"). The asserted patents discuss powder sizes using mean particle diameter as the preferred metric. *See, e.g.*, Appx101 at 4:38-42.

Second, the particles of a powder will have a hardness. The "hardness" of a material refers to its ability to resist deformation. Appx9439 at 132:1-4. The asserted patents refer to "Vicker's Hardness," which is a specific way of measuring hardness using a pyramid-shaped indenter made of diamond. Appx9670 at 345:4-23. While the asserted patents focus on Vicker's hardness (*see, e.g.*, Appx85 at Abstract), there are other ways to measure hardness, for example using different indenters, and such measurements can be converted into Vicker's hardness using known formulas. *See* Appx9773 at 391:7-15, Appx10508-10509 at 1035:17-1036:5.

## II.  <u>The Asserted Patents</u>: Powders That Differ in Size and Hardness

Cyntec asserts two related patents: U.S. Patent Nos. 8,922,312 (the "'312 patent," Appx63-84) and 9,481,037 ("'037 patent," Appx85-107).[2] The asserted patents purport to improve molded chokes by mixing two magnetic powders with specific properties: "in the present embodiment, the mean particle diameter and the hardness of the first magnetic powder 112 are both greater than the mean particle diameter and the hardness of the second magnetic powder 114." Appx102 at 5:21-

---

[2] The '037 and '312 patents share a common ancestor, but their specifications differ.

24.  In other words, in the asserted patents, the particles of the first magnetic powder are both larger and harder than the particles of the second magnetic powder.

The size difference between the two powders purportedly offers certain performance benefits.  According to the asserted patents, "during the molding process, magnetic powder of small mean particle diameter is filled in the space among magnetic powder of large mean particle diameter such that the density of compression is increased so as to improve the permeability of the electronic device." Appx101 at 3:5-9.  Using smaller particles to fill gaps between the larger particles increases the density of the magnetic material, which also increases its magnetic permeability and inductance.  Appx103 at 8:55-60; Appx105 at 12:44-58 ("Based on the above, it can be known that the smaller the mean particle diameter of the second magnetic powder is, the better effects of the inductance value of the electronic device will be …").

The hardness difference also purportedly provides a benefit.  Specifically, the patents state "the strains of magnetic powder caused during the molding process are largely reduced and the core loss of the electronic device of the present invention is further increased."  Appx101 at 3:12-15.

The asserted patents also state that the combined effect of the size and hardness differences have an impact on the formation temperature used during the molding process: "[A]ccording to the present embodiment, **by adopting first**

9

**magnetic powder and second magnetic powder of different mean particle diameter and hardness, less core loss can be obtained <u>without the performance of high temperature heat treatment</u>**.    Therefore, a step of high temperature heat treatment is omitted and a process is simplified."    Appx104 at 9:41-47 (emphasis added); *see also* Appx102 at 5:21-34; Appx77 at 2:14-37.

Claim 1 of the '312 patent is illustrative, and recites:

1. An electronic device, comprising:

a first magnetic powder;

a second magnetic powder, wherein the mean particle diameter of the first magnetic powder is larger than the mean particle diameter of the second magnetic powder, the Vicker's Hardness of the first magnetic powder is greater than the Vicker's Hardness of the second magnetic powder by a first hardness difference, and the first magnetic powder mixes with the second magnetic powder; and

a conducting wire buried in the mixture of the first magnetic powder and the second magnetic powder, wherein the conducting wire comprises an insulating encapsulant and a conducting metal encapsulated by the insulated encapsulant;

*wherein by means of the first hardness difference of the first magnetic powder and the second magnetic powder*, the mixture of the first magnetic

10

powder and the second magnetic powder and the conducting wire buried

therein are combined to form an integral magnetic body at a temperature

lower than the melting point of the insulating encapsulant.

Appx83 (emphasis added).  This claim recites two magnetic powders, and the first

powder must be both larger ("wherein the mean particle diameter of the first

magnetic powder is larger than the mean particle diameter of the second magnetic

powder") and harder ("the Vicker's Hardness of the first magnetic powder is greater

than the Vicker's Hardness of the second magnetic powder") than the second

powder.  This limitation appears in all asserted claims of both patents.

While the asserted patents say that both size and hardness impact formation

temperature (Appx104 at 9:41-47; Appx102 at 5:21-34), the asserted claims require

that the formation temperature arises "by means of the first hardness difference."

Appx83 ("wherein **by means of the first hardness difference** of the first magnetic

powder and the second magnetic powder, the mixture of the first magnetic powder

and the second magnetic powder and the conducting wire buried therein are

combined to form an integral magnetic body **at a temperature lower than the**

**melting point of the insulating encapsulant**.") (emphasis added).[3]

———————————

[3] The "insulating encapsulant" refers to the insulated coating placed around the
conducting wire.  The '312 patent states that this coating melts at temperatures above
300 degrees Celsius.  Appx77 at 2:8-12 ("Preferably, the integral magnetic body is
formed at the temperature lower than 300°C due to the fact that the melting point of

This "by means of" limitation tracks a preferred embodiment described in the '312 patent: "In the preferred embodiment, the hardness difference of the first magnetic powder 112 and the second magnetic powder 114 can determine the smaller core loss of the electronic device; in other words, **the ratio of the hardness of the first magnetic powder 112 to the hardness of the second magnetic powder 114 has a higher priority** than the ratio of the mean particle diameter of the first magnetic powder 112 to the mean particle diameter of the second magnetic powder 114. Therefore, high temperature is not needed in forming the integral magnetic body." Appx77 at 2:21-30 (emphasis added).

## III.    The Prosecution History

The "by means of" limitation was discussed during prosecution of the '037 patent. *See* Appx17383-17390. Specifically, in order to overcome an obviousness rejection, the patentee argued that the "by means of" limitation distinguished the claims from the prior art. The applicant noted that in its claims, "a first magnetic powder and a second magnetic powder are paired with an appropriate hardness difference **so as to drop the temperature during the molding process**." Appx17389 (emphasis modified). "In other words, in the amended claim 1, 'the first hardness difference of the first magnetic powder and the second magnetic powder'

---

the insulating encapsulant of the conducting wire 120 is generally lower than 300°C"). Of course this melting point would depend on the specific insulation used.

is CORRECTED [sic] to the temperature in the molding process, such that a higher temperature that is lower than the melting point of the conducting wire can be used to reduce the stress between the first magnetic powder and the second magnetic powder, WITHOUT melting the insulating layer of the insulated conductive wire of the amended claim 1." *Id*. (emphasis omitted). The applicant argued this "by means of" limitation was "NOT disclosed or taught" by the prior art of record. *Id*.

The claims were thereafter allowed, with the examiner stating the prior art did not teach or suggest "a method as claimed which employs insulated conducting wire, and by means of a hardness difference between first and second magnetic powders, a mixture of those powders … are combined to form an integral magnetic body at a temperature lower than the melting point of the insulated conducting wire." Appx17398-17400.

## IV.   The District Court Proceedings

At the district court, Cyntec asserted the '037 and '312 patents (and two other patents now resolved) against over 300 Chilisin products.   Through claim construction proceedings, dispositive motions, and a jury trial, the district court issued several rulings challenged here.

### A.   Claim Construction and Infringement

Throughout the litigation, there was a dispute over the proper construction of the "by means of" limitation.   That dispute was most directly addressed by the

district court during summary judgment.[4]  Chilisin moved for summary judgment of

non-infringement and indefiniteness, arguing the "by means of" limitation contained

two requirements.  Appx2763-2769, Appx6966-6972.  First, the magnetic body must

be formed at a temperature lower than the melting point of the insulated conducting

wire or insulating encapsulant.  Appx2764, Appx6969.  Second, the formation

temperature must be due to the fact that there is a hardness difference between the

two magnetic powders—in other words, the lower formation temperature could not

be achieved in the absence of the claimed hardness difference.  *Id*.  Chilisin argued

the limitation was indefinite because one of ordinary skill would not know how to

reduce formation temperature by modifying hardness.  Appx2764-2766, Appx6967-

6969.  Alternatively, Chilisin argued there was no infringement because Cyntec had

no evidence hardness differences in the accused products led to formation

temperatures below the melting point of insulated wire.  Appx2766-2769,

Appx6969-6970.

Cyntec argued in response that the "by means of" limitation meant the

hardness difference must have "an impact on the formation of the claimed integral

magnetic body," but disputed that hardness had to be the primary or "but for" cause

---

[4] At the *Markman* stage, Chilisin argued the "by means of" limitation was indefinite, and Cyntec argued the term should receive its plain and ordinary meaning. Appx908-912, Appx507-509.  The Court stated it would address indefiniteness during summary judgment, and did not otherwise construe the term.  Appx1976.

of the specific formation temperature.  Appx4500-4513.  Cyntec also raised a straw man argument: that Chilisin's argument meant "no other factors can impact the temperature of the integral body formation of a molded choke."  Appx4509.

In its order on summary judgment (Appx7136-7166), the district court noted there was "some support for [Chilisin's] interpretation of the 'by means of' limitation" because "[t]he claims in both patents only reference the hardness difference as leading to formation of the integral magnetic body at a temperature lower than the melting point of the insulating conducting wire or insulating encapsulant."  Appx7142-7143.  It said the "by means of" limitation does not, for example, reference the size difference between the magnetic powders as having an effect on manufacturing temperature.  *Id*.  The district court said hardness need not be the only factor that impacts formation temperature, because the specification describes size as also impacting formation.  *Id*.  The district court concluded by stating it "declines to apply defendants' interpretation that the lower temperature can only be achieved through the hardness difference," Appx7144, even though Chilisin never argued hardness must be the *sole* cause of the lower formation temperature.

The district court also rejected Chilisin's indefiniteness argument, stating the claim should be understood to mean "[the] hardness difference has an effect or impact on using a lower temperature manufacturing temperature."  Appx7148-7149. Finally, the district court rejected Chilisin's non-infringement argument, finding the

patent's description of the impact hardness has on formation temperature sufficient to send Cyntec's case to a jury.  *See* Appx7149-7153.

During a status conference held before trial, Chilisin asked the district court to further construe the "by means of" limitation.  Appx7184-7185.  The district court refused, but did agree to allow the parties to submit competing jury instructions on claim construction.  Appx7188.  Chilisin proposed that the district court construe the limitation to mean "due to the hardness difference, the magnetic body is able to be formed at a temperature that is lower than the melting point of the insulating encapsulant."  Appx7193-7197.  Chilisin further argued that, to the extent the district court was concerned this interpretation excluded other factors from influencing formation temperature, the district court could add an explanatory phrase stating, "[w]hile other parameters in addition to a hardness difference may impact the formation temperature, this limitation requires that the ability to form the body at the claimed temperature must be due to the hardness difference."  *Id*.  In the alternative, recognizing the district court's prior rulings on summary judgment, Chilisin asked the district court to at least tell the jury what it found in summary judgment, namely, that hardness "is a factor that has an impact on the formation temperature of the magnetic body such that the magnetic body is able to be formed at a temperature that is lower than the melting point of the [insulating encapsulant/insulated conducting wire]."  *Id*.  Cyntec proposed that the district court not provide any specific

16

construction, instead telling the jury to give the term its plain meaning.  Appx7190-7191.

Following these submissions, the district court issued an order stating that "the term shall be given its plain and ordinary meaning.  Notwithstanding the above, the court has reviewed the cases cited by the parties, and concludes that more guidance to the jury regarding the 'by means of' limitation may be required."  Appx7301-7302.  The district court said this guidance should "mirror the court's summary judgment ruling that 'the hardness difference has an impact on the temperature but is not the only potential cause of a lower temperature.'"  *Id.*  That is the construction the court ultimately gave the jury at trial.   Appx9439-9440 at 132:9-133:2; Appx10742 at 1265:19-21.[5]

Applying the district court's construction, the jury found it more likely than not that "[a] Chilisin product infringes" claims 1, 2, 5, 8, 10 and 18 of the '312 patent and claims 9 and 12 of the '037 patent.[6]  Appx10779-10783.  The jury also found Chilisin induced infringement, and that its infringement was willful.  *Id.*

---

[5] The limitation was also discussed during the pretrial conference, but the district court again said it would not deviate from the interpretation it gave at summary judgment.  *See* Appx8881-8883 at 15:6-17:21.

[6] The verdict form did not differentiate between accused products, despite there being fact disputes over whether the accused products were similar.  Also, in asking whether "any Chilisin product infringes" the verdict form did not differentiate between the claims of the '312 patent, which cover devices, and the claims of the '037 patent, which cover a method of manufacture.

### B.     Invalidity

During trial, Chilisin raised two separate invalidity theories for all asserted claims, one based on inherent anticipation and a second based on obviousness.

Chilisin's inherent anticipation argument was based on U.S. Patent No. 6,460,244 to Shafer *et al*. Appx11408-11416 ("Shafer"). Shafer teaches creating an inductor by mixing "a first powdered iron, [and] a second powdered iron" with "differing electrical characteristics." Appx11417 at 3:29-43. "Examples of preferred powdered irons" in Shafer include "Ancorsteel 1000C" and "Carbonyl Iron." *Id.* at 3:33-43.

Shafer does not expressly teach the size or hardness of its two iron powders, so Chilisin relied on inherency. Appx10505-10506 at 1032:24-1033:6. Specifically, Chilisin's technical expert, Dr. John Bravman, explained that a skilled artisan knew the size and hardness of both powders. *Id.* With respect to Ancorsteel 1000C, he showed it was known that this powder could be "sieved into eleven separate size fractions" with various mean particle sizes. Appx11507-11508; Appx10506 at 1033:7-20. He also testified it was known that Ancorsteel 1000C had a Vicker's hardness of 100-115. Appx11511-11513; Appx10507 at 1034:3-25.

For the second powder, carbonyl iron, Dr. Bravman demonstrated carbonyl iron had known particle sizes of 3.9-5.0 microns. Appx15949-15951; Appx10508 at 1035:1-10. He also showed carbonyl iron had a known Rockwell hardness of

B50, which equals a Vicker's hardness of about 95. Appx16292 at 2:6-19; Appx10509-10510 at 1036:14-1037:13.[7] Based on the inherent properties of the powders, Dr. Bravman concluded Shafer anticipated the asserted claims because it teaches two magnetic powders with the claimed size and hardness differences. Appx10478 at 1005:2-15.

For obviousness, Dr. Bravman combined the teachings of Shafer with a second reference, a Japanese unexamined patent application publication to Nakamura *et al.* Appx11347-11356 ("Nakamura"). Unlike Shafer, Nakamura expressly discloses both size and hardness values for its two magnetic powders. The first iron powder in Nakamura is represented by the element symbol for iron, "Fe," and the second powder is an alloy consisting of the elements iron, silicon, and boron ("Fe-Si-B"):

- "Here, the Vickers hardness of the Fe powder is within the range of **100 to 300**, and that of the aforesaid Fe-Si-B alloy powder is within the range of **800 to 1400**."
- "Particle size for the Fe powder should be within the range of **1 μm to 10 μm,** while particle size for the Fe-Si-B alloy powder should be within the range of **5 μm to 20 μm.**"

Appx11353 at ¶ 0032 (emphases added); *see also* Appx10491 at 1018:10-18 ("you can see here that both the size and the hardness are described for the first and second

---

[7] Both technical experts agreed carbonyl iron is a "very famous" product that is "almost a century old" (Appx10489 at 1016:10-22, Appx9680-9681 at 355:21-356:7), so a skilled artisan would have known its properties.

magnetic powder"). Dr. Bravman also testified that Nakamura is analogous art because it addresses a similar field and problem. *See, e.g.*, Appx10511-10513 at 1038:15-1040:5 ("it's trying to solve a problem in this field with very specific guidance"); Appx10491-10493 at 1018:23-1020:22. Dr. Bravman also demonstrated a motivation to combine Shafer with Nakamura based on multiple additional references establishing the state of the art and a skilled artisan's knowledge. *Id*. at 1020:2-22.

After Cyntec put on its technical expert in rebuttal, and before Chilisin was able to cross-examine that expert, the district court addressed motions for judgment as a matter of law ("JMOL"). During that hearing, Cyntec asked the Judge to grant JMOL on anticipation and obviousness. Appx10627-10628 at 1150:25-1151:22. Cyntec argued "Shafer admittedly does not disclose [a] hardness difference" and "[i]t does not disclose size difference." *Id*. at 1151:2-3. Cyntec's argument ignored inherency. For obviousness, Cyntec argued "there is no dispute that Nakamura and Shafer are missing the elements," though it did not say which elements were purportedly missing. *Id*. at 1151:15-17. Cyntec also argued Chilisin "cannot meet [the] clear and convincing evidence standard as to why [Shafer and Nakamura] would be combined," though it did not explain why. *Id*. at 1151:17-19. Cyntec also argued "[n]either [Shafer nor Nakamura] talk about size difference or hardness difference," despite the fact that Nakamura expressly discloses two iron powders

that differ in both size and hardness. *Id*. at 1151:19-20. Finally, Cyntec argued neither reference "address[es] high-temperature annealing or potential damage to the buried wire," despite the fact that Shafer teaches forming its device at a temperature far below the melting point of wire insulation. *Id*. at 1151:20-22; Appx10518-10520 at 1045:2-1047:13; Appx11417 at 4:12-19.[8]

The district court granted Cyntec's JMOL motion. With respect to anticipation, the district court's sole stated reason for granting JMOL was a finding that Shafer "doesn't disclose the hardness or the size. Those are the two things I kept looking for." Appx10636 at 1159:11-17. The district court did not address inherency. For obviousness, the district court's only statement for its rationale in granting JMOL was, "even in combination with Nakamura, [Shafer], I believe, does not render the patent obvious." *Id*. at 1159:17-18.

Following trial, Chilisin moved for a new trial on anticipation and obviousness under Rule 59. Appx10876-10883. The district court denied the motion, relying solely on the "high standard of clear and convincing evidence" for invalidity, without addressing the disclosures of the references. Appx16-18.

---

[8] In this passage, Shafer specifically discloses molding its choke at 325 degrees Fahrenheit, which is approximately 163 degrees Celsius—well below the 300 degree Celsius melting point for wire insulation recited in the asserted patents. Appx77 at 2:8-12.

21

### C.    Damages

At trial, Cyntec presented a market-share lost profits theory. *See* Appx9942 at 560:18-23.

Chilisin primarily sells accused chokes to original equipment manufacturers ("OEMs")—companies such as Foxconn, Pegatron, or Wistron—who, in turn, place them into devices eventually sold by companies such as Microsoft or Apple. *See* Appx10085-10086 at 692:18-693:17.  Because nearly all the accused sales occur outside of the United States,[9] Cyntec first had to identify which accused parts it believed were sold to companies that would then import them into the United States. Cyntec developed a list of approximately 27 companies it believed were direct or indirect Chilisin customers who performed such importation. *See* Appx9917-9925 at 535:9-543:18; Appx15818-15819 ("United States Sales Distribution – Summary").[10]

Next, Cyntec had to determine how many accused products each of these 27 companies allegedly imported into the United States.  Cyntec did not take any discovery from any of these 27 companies, and its damages expert admitted at trial

---

[9] Over 95% of Cyntec's claimed lost profits came from so-called "indirect damages," situations where Chilisin allegedly induced third parties to import accused products into the United States. *See* Appx15877.

[10] Appx15819 (Trial Exhibit 1312) lists 29 companies, but there were no accused sales under the '312 and '037 patents to two of those companies, LG and GoPro. *See* Appx15813-15814; Appx15883-15884.

22

he had no idea how many accused products each of these companies actually placed into devices they may have sold to the U.S. *See* Appx10022-10023 at 629:4-630:17, Appx10024 at 631:3-13. Instead of focusing on specific end products containing accused chokes, Cyntec and its damages expert, Mr. Brian Van Uden, instead relied on statements in Form 10-K filings and annual reports disclosing the total revenue each company earned for U.S. sales. *See* Appx9928 at 546:8-20. So for example, when Apple's Form 10-K reported that approximately 40% of its revenue was from U.S. sales in 2020, Mr. Van Uden simply applied that number for his estimate of Apple's importation of accused chokes, even though Apple revenue includes sales of other irrelevant products and services such as advertising, technical support, and the iPhone App Store, among other things. *See* Appx11045-11046, Appx11099-11100.

After determining the number of accused chokes he believed had been imported into the United States, Mr. Van Uden next had to determine the lost profits associated with those sales. As part of this process, Mr. Van Uden applied a number he described as a "weighted average" of "Cyntec market share by application." *See* Appx15770. This number took Cyntec's market share in various product segments (PC & notebook, communication, automotive & industrial, consumer, and mobile & tablet) and weighted them by Chilisin's purported share of revenue into each segment. *Id*. He multiplied importation revenue by this weighted average market

23

share percentage, which he then multiplied by Cyntec's profit margin in order to determine purported lost profits.  *See* Appx16808.

The total damages Cyntec claimed at trial were $1,872,956 (Appx9997 at 604:22-23), which was the amount the jury awarded.  Appx10783.  The district court trebled damages based on the jury's finding of willful infringement, awarding Cyntec $5,553,244 in damages.  Appx27.

## SUMMARY OF ARGUMENT

The appealed judgment rests on erroneous orders by the district court concerning infringement, validity, and damages.

For infringement, the jury verdict should be reversed because it was based on an incorrect claim construction. Both the '037 and '312 patents require products formed "at a temperature lower than the melting point" of wire insulation "by means of" a hardness difference between two magnetic powders. The district court's construction—that hardness need only have "an impact on [formation] temperature," even if that impact is trivial—effectively reads out the limitation. Cyntec has insufficient evidence of infringement under the proper construction, warranting reversal. Even under the district court's more permissive construction, the verdict lacks substantial evidence, warranting reversal.

For invalidity, Chilisin is entitled to a new trial on obviousness. The district court took invalidity away from the jury via JMOL because one prior art reference (Shafer) purportedly did not "disclose the hardness or the size" of its two magnetic powders. That holding ignored inherency, but more importantly for purposes of this appeal, the district court never addressed the specific obviousness combination Chilisin presented at trial. That combination introduced a second reference (Nakamura) that expressly disclosed size and hardness values for its two magnetic powders. In post-trial rulings, the district court refused to remedy its error, relying

25

solely on the clear and convincing evidence burden of proof to justify its ruling. Because Chilisin presented a *prima facie* case of obviousness—showing the art disclosed all claim elements and a motivation to combine—the jury should have resolved this dispute, and the district court's JMOL ruling was reversible error.

For damages, the district court abused its discretion in allowing Cyntec to present a flawed importation theory that relied on numbers untethered from the actual accused products at issue in the case. The district court also erroneously concluded that Cyntec was entitled to lost profits, even though the data Cyntec used to support its "market share" theory did not cover the correct customers, the correct products, or even the correct time period. Cyntec also did nothing to attempt to tie its market segments to any actual accused sales. Such a flawed analysis mandated a judgment of no lost profits. At a minimum, Chilisin is entitled to a new trial on damages.

# ARGUMENT

## I.    STANDARD OF REVIEW

On an appeal from a district court in the Ninth Circuit, this Court reviews JMOL orders without deference, and judgment as a matter of law requires that "the evidence, construed in the light most favorable to the non-moving party, permits only one reasonable conclusion." *See Lucent Techs., Inc. v. Gateway, Inc*., 543 F.3d 710, 717 (Fed. Cir. 2008).

The Ninth Circuit upholds a jury verdict supported by substantial evidence, which is "relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *See CollegeNet, Inc. v. ApplyYourself, Inc*., 418 F.3d 1225, 1230 (Fed. Cir. 2005).

This Court reviews *de novo* a district court's claim constructions; and where there is no factual dispute as to whether accused products practice a claim under the correct construction, judgment in favor of the accused infringer is appropriate. *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1323 (Fed. Cir. 2016).

This court reviews eligibility for lost profits damages without deference. *DSU Med. Corp. v. JMS Co*., 471 F.3d 1293, 1308 (Fed. Cir. 2006); *Rite Hite Corp. v. Kelley Co*., 56 F.3d 1538, 1544 (Fed. Cir. 1995) ("Whether the lost profits at issue are legally compensable is a question of law, which we review de novo.").

Whether proffered evidence should have been admitted in a trial is a procedural issue not unique to patent law, and therefore this Court reviews the district court's decision whether to admit expert testimony under the law of the regional circuit, here the Ninth Circuit. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003). The Ninth Circuit reviews evidentiary rulings for an abuse of discretion. *See Genentech, Inc. v. Amgen, Inc.*, 289 F.3d 761, 768 (Fed. Cir. 2002).

## II. CHILISIN IS ENTITLED TO JUDGMENT OF NON-INFRINGEMENT

The infringement judgment should be reversed because it rests on a flawed claim construction. The asserted claims include a limitation that requires formation at a certain temperature. That formation temperature must arise "by means of" a hardness difference between two magnetic powders. The plain language of the claims says hardness (not another factor, such as size) is the primary or "but for" cause of reduced formation temperature. The district court erred by instructing the jury that infringement could occur even when hardness played a trivial or minor role in reducing formation temperature. Under a correct construction, there is no infringement, warranting reversal.

### A. The Claims Require Lower Formation Temperature Due To A Hardness Difference

#### 1. The '312 Patent

As this Court has explained, "[c]laims mean precisely what they say." *Cent.*

*Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1355 (Fed. Cir. 2007).   As such, "the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point out and distinctly claim the subject matter which the patentee regards as his invention.'"   *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112, ¶ 2); *see also Imaginal Systematic, LLC v. Leggett & Platt, Inc.*, 805 F.3d 1102, 1108 (Fed. Cir. 2015).

Here, claim 1 of the '312 patent contains a product-by-process limitation.  The claim recites an "electronic device," and certain components of that device, namely, two powders and a conducting wire.  Appx83.  The claim also places structural limitations on the powders—that particles of the first powder are both larger and harder than particles of the second powder.  *Id*.  Finally, the claim recites a limitation on the process for forming the device: "wherein **by means of the first hardness difference** of the first magnetic powder and the second magnetic powder, the mixture of the first magnetic powder and the second magnetic powder and the conducting wire buried therein **are combined** to form an integral magnetic body **at a temperature lower than the melting point of the insulating encapsulant**."  *Id*. (emphasis added).

Process limitations such as this are permissible: "[an] inventor is absolutely

free to use process steps to define [a] product.  The patent will issue subject to the ordinary requirements of patentability.  The inventor will not be denied protection." *See Abbott Labs. v. Sandoz, Inc.*, 556 F.3d 1282, 1294 (Fed. Cir. 2009) (en banc). Yet when an inventor chooses to claim a product at least in part by the process of its creation, "that definition also governs the enforcement of the bounds of the patent right." *Id.*

This Court's decision in *ArcelorMittal Atlantique et Lorraine v. AK Steel Corp.*, 908 F.3d 1267 (Fed. Cir. 2018), is instructive.  The patent in *Arcelor* recited a "hot-rolled coated steel sheet" with a particular composition of metallic elements. *Id.* at 1270.  The claim then recited a limitation that the sheet had "very high mechanical resistance in excess of 1500 MPa after thermal treatment."  *Id.*  This Court noted that for infringement purposes the claim was not defined solely in terms of the recited metallic elements (the "pre-stamped product"), it also required mechanical resistance added through heat treatment.  *Id.* at 1276.  The Court found any other interpretation would "ignore the inventor's definition of her product" and "[i]n view of the claim language, the claimed thermal treatment process step, i.e., hot-stamping, and resulting [ultimate tensile strength], is of significant consequence to the infringement analysis."[11]  *Id.*

───────────────

[11] As discussed further below, this claim construction dispute affects infringement, not validity.  For validity, product-by-process limitations are not limiting.  *See, e.g.,*

Here, like in *Arcelor*, the asserted claims include a final limitation reciting an aspect of the product's formation.  In the '312 patent, this limitation is not mere surplusage, it is the purported novelty of the alleged invention.  The '312 patent complains that prior art inductors required high temperature heat treatment.  Appx77 at 1:44-47.  It says "the present invention proposes the structure of the electronic device **and its manufacturing method** to overcome the above-mentioned problems."  *Id.* at 1:48-50 (emphasis added).  It says an "objective of the present invention is to lower the temperature for annealing more than two mixed magnetic powders of different sizes to form an integral magnetic body **by using the hardness differences between the magnetic powders**."  *Id.* at 1:54-58 (emphasis added).  It says "[i]n the preferred embodiment, the hardness difference of the first magnetic powder and the second magnetic powder can determine the smaller core loss of the electronic device; in other words, the ratio of the hardness of the first magnetic powder to the hardness of the second magnetic powder has a higher priority than the ratio of the mean particle diameter of the first magnetic powder to the mean particle diameter of the second magnetic powder."  *Id.* at 2:21-28.

Claim 1 expressly says the reduced formation temperature must arise "by

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1369-70 (Fed. Cir. 2009) ("In determining validity of a product-by-process claim, the focus is on the product and not on the process of making it.").

means of the first hardness difference," not by means of something else.  Appx83.

Cyntec in briefing before the district court said "by means of" means "through the

use of," "due to," or "because" of.  *See* Appx4510.  In other words, the reduced

formation temperature must be "due to" or "because of" the hardness difference.  By

way of analogy, if a claim recited digging a hole "by means of a shovel," the shovel

must do at least the majority of the digging.  Using a backhoe to dig most of the hole,

and a shovel to remove only the final scoop, would not be digging a hole "by means

of" a shovel.

The "by means of" limitation in the '312 patent can be expressed in many

different ways: that hardness must be the "but for" cause of the formation

temperature (Appx4508); that lower formation temperature cannot be achieved

without the hardness difference (Appx2764); that other factors (such as particle size,

or manufacturer preferences) cannot supplant hardness as the primary reason for the

reduced formation temperature (Appx2765-2766).  Regardless of the articulation,

the outcome is the same: the formation temperature must arise because of the

hardness difference between the two powders.

The district court's construction gives hardness short shrift.  The district court

instructed the jury that "the hardness difference has **an impact** on the temperature,

but is not the only potential cause of the lower temperature."  Appx9439 at 132:15-

18 (emphasis added).  The district court failed, however, to quantify the degree of

32

impact required and, as a result, the jury was free to find infringement even if hardness made only the smallest, most negligible contribution to reducing formation temperature. This construction was legal error this Court must correct.

## 2. The '037 Patent

Unlike claim 1 of the '312 patent, claim 1 of the '037 patent does not recite a device, it recites a method for manufacturing a device. Appx106. Both claims are otherwise materially identical; the parties and the district court treated the two claims identically for claim construction purposes, and this Court should do the same.[12]

Here, the final step of claim 1 of the '037 patent recites a "molding process." That process has an important characteristic—that the part is molded at a temperature lower than the melting point of the insulated conducting wire "by means of" a hardness difference between the powders. Appx106. Similar to the '312 patent, the '037 patent describes the purported benefits of combining particles that differ in size and hardness. Appx100 at 1:50-54, Appx101 at 3:3-25, Appx102 at 5:21-44, Appx104 at 9:29-60, Appx105-106 at 12:50-13:4. Like in the '312 patent,

---

[12] Treating the "by means of" limitation consistently between the two patents aligns with this Court's precedent. For example, this Court has said that the interpretation of a product-by-process limitation does not change simply by placing the limitation into a method claim. *See Biogen MA Inc. v. EMD Serono, Inc.*, 976 F.3d 1326, 1334 (Fed. Cir. 2020). Similarly, this Court has said that "when [a] 'whereby' clause states a condition that is material to patentability, it cannot be ignored in order to change the substance of the invention." *See Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1329 (Fed. Cir. 2005).

Cyntec chose to claim the impact hardness has on formation temperature; the potential impact of size is disclosed in the patent, but not claimed. *See id.* and Appx106, cl. 1. The "by means of" limitation was also the primary basis upon which Cyntec distinguished its claims from the prior art during prosecution. *See* Appx17389, Appx17398-17400. This Court must respect Cyntec's choice of claim language, and it should find both patents require lower formation temperatures arising due to a hardness difference between two magnetic powders.

### B.    Cyntec Has No Evidence of Infringement Under the Proper Claim Construction

Once properly construed, Cyntec's lack of evidence is readily apparent. To understand Cyntec's lack of proof, it is instructive to view the portion of the trial transcript where Cyntec's expert analyzed the "by means of" limitation. When Cyntec's infringement expert performed his infringement analysis for "limitation 1E" of the '312 patent (the "by means of" limitation), he relied on a single piece of evidence: Trial Exhibit 50. Appx9795-9797 at 413:18-415:3. Exhibit 50 is a Chilisin specification describing one of the accused chokes, but with no discussion of powder hardness or formation temperature. Appx10889-10891. Cyntec's expert testified that this exhibit shows Chilisin's mixed powder chokes have better performance than a single-powder choke without annealing,[13] but that does not

---

[13] "Annealing" is a process of heat treatment. *See* Appx9453 at 146:10-12.

answer the critical question: did a hardness difference between the powders in this product cause a lower formation temperature? Exhibit 50 does not answer this question—again, the exhibit says nothing about hardness and nothing about what caused a given product to form at a given temperature. *See* Appx10889-10891.

Cyntec's analysis for claim 1 of the '037 patent was even more cursory. Its expert gave *ipse dixit* testimony that hardness has an impact on formation temperature, but for support he referred back to his prior testimony on claim 1 of the '312 patent. Appx9805-9806 at 423:14-424:16. As noted, that prior testimony relied on a single exhibit that says nothing about hardness and nothing about formation temperature.

This was Cyntec's entire analysis of this critical, disputed limitation, and it was plainly deficient. At most, Cyntec's expert showed the accused chokes have certain performance characteristics, but Cyntec's own patents say those performance characteristics could arise because of, for example, size differences between the two powders. *See, e.g.*, Appx81 at 9:7-11 ("Based on the above, it can be known that the smaller the mean particle diameter of the second magnetic powder is, the better effects of the inductance value of the electronic device will be by means of the second magnetic powder of different mean particle diameters and the same first magnetic powder."); Appx83 at 13:21-25 ("Based on the above, it can be known that the smaller the mean particle diameter of the second magnetic powder is, the better

35

effects of the inductance value of the electronic device will be by means of the second magnetic powder of different mean particle diameters and the same first magnetic powder."). There is no longer a dispute the accused powders contain particles that differ in ***both*** size and hardness. Nothing in Cyntec's evidence, however, shows whether it was size, hardness, or something else that led to the formation temperatures observed in each of the accused products.

In post-trial briefing, Cyntec attempted to defend the jury's verdict by pointing to various exhibits its expert never discussed, but those exhibits have the same deficiencies as Trial Exhibit 50. Specifically, none of the exhibits Cyntec identified discuss hardness or, more importantly, the impact hardness has on formation temperature. *See* Appx16933 (discussing Trial Exhibits 6, 34, 39, 40, 42, 44, 47, 50, 51, 216, 217, 218 & 260).

Cyntec also pointed to certain testing its experts performed on the accused products, but that testing only showed the existence of a hardness difference between the magnetic powders in the accused products. *See* Appx15319-15333. Cyntec performed no testing on formation temperature, and no testing on what impact hardness had on formation temperature. *See* Appx15300, Appx9854-9855 at 472:18-473:10.

Cyntec also pointed to certain of its own internal documents, but (1) none of those documents discuss the accused products, and (2) none mention hardness or its

impact on formation temperature.  *See* Appx16933 (discussing Trial Exhibits 300, 342, 343, 345, 346, 347, 1293, and 1364).

Cyntec also said the asserted patents supported its contention that hardness has an impact on formation temperature, but as noted above, the patents say *either* size or hardness may impact formation temperature.  The patents cannot answer the critical question of whether size, hardness, or something else entirely, impacted formation temperatures in any of the Chilisin accused products.

Finally, both Cyntec and the district court pointed to testimony from Cyntec's expert that hardness had a "direct impact" on formation temperature.  *See* Appx8, citing Appx9787 at 405:5-13.[14]  Conclusory expert testimony such as this is not sufficient to carry a party's burden of proof.  *See z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1355 (Fed. Cir. 2007).  Cyntec's expert did nothing to confirm it was hardness that caused lower formation temperatures in any accused product.  As noted, the only exhibit he relied on fails to support his statement that hardness had a "direct impact" on formation temperature, let alone that it was the cause of that temperature.  The only exhibits that suggest hardness has even the potential to impact formation temperature are the asserted patents themselves, but they also say size can

---

[14] The district court also cited Appx9776 at 394:5-8 and Appx9786 at 404:14-17, but those are simply the expert's testimony that the accused products have a hardness difference, not any testimony on its impact on formation temperature.

have the same impact. There is no dispute the accused products have powders with different sizes, and Cyntec did nothing to attempt to determine whether it was size, hardness, or something else that impacted the formation temperature in the accused products. Because Cyntec has no evidence the "by means of" limitation is met under a proper claim construction, reversal is warranted. *See Eon Corp.*, 815 F.3d at 1323.

### C.    Even Under the District Court's Construction, Reversal is Appropriate

Even if this Court were to affirm the district court's claim construction, reversal is still appropriate. The district court said hardness must have some impact on formation temperature, even if that impact is small. Appx9439 at 132:15-18. As discussed above, the only evidence indicating hardness has any impact on formation temperature is the asserted patents themselves. The patents, however, cannot be used as evidence of infringement, for two reasons.

First, the patents do not describe the accused products. The case of *Herschler v. Gateway Products*, 1995 U.S. App. LEXIS 40363 (Fed. Cir. Jul. 14, 1995) (unpublished), is instructive. There, the claim required performing a method in an animal that suffered from a sulfur deficiency. *Id*. at *6. The defendant argued that the plaintiff had no evidence any of the horses it treated suffered from such a deficiency. *Id*. The plaintiff responded by pointing out that the patent said "all horses are deficient in sulfur at some time during a given day." *Id*. The plaintiff argued defendant "must disprove statements in the specification to show

38

noninfringement." *Id*. This Court rejected such logic. It noted that the patent specification "is no substitute for evidence of infringing acts." *Id*. at *8. Because the plaintiff had no evidence any horse the defendant fed actually had a sulfur deficiency, it found the district court had erred in denying JMOL of no infringement. *Id*. at *8-9. Here, as in *Herschler*, the only evidence Cyntec has that hardness has even a theoretical impact on formation temperature is ultimately its own patents.

Second, even if this Court were to allow Cyntec to use its patents as evidence of infringement, the asserted patents do not say hardness is always the cause of lower formation temperatures—as noted, they also teach size may have the same impact. *See* Appx79-83 at 5:1-11, 9:7-11; 13:21-25. The patents do say that in one "preferred embodiment" hardness has an impact on formation temperature (Appx81 at 10:5-13), but by saying this is just one "preferred embodiment," the patent suggests that other embodiments are also possible. *See Prima Tek II, L.L.C. v. Polypap*, 318 F.3d 1143, 1151 (Fed. Cir. 2003). In other words, the patents teach size or hardness (or both) could impact formation temperature, but specifically claims the effect of only one—hardness. The patents give no way of knowing, in any given Chilisin choke, which of these two factors caused lower formation temperature.

This lack of evidence is also evident from the district court's post-trial JMOL ruling. There, the district court only pointed to three pieces of expert testimony it

said supported the jury's verdict. The first two citations were to testimony from Cyntec's expert that there is a difference in hardness between the powders in the accused products. Appx8, citing Appx9776 at 394:5-8 and Appx9786 at 404:14-17. That is no longer disputed, but it is also insufficient, since the existence of a hardness difference says nothing about what impact, if any, that difference had on formation temperature. The district court's third citation is to the expert's *ipse dixit* statement that hardness had a "direct impact" on formation temperature. Appx8, citing Appx9787 at 405:5-13. As discussed above, without more, this unsupported expert testimony cannot be the sole basis supporting the jury's verdict. *See z4*, 507 F.3d at 1355. Consequently, even under the district court's more permissive claim construction, the lack of evidence warrants reversal.

The district court found alternatively that Chilisin waived this non-infringement argument. *See* Appx8.[15] The district court's waiver finding was incorrect. First, Chilisin expressly raised the "by means of" limitation in its Rule 50(a) motion. *See* Appx10264 at 866:8-10 ("no infringement for all the accused products based on the fact that there is no evidence that any of the products infringed the 'by means of' limitation"); Appx10271 at 873:16-17 ("No infringement of any

---

[15] This waiver finding is only relevant to the analysis under the district court's claim construction, since Chilisin preserved its alternative construction by raising it in summary judgment and in proposed jury instructions submitted before trial, as discussed above.

claim that includes the 'by means of' limitation."). Such a plain statement of the basis for a Rule 50 motion is all that is required to preserve the issue. *See Western Union Co. v. MoneyGram Payment Sys.*, 626 F.3d 1361, 1367 (Fed. Cir. 2010).

Second, the district court appears to have misunderstood Chilisin's argument. The question presented here is whether Cyntec has evidence the ***hardness*** difference in the accused products impacted their formation temperature. Chilisin has repeatedly pointed out the absence of such evidence. In summary judgment, Chilisin noted that formation temperature could be caused by size differences, or by manufacturer preferences. Appx2765-2768. At trial, Chilisin additionally pointed out that its single powder chokes are formed at the same temperature as its mixed-powder chokes. Appx10271-10272 at 873:20-874:3. This shows formation temperature cannot be caused by a hardness difference between two powders, because in a single-powder choke there is no such hardness difference. All of these arguments, however, raise the same underlying issue: Cyntec's lack of proof that formation temperature in the accused product was specifically "due to" or "by means of" the presence of a ***hardness*** difference between the two powders.

The district court misunderstood Chilisin's arguments during trial as suggesting "there was no temperature change in the first place, because 'the chokes are formed at room temperature.'" Appx7. This is simply not correct. The limitation at issue does not require a temperature change *per se*, it requires causation:

41

formation "at a temperature lower than the melting point of the insulating encapsulant" because of ("by means of") a hardness difference. Chilisin never argued, for example, that any of its products were formed at a temperature over the melting point of insulated wire.[16] Instead, Chilisin consistently argued there is a lack of evidence showing the temperatures used to form the accused products was caused by, due to, because of, or "by means of" any difference in hardness between their powders. This same argument was made before, during, and after trial, and was not waived.

In summary, the record contains legally insufficient evidence that hardness caused a lower formation temperature in any accused products. Chilisin never waived that argument, and the infringement ruling must be reversed.

## III.   CHILISIN IS ENTITLED TO A JURY TRIAL ON OBVIOUSNESS

The district court's decision to take invalidity away from the jury was reversible error. Through its technical expert, Dr. Bravman, Chilisin presented substantial evidence of obviousness based on a combination of the Shafer and Nakamura references. Shafer expressly teaches creating a molded choke using a combination of two iron powders, and Nakamura teaches combining two powders

---

[16] It would be nonsensical to form a molded choke over the melting point of the wire's insulation. Doing so would lead to exposed wire, causing short-circuits. *See* Appx9453 at 146:17-24; Appx10576 at 1099:3-5.

that have specific size and hardness ranges—ranges that fall squarely within the claims of the asserted patents. The district court gave no explanation for why it granted JMOL on obviousness. During trial it simply said, "even in combination with Nakamura, [Shafer], I believe, does not render the patent obvious." Appx10636 at 1159:17-18. On post-trial motions, the district court said its decision was based on the presumption of validity. Appx16-18. Both of these holdings ignore the *prima facie* case Chilisin presented at trial. If this Court does not reverse on infringement, it should at least remand for a new trial on obviousness.

### A.    The Prior Art Teaches the Claimed Size and Hardness Ranges

At trial, Chilisin and its expert demonstrated that the prior art taught creating a mixed-powder molded choke with the claimed size and hardness properties. Chilisin's technical expert, Dr. Bravman, walked the jury through the Shafer reference, explaining how it discloses an inductor made up of two magnetic powders and a buried wire. *See* Appx10503-10510 at 1030:10-1037:13; Appx10514-10516 at 1041:24-1043:9; Appx10526-10529 at 1053:20-1056:7; Appx10532 at 1059:1-13. Dr. Bravman also explained why Nakamura, when combined with Shafer, rendered the claims obvious. *See* Appx10510-10511 at 1037:14-1038:14. As noted above, Nakamura expressly discloses two powders (Fe and Fe-Si-B) with differing size and hardness ranges:

- "Here, the Vickers hardness of the Fe powder is within the range of **100 to 300**, and that of the aforesaid Fe-Si-B alloy powder is within the range of **800**

43

**to 1400.**"

- "Particle size for the Fe powder should be within the range of **1 μm to 10 μm,** while particle size for the Fe-Si-B alloy powder should be within the range of **5 μm to 20 μm.**"

Appx11353 at ¶ 0032 (emphases added); *see also* Appx10491 at 1018:10-18 ("you can see here that both the size and the hardness are described for the first and second magnetic powder"). Dr. Bravman explained why a skilled artisan would have been motivated to combine Nakamura with Shafer. *See* Appx10511-10514 at 1038:15-1041:15. Dr. Bravman's analysis covered each limitation of the independent claims, *see* Appx10503-10510 at 1030:10-1037:13; Appx10514-10516 at 1041:24-1043:9; Appx10526-10529 at 1053:20-1056:7; Appx10532 at 1059:1-13,[17] as well as the asserted dependent claims. *See* Appx10520-10526 at 1047:14-1053:19; Appx10529-10531 at 1056:8-1058:25.

Dr. Bravman also demonstrated additional motivation to combine Shafer with Nakamura based on references establishing the state of the art. He explained to the jury that "there's a rich body of literature out there that has a combination of two or more powders that have different compositions and properties that can affect the engineered product of a choke." Appx10493 at 1020:2-9. He stated that mixing

---

[17] As discussed above, the "by means of" limitation is not a limitation for invalidity purposes. Appx10516-10518 at 1043:10-1045:1. To the extent disclosure of formation temperature was required, however, Dr. Bravman also addressed that teaching in Shafer. *See* Appx10518-10520 at 1045:2-1047:13.

magnetic powders was "a kind of common-sense idea" because "you've got big things and you push them together, there is spaces in between, so you can imagine filling some of that space." *Id.* at 1020:10-22. This testimony was supported by multiple documents including:

- The **Gramatyka** reference, which shows that a POSITA knew to improve the magnetic characteristics of inductors, with Figure 2 showing specifically that "particle shape" and "size distribution" were known variables. Appx11466-11471; Appx10481-10482 at 1008:3-1009:22.

- The **Brunner** reference, which discloses that particle size was a known variable for magnetic powders. Appx11472-11480; Appx10486-10487 at 1013:2-1014:9.

- The **Hiroyoshi** reference, which states that it was desirable to fill voids between larger particles in a powder. Appx11357-11396 at [0015]; Appx10495 at 1022:6-15.

- The **Watanabe** reference, which teaches "mixing and pressure-molding comparatively soft crystalline alloy magnetic powder with extremely hard amorphous alloy magnetic powder. . . ." Appx11400-11409 at [0045]. That teaching "speaks directly to the motivation of looking and considering these kinds of features." Appx10496-10497 at 1023:20-1024:3.

- The **Masaru** reference, which shows the previously known desirability of having permeable particles that allow smaller particles to fill the interstices. Appx11481-11506; Appx10498-10500 at 1025:6-1027:5.

Collectively, these references and testimony show why a skilled artisan would have been motivated to combine Shafer and Nakamura to bridge any differences from the '312 and '037 patents.[18]

---

[18] In addition to Nakamura, as explained above, Chilisin also showed that Shafer discloses two magnetic powders which inherently have the claimed size and hardness differences. Dr. Bravman detailed for the jury how Shafer teaches "preferred powdered irons" that include "Ancorsteel 1000C" and "Carbonyl Iron." Appx11417 at 3:33-43. Ancorsteel 1000C has a Vicker's hardness of 100-115, and a particle size that exceeds that of carbonyl iron. Appx11508; Appx10506 at 1033:7-20; Appx11513; Appx10507 at 1034:3-25. Carbonyl iron has a Vicker's hardness

### B.    JMOL of Validity Was Improperly Granted

The district court's sole stated basis disposing of invalidity mid-trial was that Shafer "doesn't disclose the hardness or the size" of magnetic powders.  Appx10636 at 1159:11-18.  Chilisin disputed that, since Shafer discloses well-known magnetic powders with inherent properties.[19]  Setting that dispute aside, however, the district court's holding entirely ignores the teachings of Nakamura.  Nakamura describes mixing two powders, with one powder being both larger and harder than the other.  Appx11353 at ¶ 0032.  When combined with Shafer, all the disputed claim limitations are present.

Even Cyntec itself has not articulated why JMOL of obviousness was appropriate.  During trial, Cyntec argued "Nakamura and Shafer are missing the elements," without identifying which elements were missing.  Appx10628 at 1151:14-19.  Cyntec argued that neither Shafer nor Nakamura "talk about size difference or hardness difference," *id.* at 1151:19-20, ignoring the fact that

---

of about 95, and a particle size of 3.9-5.0 microns.  Appx15949-15951; Appx10508 at 1035:1-10; Appx16292 at 2:6-19; Appx10509-10510 at 1036:14-1037:13.  These inherent properties also demonstrate obviousness.  *See Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322, 1329 (Fed. Cir. 2020).

[19] Cyntec's main argument against inherency was that Chilisin relied on evidence that post-dated the filing of the asserted patents to show inherency, but this Court has long held that "inherent anticipation does not require a person of ordinary skill in the art to recognize the inherent disclosure in the prior art at the time the prior art is created."  *See SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005).

Nakamura clearly discloses two magnetic powders differing in both size and hardness. Appx11353 at ¶ 0032.[20] Finally, Cyntec argued neither Shafer nor Nakamura "address high-temperature annealing or potential damage to the buried wire." Appx10628 at 1151:20-22. This appears to have been an argument that the references do not address the same problem as the asserted patents,[21] but the asserted patents claim a product formed by placing a wound insulated wire in specific types of magnetic powders. Shafer teaches the same product, *see* Appx11416-11417 at 2:52-3:56, and Nakamura teaches the same powders. Appx11353 at ¶ 0032. To the extent Cyntec was attempting to argue the way it formed its products (*e.g.*, below the melting point of insulated wire) was new, "an old product made by a new process is not novel and cannot be patented." *See Biogen*, 976 F.3d at 1334; *Atl. Thermoplastics Co. v. Faytex Corp.*, 970 F.2d 834, 842 (Fed. Cir. 1992) ("a patentee who does not distinguish his product from what is old except by reference, express

---

[20] Cyntec's argument appears to have been based on its expert's testimony that Nakamura discloses a range of sizes for its particles, "[s]o *it's possible* that the first powder, the iron-silicon-boron, could be smaller than the iron powder and both of them be within their ranges." Appx10611-10612 at 1134:19-1135:13 (emphasis added). This ignores that the claims require only that the *mean* particle sizes differ, not that every particle within the first powder be larger than every particle in the second powder. This argument also ignores this Court's precedent, which states any overlap in a claimed value of ranges establishes a *prima facie* case of obviousness. *See Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1341 (Fed. Cir. 2020).

[21] "Whether a reference in the prior art is 'analogous' is a fact question." *See In re Clay*, 966 F.2d 656, 658 (Fed. Cir. 1992).

or constructive, to the process by which he produced it, cannot secure a monopoly on the product by whatever means produced") (quoting *Gen. Elec. v. Wabash Appliance*, 304 U.S. 364 (1938)).    Moreover, even if treated as a limitation, Chilisin's expert explained how Shafer disclosed forming its inductor at a temperature well below the melting point of insulated wire, and that doing so was a matter of common sense.  Appx10518-10520 at 1045:2-1047:13, Appx10575-10576 at 1098:25-1099:5.  The jury should have been permitted to consider this evidence. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) ("Rigid preventative rules that deny factfinders recourse to common sense … are neither necessary under our case law nor consistent with it.").

During post-trial motions, Cyntec largely repeated these same arguments.[22] The district court, however, did not explain which of these arguments (if any) it found persuasive.  Instead, in response to Chilisin's request for a new trial, the district court relied solely on the burden of proof for invalidity: "As with anticipation, given the high standard of clear and convincing evidence that needs to be met by a party asserting obviousness, the court concludes that Chilisin has not met its burden to show the right to a new trial on obviousness."  Appx18.  The

---

[22] Cyntec also argued "Chilisin did not even cross examine Cyntec's expert on the issue of secondary considerations," Appx14178, ignoring the fact that JMOL was granted *before* Chilisin was given the opportunity to cross-examine Dr. Kohl.

presumption of validity cannot resolve fact disputes between the parties and their experts. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."); *Transweb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1303 (Fed. Cir. 2016) ("The jury was free to credit this testimony and conclude based on the evidence presented that claim 31 was obvious."). Because the district court failed to consider the express disclosures of the prior art, and failed to allow the jury to weigh competing evidence, if the Court does not reverse on liability, a new trial on obviousness is necessary. *See Drinkwine v. Federated Publications, Inc.*, 780 F.2d 735, 738 (9th Cir. 1985) ("A directed verdict under Fed. R. Civ. P. 50(a) will be sustained on appeal if the 'evidence permits only one reasonable conclusion as to the verdict.'") (citation omitted).

## IV.    THE DAMAGES VERDICT SHOULD BE VACATED

If the Court does not reverse on liability, it should either enter a judgment of no lost profits or at least vacate the damages award. To recover lost profits, a patentee must show what sales it would have made in a "but for" world where the adjudged-infringing sales did not occur. *See Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999) ("The 'but for' inquiry … requires a reconstruction of the market, as it would have developed absent the infringing

product, to determine what the patentee 'would have made.'"). To prevent this analysis from lapsing into "pure speculation," a patentee must provide "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Id*. In other words, the patent holder must give the jury sufficient information such that it can determine, with reasonable probability, that the patent holder would have made the infringer's sales in the "but for" world where the infringing sales did not occur. *See BIC Leisure Prods. v. Windsurfing Int'l*, 1 F.3d 1214, 1218 (Fed. Cir. 1993) ("An award of lost profits may not be speculative. Rather the patent owner must show a reasonable probability that, absent the infringement, it would have made the infringer's sales."). A lost profits theory cannot be based on unreliable expert testimony. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348 (Fed. Cir. 2013). Here, Cyntec's lost profits theory is improper because its expert used unreliable calculations for importation of accused products, and because Cyntec cannot show with reasonable certainty what profits it lost.

### A. The District Court Erred in Refusing to Exclude Cyntec's Importation Calculations

Over 95% of Cyntec's claimed lost profits came from so-called "indirect damages." *See* Appx15877. These were damages based on products Chilisin sold overseas that were then allegedly imported into the United States by third parties. Appx9915 at 533:4-9; Appx9917-9918 at 535:9-536:16; Appx15818-15819

(identifying indirect damages customers).   The methodology Cyntec's expert used to determine the amount of each third party's importation of accused products was deeply flawed, and the district court abused its discretion in denying Chilisin's pretrial motion to exclude these importation calculations under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) and Federal Rule of Evidence 702. Appx2512-2513.

For all but one of the 27 customers in Cyntec's but-for market, Cyntec's expert relied solely on Form 10-K filings with the Securities and Exchange Commission ("SEC") and annual reports.  *See* Appx11274-11329.  These sources, however, do not provide information on importation for specific products; for example, they do not show importation rates for phones or laptop computers that may contain chokes. To the contrary, the only data they provide (and the only data Mr. Van Uden relied on) is total revenue, reporting sales to the United States and sales to the rest of the world.  So for example, Apple's Form 10-K reported that approximately 40% of its revenue was from U.S. sales in 2020.   Appx11100.[23]   That U.S. sales figure, however, included not just sales of choke-containing products such as iPhones and iPads, but also sales of irrelevant products and services such as advertising, technical support, and the iPhone App Store, among other things.  *See* Appx11045-11046

---

[23] These numbers are what Mr. Van Uden used in his calculation without modification.  *See* Appx11275.

(listing Apple products and services).  Similarly, when Microsoft reported in its Form 10-K that approximately 51% of its sales were made to the United States, that included sales of Microsoft Office, Skype, LinkedIn, Windows, and many other irrelevant products and services.  *See* Appx11237-11238.[24]  It was pure speculation for Cyntec and its expert to assume Microsoft's importation of software such as Office or Windows, or Apple's revenue from its application store, had anything to do with sales of choke-containing products.

These flaws were compounded by the fact that no party in this case knows exactly which third-party products contain accused chokes, or how many accused chokes those products contain.  While Cyntec introduced evidence that Chilisin sold chokes to companies such as Apple and Intel, Cyntec's expert admitted on cross-examination he had no idea how many Chilisin chokes were actually used in any products sold by these companies.  *See* Appx10022-10024 at 629:4-630:17 & 631:3-13.  Thus even if Cyntec had evidence of importation on a product-by-product basis (which it did not), there still would have been no way to know how many of the accused chokes were imported into the United States by these third parties.

This Court's decision in *Power Integrations* is directly on point.  There, the damages expert attempted to use sales data for Samsung mobile phones to estimate

---

[24] Again, these numbers were used by Mr. Van Uden without modification.  *See* Appx11295.

sales of accused power circuits, which Samsung incorporated into mobile phone chargers. 711 F.3d at 1372. This Court found two flaws in the damages expert's methodology. First, the expert assumed without support that sales of one product (cellular phones) were representative of sales of a related but separate product (cellular phone chargers). *Id*. at 1373. This was not necessarily true, since not all cellular phones come with chargers, and the expert provided no "reliable link" between sales of the two different items. *Id.* at 1374. Second, even assuming all Samsung cellular phones came with chargers, there was insufficient evidence that each charger contained an accused chip. *Id*. Because his numbers were "built on speculation," this Court found the district court abused its discretion in admitting the testimony. *Id*.

Here, the facts are even worse than in *Power Integrations*. At least in *Power Integrations* there was a logical relationship between a phone and a charger. Here, there is no logical relationship between, for example, sales of iPhones (which may have chokes), and sales of advertising, maintenance, or software, which have nothing to do with chokes. Indeed, for many customers in Cyntec's but-for market— companies such as AsusTek, Harman, Lite-On, Motorola, Qualcomm, SanDisk, Sony, and many others—there is no evidence in the record as to what products these companies make or sell that even allegedly contain accused chokes. There is thus no way to tell whether these companies' United States revenue numbers relate to

accused products.[25]   Because Cyntec's importation calculations were based on an

unreliable methodology, the district court abused its discretion in refusing to exclude

this theory.

### B.   Cyntec's Lost Profits are Speculative

While Cyntec has at times suggested it competes in a two-player market with

Chilisin,[26] its expert presented a "market share" theory of lost profits at trial.   "In a

complex market with numerous competitors, a patentee may be awarded lost profit

damages calculated using its market share among its competitors." *Mentor Graphics*

*Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1286 n.5 (Fed. Cir. 2017) (citing *State*

*Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577-78 (Fed. Cir. 1989)).   Of

---

[25] Cyntec may argue its importation figures are also based on data from Gartner Research, a well-known research and consulting company, but this argument has multiple flaws.   First, Cyntec only used Gartner Research data to estimate importation for a single company, HTC.   *See* Appx15819 at n.2.   Second, Cyntec never actually introduced the Gartner data at trial.   Cyntec introduced Trial Exhibit 1289, which its attorney called "the Gartner data relied upon by Mr. Van Uden" (*see* Appx9968 at 575:21-23), but this exhibit on its face says nothing about what the data is or where it came from.   Appx15758-15760.   Cyntec did not have its expert explain the exhibit, and he did not confirm it was the same "Gartner data" he used when calculating importation for HTC.   *See* Appx9969 at 576:1-8.   When Chilisin's expert was asked about the same exhibit on cross-examination, he said he had no idea what it was or what it was purporting to show.   Appx10419-10421 at 946:14-948:1. Without more, it is impossible to say whether the so-called "Gartner data" was more or less reliable than the evidence Cyntec used for all the other companies in its lost profits calculation.

[26] *See, e.g.*, Appx14202 ("the trial evidence showed that Cyntec and Chilisin frequently compete head-to-head…").

course, such a theory requires accurately defining the relevant market, since Cyntec must show what sales it would have made into that market in the but-for world. Here, Cyntec's market share theory was speculative, for multiple reasons.

First, there is no evidence Cyntec's purported "market share" evidence had anything to do with the 27 companies it included in its "but for" market. Cyntec is not seeking to recover lost profits for all Chilisin customers, only for sales Chilisin made to 27 specific companies. *See* Appx15819, Appx9926-9928 at 544:25-546:20. Yet Cyntec did not give the jury any information about what sales it actually made to those 27 customers. Cyntec relied on a single document for its purported market share,[27] but that document does not address the same customers. For example, Cyntec's market share document identifies companies who are not in the "but for" market, including ABB, Alpine, Bosch, Cisco, Danfoss, Dell, Dyson, Ericsson, Fujitsu, Huawei, HP, Lenovo, Innolux, Samsung, Siemens, Koiti, Visteon, Yasakawa, Infineon, and On Semi, among others. *Compare* Appx15514 *with* Appx15819. There is no evidence suggesting sales to these irrelevant companies is somehow representative of the sales Cyntec would have made to the 27 customers in its but-for marketplace.

---

[27] *See* Appx15770, citing Appx15514 as the source for market share data for 2017 and 2018.

Similarly, Cyntec's market share document does not include several customers who are in the but-for market—companies including Ambarella, Arris, Marvell, Motorola, Jabil, Lite-On, Sercomm, and SanDisk, among others. *See id.* Here too, Cyntec does not explain how its market share for unrelated companies shows what sales it would have made to an entirely different set of companies. Indeed, Cyntec's own exhibits showed that many of the companies in its "but for" market—companies including Jabil, Lite-On, Motorola, Sercomm, SanDisk, Marvell, Arris, and Ambarella—are not even Cyntec customers. *See* Appx14057-14059 (listing Cyntec customers). In other words, for some companies in its "but for" market, Cyntec has a market share of 0%. Cyntec and its expert did not explain how the market share data they relied on was applicable to these companies.

Second, the key document Cyntec used for its market share data does not even match its lost profits theory. Cyntec's lost profits theory broke the but-for market into five sub-segments: PC & notebook, "Communication," "Automotive & Industrial," Consumer," and "Mobile & Tablet." Appx15770. Yet the source of its market share data only provided market share data for a portion of three of these sub-categories; specifically, it provides data for the "NB [notebook] Market," "Smartphone" and "Server/Base station" segments. *See* Appx15514. There is no market share data for personal computers ("PCs") or "Tablets," even though both segments were included in Cyntec's but-for market. *See id.* and Appx15770. Also,

56

the "Consumer" and "Automotive & Industrial" sub-segments are completely missing from Cyntec's market share exhibit. Appx15514. Cyntec's expert said he obtained market share data for these sub-segments from "discussions with Dan Wu," Appx15770 n.6, but Cyntec chose not have Mr. Wu provide this testimony when he was under oath at trial. *See generally* Appx9486-9566 at 179:5-241:22. In other words, the record contains no actual evidence of Cyntec's market share for two of the five market segments that Cyntec chose to include in its lost profit calculation.

Third, Cyntec did nothing to try to tie its market sub-segments to any actual accused sales. As noted, Cyntec claims that in the but-for world it would have made sales to 27 customers in five market sub-segments, but it is entirely unclear which customers and which chokes would purportedly be sold into each segment. For example, it is possible the majority of accused chokes were sold into the "Consumer" segment, where Cyntec only claims a 20% market share—not the 35.4% market share it used in its lost profits calculations. *See* Appx15770. To attempt to address this shortcoming, Cyntec took a "weighted average" of the various market sub-segments based on certain Chilisin sales information (*see* Appx15770, citing Appx16094-16095 at Appx16198), but the information it chose to use for its weighting had nothing to do with the but-for market either. Specifically, the data

Cyntec used for weighting (Appx16198)[28] covered all Chilisin's products (not just molded chokes) and all Chilisin's customers (not just the 27 customers in the but-for market). *See* Appx10375-10377 at 902:10-904:10. Chilisin sells many other products, not just chokes, and it sells those products to many companies not in Cyntec's but-for market. Appx16056, Appx16061-16063. There is no evidence sales of irrelevant products, such as thin-film RF inductors, or sales to irrelevant customers such as Oracle, have anything to do with the but-for market for accused chokes.

Fourth, Cyntec's market share data does not cover the relevant time period. Specifically, the presentation forming the sole basis of Cyntec's market share data is dated October 2018 (*see* Appx15497-15498), yet its lost profits damages calculation goes through 2021. Appx16808. Rather than attempting to find market share data for later years, Cyntec's expert simply assumed data for 2018 applied to 2019, 2020, and 2021, apparently based on another oral conversation with Dan Wu. *See id.* at n.3 ("According to Dan Wu, Cyntec's 2018 market share remained consistent throughout 2018, 2019, 2020, and 2021."). Yet once again Cyntec chose not have Mr. Wu provide this testimony when he testified to the jury under oath. *See*

---

[28] Cyntec's market share calculation used different documents to support its market share data for 2015 and 2016, but its indirect damages calculations did not begin until December 2017 (*see* Appx16808), so those figures are not relevant.

*generally* Appx9486-9566 at 179:5-241:22.  There is thus no evidence in the record that Cyntec's market share remained static for four years—through the global downturn, the economic recovery, and the COVID pandemic.  This is an incredible, and unsupported, assumption.

This Court reviews eligibility for lost profits damages without deference. *DSU*, 471 F.3d at 1308.  Here, because Cyntec failed to perform an accurate recreation of the but-for market, its lost profits damages must be rejected, and the lost profits portion of the judgment should be vacated.

### C.    The District Court Erred in Refusing to Grant JMOL of No Lost Profits

The district court rejected all of Chilisin's arguments regarding lost profits, for two reasons.  First, the district court suggested Chilisin did not raise its challenges in its JMOL motions made during trial.  Appx9-10.  This is incorrect.  During trial, Chilisin specifically moved for "no lost profits" based on "failure by Cyntec to prove the share of sales that Cyntec would have made but for Chilisin's sale of the accused products."  Appx10738 at 1261:20-22.  Such a plain statement of the basis for a Rule 50 motion is all that is required to preserve the issue.  *See Western Union*, 626 F.3d at 1367; *see also Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967, 973-74 (Fed. Cir. 2010) (finding a motion for "partial judgment as a matter of law based on prior art" sufficient to preserve validity challenges); *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (holding that in the 9th Circuit issues can be

preserved through an "ambiguous or inartfully made motion under Rule 50(a)").[29] Confusingly, the district court agreed Chilisin had sufficiently challenged whether Cyntec had shown what sales it would have made in the "but for" world.  Appx10. The district court also suggested Chilisin may have sufficiently challenged Cyntec's market share evidence.  *Id*.  The district court apparently believed Chilisin's challenges to market share were separate from its challenge to Cyntec's failure to accurately recreate the "but for" market, but this is not correct.  As this Court has explained, market share evidence is used to show "but for" causation.  *See BIC Leisure Prods. v. Windsurfing Int'l*, 1 F.3d 1214, 1219 (Fed. Cir. 1993).  By finding Chilisin properly challenged "but for" causation, the district court should have considered Chilisin's critiques to Cyntec's "market share" theory.

Second, the district court concluded Cyntec had presented "many examples of Chilisin discussing efforts to make their products in line with the specifications of Cyntec's products," which was "more than a reasonable basis for the jury to conclude that Cyntec would have made Chilisin's sales but for the alleged infringement."  Appx11.  Effectively, the district court said it found evidence of

---

[29] Chilisin's expert raised all these same challenges to Cyntec's lost profits theory in his testimony, so the parties and the district court were aware of the bases for Chilisin's JMOL motion.  *See* Appx10372-10381 at 899:15-908:23; Appx10434-10435 at 961:8-962:14; Appx10444-10445 at 971:20-972:8; Appx10366-10371 at 893:22-898:4; Appx10445-10446 at 972:20-973:14.

head-to-head competition, but that is irrelevant since Cyntec did not argue a two-player market. In other words, the dispute here is not whether the parties compete, but what sales Cyntec would have made to 27 specifically-identified Chilisin customers. Neither the district court nor Cyntec identified any credible evidence that would allow a jury to draw reasonable conclusions about what sales Cyntec would have made to those customers but for Chilisin's adjudged infringement. Consequently, if the liability judgment is not reversed, judgment of no lost profits damages is appropriate. At the very least, a new trial on damages is warranted.

## CONCLUSION

For the above reasons, the judgment against Chilisin should be reversed or at least vacated.

August 5, 2022                              Respectfully submitted,

                                           */s/ Jonathan Lamberson*
                                           Jonathan Lamberson
                                           Henry Huang
                                           Hallie Kiernan
                                           WHITE & CASE LLP
                                           3000 El Camino Real
                                           2 Palo Alto Square, Suite 900
                                           Palo Alto, CA 94306
                                           (650) 213-0300 (telephone)
                                           (650) 213-8158 (facsimile)
                                           lamberson@whitecase.com
                                           henry.huang@whitecase.com
                                           hallie.kiernan@whitecase.com

                                           *Counsel for Appellants Chilisin
                                           Electronics Corp. and Chilisin America
                                           Ltd.*

# Addendum

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4

5

6    CYNTEC COMPANY, LTD.,

7                Plaintiff,                    Case No. 18-cv-00939-PJH

8         v.
                                              **ORDER RE POST-TRIAL MOTIONS**
9    CHILISIN ELECTRONICS CORP., et al.,
                                              Re: Dkt. Nos. 285, 286, 288, 294
10               Defendants.

11

12

13

14         Before the court are the post-trial motions filed by the parties in the above-

15   captioned case.  Defendants Chilisin Electronics Corp. and Chilisin America Ltd.

16   (collectively "Chilisin") filed a renewed motion for judgment as a matter of law under Rule

17   50(b) (Dkt. 285) and a motion for a new trial under Rule 59 (Dkt. 286).  Plaintiff Cyntec

18   Company Ltd. ("Cyntec") filed a motion for permanent injunction and enhanced damages

19   (Dkt. 288).  Chilisin also filed a motion to seal in connection with its opposition to Cyntec's

20   motion for permanent injunction and enhanced damages (Dkt. 294).  The matters are

21   fully briefed and suitable for resolution without oral argument.  Having read the papers

22   filed by the parties and carefully considered their arguments and the relevant legal

23   authority, and good cause appearing, the court rules as follows.

24                              **BACKGROUND**

25         This is a patent case, in which Cyntec filed suit against Chilisin for infringement of

26   patents relating to electronic chokes.  After a seven-day trial, a jury returned a verdict in

27   Cyntec's favor, finding that Chilisin willfully infringed every asserted claim of the patents-

28   in-suit.  See Dkt. 269.  The jury awarded the full amount of damages sought by Cyntec,

United States District Court
Northern District of California

1   namely, $1,552,493 in lost profits and $320,463 in reasonable royalties, for a total

2   damages award of $1,872,956.  See id.

3        Before the court are the parties' post-trial motions, as described above.

**DISCUSSION**

Chilisin's renewed motion for judgment as a matter of law under Rule 50 (Dkt. 285)

A.   Legal standard

7        Judgment as a matter of law is appropriate when "a party has been fully heard on

8   an issue during a jury trial and the court finds that a reasonable jury would not have a

9   legally sufficient evidentiary basis to find for the party on that issue ...."  Fed. R. Civ. P.

10  50(a)(1); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000).

11       A party must make a motion for judgment as a matter of law under Rule 50(a)

12  before a case is submitted to the jury.  If the judge denies or defers ruling on the motion,

13  and if the jury then returns a verdict against the moving party, the party may renew its

14  motion under Rule 50(b).  In ruling on the renewed motion, the court may either "allow

15  judgment on the verdict, if the jury returned a verdict," or "order a new trial," or "direct the

16  entry of judgment as a matter of law."  Fed. R. Civ. P. 50(b).

17       The standard for judgment as a matter of law "mirrors" that for granting summary

18  judgment.  Reeves, 530 U.S. at 150.  The court "should review all of the evidence in the

19  record," but "may not make credibility determinations or weigh the evidence."  Id.; see

20  also Josephs v. Pac. Bell, 443 F.3d 1050, 1062 (9th Cir. 2006).  The court should give

21  credence to the evidence favoring the non-moving party, as well as that evidence

22  supporting the moving party that is uncontradicted and unimpeached, to the extent that it

23  comes from disinterested witnesses.  Reeves, 530 U.S. at 151.

24       The test applied is whether the evidence permits only one reasonable conclusion,

25  and that conclusion is contrary to the jury's verdict.  Josephs, 443 F.3d at 1062.  The

26  verdict must be upheld if the evidence is adequate to support the jury's conclusion, even

27  if it is also possible to draw a contrary conclusion from the same evidence.  Johnson v.

28  Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1227 (9th Cir. 2001). The court "may

United States District Court
Northern District of California

1   not substitute its view of the evidence for that of the jury." Id. (citing Gilbrook v. City of

2   Westminster, 177 F.3d 839, 856 (9th Cir. 1999)).

3         Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited

4   to the grounds asserted in the pre-deliberation Rule 50(a) motion.  Thus, a party cannot

5   properly "raise arguments in its post-trial motion for judgment as a matter of law under

6   Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion."  EEOC v. Go Daddy

7   Software, Inc., 581 F.3d 951, 961 (9th Cir. 2009) (citing Freund v. Nycomed Amersham,

8   347 F.3d 752, 761 (9th Cir.2003)).

9         While Rule 50(b) "may be satisfied by an ambiguous or inartfully made motion"

10  under Rule 50(a), a party must still put the opposing party and the court on adequate

11  notice of the basis for its motion.  See Go Daddy Software, 581 F.3d at 961; Freund, 347

12  F.3d at 761.

13  B.    Analysis

14        1.    Infringement

15              a.    Specific accused products

16        Chilisin's first argument is that the court should enter judgment as a matter of law

17  "on products Cyntec did not analyze."  Dkt. 285 at 8.  Specifically, Chilisin argues that

18  fourteen of the 310 accused products contain at least one powder that Cyntec did not

19  test. See Dkt. 25 at 8.

20        Cyntec first responds that Chilisin has waived its argument with respect to the

21  fourteen accused products in question by not raising it as part of its original Rule 50(a)

22  motion.  See Dkt. 297 at 8 (citing Trial Transcript (Trial Tr.) at 866:1-879:21, 1260:10-

23  1262:23).  Cyntec further argues that Chilisin's argument fails on the merits, because

24  Cyntec's expert, Dr. Paul Kohl, testified that he analyzed the characteristics of all

25  accused products, including the fourteen products in Chilisin's motion.

26        The court agrees that Chilisin's Rule 50(a) motion did not raise the issue of

27  whether Cyntec failed to test powders included in fourteen of the accused products.

28  Chilisin's first Rule 50(a) motion on August 27, 2021 did not raise the argument, nor did

1    Chilisin's "renewed" Rule 50(a) motion on August 31, 2021 raise the issue.  See Trial Tr.

2    vol. 5 (Dkt. 260) at 866-81; vol. 7 (Dkt. 266) at 1260-63.  Accordingly, this argument is

3    waived and may not be raised on this renewed motion under Rule 50(b).  See Freund,

4    347 F.3d at 761.

5          Moreover, even if the court were to consider the merits of Chilisin's motion on this

6    issue, giving credence to the evidence of the non-moving party, Chilisin has not shown

7    that the evidence permits only one reasonable conclusion, and that conclusion is contrary

8    to the jury's verdict.  As Cyntec argued, its expert testified that he reviewed the material

9    specifications for each of the powders used in the accused products, and that "the larger

10   alloy powder is harder in every case than the smaller iron powder."  See Trial Tr. vol. 3

11   (Dkt. 255) at 378:25-379:2, 404:1-19.

12         Accordingly, Chilisin's renewed motion for judgment as a matter of law is DENIED

13   as to its argument that Cyntec did not prove infringement for fourteen of the accused

14   products.

15                b.     Infringement of the '037 patent by direct sales

16         Next, Chilisin argues that the court should grant judgment as a matter of law that

17   direct sales do not infringe the '037 patent.  See Dkt. 285 at 9.  Chilisin argues that the

18   '037 patent is a method patent, and that "there is no dispute Chilisin manufactures the

19   accused chokes entirely outside of the United States," and "thus Cyntec's only viable

20   theory at trial was that Chilisin induced others to import chokes."  Id.

21         Chilisin's argument relies on a quotation from Cyntec's counsel during trial stating

22   that "with regard to the '037 patent, we are only asserting induced infringement."  See

23   Dkt. 285 at 9 (citing Trial Tr. vol. 5 at 868:23-869:3).  However, the full trial transcript

24   shows that Cyntec's counsel corrected himself, stating "with regards to the '037 patent . .

25   . we did assert [direct] infringement under 271(g) in our infringement contentions, just to

26   be clear."  See Trial Tr. vol. 5 (Dkt. 260) at 869:18-23.

27         Cyntec's opposition brief further argues that, after the hearing, Cyntec clarified

28   with Chilisin via email that it had not withdrawn or waived its claim for direct infringement

United States District Court
Northern District of California

4

**Appx4**

1    under section 271(g), and cited portions of its pretrial papers disclosing the substance of

2    the theory.  See Dkt. 297 at 11 (citing Dkt. 298, Ex. 3).  Cyntec argues that "Chilisin did

3    not respond to that email or dispute its contents."  Id. at 11.

4         In its reply, Chilisin does not discuss Cyntec's corrective statement in the trial

5    transcript or the email sent by Cyntec to Chilisin after the Rule 50(a) hearing, instead only

6    arguing that Cyntec has waived its argument for infringement under section 271(g).  See

7    Dkt. 306 at 8.  Chilisin further argues, for the first time in reply, that "the court never

8    instructed the jury on relevant exceptions to section 271(g), such as the exception that a

9    product is non-infringing if it becomes 'a trivial and non-essential component of another

10   product.'"  Id. at 9.  However, Chilisin provides no basis for the court to conclude that

11   such an instruction would have been relevant on the "trivial and non-essential

12   component" exception, such that a reasonable jury would not have a legally sufficient

13   evidentiary basis to find for Cyntec on that issue.

14        Because Chilisin's motion on this issue is premised on its argument that "Cyntec's

15   theory for the '037 patent was limited to inducement," (See Dkt. 285 at 9) and because

16   the record shows that Chilisin was aware of Cyntec's intent to proceed under a theory of

17   direct infringement under section 271(g), Chilisin's motion is DENIED.

18             c.    The "by means of" limitation

19        Chilisin's next argument is that Cyntec has not shown that Chilisin infringed the "by

20   means of" element of the asserted claims.  Chilisin first re-argues the substance of its

21   claim construction argument, that hardness must be the primary factor affecting the

22   formation temperature, rather than having just an "effect or impact" on the temperature.

23   See Dkt. 285 at 10.

24        As an initial matter, Cyntec correctly points out that Chilisin's original Rule 50(a)

25   motion did not ask the court to amend its original claim construction.  See Trial Tr. at

26   873:20-23.  However, in its reply, Chilisin acknowledges that it "is not seeking

27   reconsideration here," and clarifies that it is discussing the claim construction as

28   background "because it is the first step in performing an infringement analysis."  See Dkt.

**Appx5**

United States District Court
Northern District of California

1  306 at 10.  Given the representations in Chilisin's reply, the court will not address the

2  substance of Chilisin's argument regarding claim construction of the "by means of" term.

3      Chilisin next argues that "Cyntec failed to show hardness has an impact on the

4  accused chokes' formation temperature."  See Dkt. 285 at 11.  Specifically, Chilisin

5  argues that "[g]iven that the causal relationship between hardness difference and

6  formation temperature was expressly claimed, under the court's construction, Cyntec

7  must prove that the hardness difference in Chilisin's products is a cause of their lower

8  formation temperature."  Id.

9      Chilisin then provides a more robust version of its current argument:

In order to understand Cyntec's lack of proof, it is instructive to review the
portion of the trial transcript where Cyntec's expert actually analyzed the
disputed limitation.  When Cyntec's infringement expert performed his
analysis of "limitation 1E" of the '312 patent (the "by means of" limitation),
he only relied on a single piece of evidence: Exhibit 50.  Cyntec's expert
testified that Exhibit 50 shows Chilisin's mixed powder chokes have better
performance than a single-powder choke without annealing, but that does
not answer the critical question: what caused that better performance and
lack of annealing?  Was it the size differences between the magnetic
powders, was it the hardness difference, or was it something else?  Exhibit
50 does not say, and indeed the exhibit says nothing about hardness
whatsoever.  There is also nothing in Exhibit 50 about formation
temperature, and nothing about what caused a given product to form at a
given temperature.

Cyntec's analysis for claim 1 of the '037 patent was even more sparse. Its
expert gave ipse dixit testimony that hardness has an impact on formation
temperature, but for support he referred back to his prior testimony on claim
1 of the '312 patent.  As noted, that prior testimony relied on a single exhibit
that says nothing about hardness and nothing about formation temperature.
This was Cyntec's entire analysis of this critical, disputed limitation, and it
was plainly deficient.  At most, Cyntec's expert showed the accused chokes
have certain performance characteristics, but its own asserted patents say
those same performance characteristics could be caused by size
differences, not hardness differences.

25  See Dkt. 285 at 11-12 (emphasis added and internal citations omitted).

26      Chilisin's current argument bears little resemblance to the argument made in its

27  Rule 50(a) motions.  This was the substance of Chilisin's initial Rule 50(a) motion on

28  August 27, 2021:

United States District Court
Northern District of California

> No infringement of any claim that includes the "by means of" limitation. We have had this argument with plaintiffs a number of times. We think the claim is clear.
>
> Prior to the trial, all the witnesses seemed to agree that the claim related to the forming step and that the differences in hardness of the particles has to impact the temperature at which the choke is formed. All of the evidence is that <u>the chokes are formed at room temperature</u> regardless of the powders that are used. <u>There can be no infringement</u> of that step if the chokes with a single powder are <u>molded at room temperature</u> and the chokes with a dual powder are <u>molded at room temperature</u>.
> …
> And their argument that you don't have to later perform an annealing step to meet the performance characteristics of a customer is nowhere in the claim, and we don't think any reasonable jury can conclude the products infringe.

Trial Tr. vol. 5 (Dkt. 260) at 873:16-874:3, 874:9-13 (emphasis added).

During the hearing on Chilisin's "renewed" Rule 50(a) motion on August 31, Chilisin simply reasserted its original grounds for the motion:

> You know this one is coming, the no infringement of the "by means of" limitation of the '312 and '037 patent. There is no way for Cyntec to prove, and they have not proven, that we infringed the "by means of" limitation under the Court's interpretation of that term.

Trial Tr. vol. 7 (Dkt. 266) at 1261:11-15.

To summarize, the argument made in Chilisin's Rule 50(a) motion was an argument that there was no temperature change in the first place, because "the chokes are formed at room temperature." Trial Tr. vol. 5 (Dkt. 260) at 873:20-25. That was also the argument made during Chilisin's closing argument to the jury. <u>See, e.g.</u>, Trial Tr. vol. 7 (Dkt. 266) at 1219:21-1221:25 ("All the chokes are molded at room temperature, and, therefore, the hardness difference has no impact on the temperature at which the choke is formed or molded.")

Chilisin's current argument on its Rule 50(b) motion is a causation argument, arguing that any "performance characteristics" such as a lower temperature were not necessarily caused by a hardness difference, but could have been caused by a size difference or other difference(s). <u>See, e.g.</u>, Dkt. 285 at 13 ("Nothing in Cyntec's evidence shows whether it was size, hardness, or something else that led to the formation

United States District Court
Northern District of California

temperatures used for each accused product."). This was an argument that Chilisin made, and the court rejected, during summary judgment. See, e.g., Dkt. 170 at 20-22 ("Defendants offer one broad argument as to why their devices do not infringe on plaintiff's claims: there is no evidence that forming the magnetic body of the choke at a temperature lower than the melting point of the wire is the result of the hardness difference between two magnetic powders used to form the choke.") ("defendants argue that Kohl's opinion does not differentiate between the size difference and the hardness difference as having the desired effect").

As a threshold matter, the court concludes that Chilisin's current Rule 50(b) motion on the "by means of" issue is based on an entirely different premise than its Rule 50(a) motion. Given that Rule 50(b) specifically provides that any motion be a "renewed" Rule 50(a) motion, the shifting-sands nature of Chilisin's "by means of" argument creates a procedural hurdle in that it now "raise[s] arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion." Go Daddy Software, 581 F.3d at 961 (citing Freund, 347 F.3d at 761). For that reason alone, the court concludes that Chilisin's Rule 50(b) motion must be DENIED as to the "by means of" issue.

Moreover, even if the court were to reach the merits of the "by means of" issue, the record shows that this issue is not suited for judgment as a matter of law. Chilisin's own motion argues that the "testimony at trial confirmed that both size and hardness difference may impact formation temperature," and that under the court's construction, Cyntec need only show that hardness have "an effect or impact," even if it is not "the primary or most significant factor." See Dkt. 285 at 10, 13; see also, e.g., Trial tr., vol. 3 (Dkt. 255) at 394:5-8, 404:14-17, 405:5-13. Based on the trial testimony, the jury found that Chilisin's accused products did meet the "by means of" limitation, and Chilisin has given the court no basis to conclude that "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." Instead, Chilisin appears to be asking the court to conduct its own weighing of the evidence and to reach a

conclusion contrary to the jury's.  Accordingly, even if the court were to reach the merits of Chilisin's argument, Chilisin does not satisfy the standard for judgment as a matter of law under Rule 50(b).

Chilisin makes an additional argument that Cyntec's infringement theory "relies on irrelevant evidence."  See Dkt. 285 at 14.  As before, Chilisin's argument is primarily one of causation.  It argues that "[a]ll of Cyntec's evidence, including its own internal testing, varied both size and hardness together," and thus, "it is impossible for Cyntec to say which of the two caused the lower formation temperatures it observed."  Id. at 15.  Chilisin again asks, "what causes reduced formation temperatures?  Is it size differences, hardness differences, or something else entirely?"  Id.

For the same reasons discussed above, the parties presented evidence regarding the effect of the hardness difference on the formation temperature, and the jury found that the accused products fell within the scope of the claim as construed by the court.  Chilisin has provided no basis for concluding that "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict."  Accordingly, for the same reasons mentioned above, even if the court were to reach the merits of Chilisin's argument on the "by means of" issue, Chilisin does not satisfy the standard for judgment as a matter of law under Rule 50(b).

### 2. Damages

#### a. Lost profits

Next, Chilisin argues that the court should grant judgment as a matter of law of no lost profits damages.  See Dkt. 285 at 16.  Specifically, Chilisin raises three arguments regarding lost profits.  First, Chilisin argues that Cyntec "presented no evidence it would have made all the sales it purportedly lost to Chilisin in the 'but for' world."  See id. at 16.  Next, Chilisin argues that "Cyntec's market share analysis is unfounded."  Id. at 18.  Finally, Chilisin argues that "Cyntec's importation percentages are unfounded."  Id. at 21.

As an initial matter, only one damages-related argument was raised in Chilisin's first Rule 50(a) motion on August 27, 2021.  See Trial Tr. vol. 5 (Dkt. 260) at 866-77.

9

**Appx9**

1    Specifically, the only damages-related issue raised at the August 27 hearing was the

2    issue related to importation of the accused products manufactured outside of the United

3    States.  See id. at 876:13-879:7.

4         However, when Chilisin made its "renewed" Rule 50(a) motion on August 31,

5    2021, it stated that it was raising "two damages issues."  See Trial Tr. vol. 7 (Dkt. 266) at

6    1261:16-19.  The first issue was "no damages for any – all of the sales made outside of

7    the United States."  Id.  Chilisin's counsel then stated:

8         Second damages issue, no lost profits, failure by Cyntec to prove the share
          of sales that Cyntec would have made but for Chilisin's sale of the accused
9         products.

10   Id. at 1261:20-22.

11        Given that Rule 50(a) provides that a motion "may be made at any time before the

12   case is submitted to the jury," the court concludes that the additional damages-related

13   issue raised by Chilisin at the August 31 hearing is properly included within the scope of

14   the present Rule 50(b) motion.  And as the court understands it, that "second damages

15   issue" raised at the August 31 hearing corresponds with the first issue raised in Chilisin's

16   present motion, namely, that Cyntec "presented no evidence it would have made all the

17   sales it purportedly lost to Chilisin in the 'but for' world."

18        However, neither of Chilisin's Rule 50(a) motions raised the issues that Chilisin

19   now raise regarding the Cyntec's market share analysis – specifically, the contentions

20   that Cyntec failed to "accurately defin[e] the relevant market" and to "recreate sales for

21   the entire marketplace for the relevant damages period."  See Dkt. 285 at 20-21.

22   Because these were not arguments raised in any Rule 50(a) motion, the court concludes

23   that they are waived, and Chilisin's Rule 50(b) motion is DENIED to the extent it is based

24   on challenging Cyntec's market share analysis.[1]  And to the extent that Chilisin did

25   preserve a general "market share" argument by using the word "share" at the August 31

26

27   _____

28   [1] Moreover, even if the court were to consider the merits of a standalone argument
     regarding Cyntec's market share analysis, its argument would fail for the same reasons
     as its arguments regarding the but-for analysis, as discussed below.

United States District Court
Northern District of California

United States District Court
Northern District of California

hearing, the court concludes that such argument overlaps with Chilisin's first argument that Cyntec failed to prove that it would have made sales "but-for" the infringement. See Trial Tr. vol. 7 (Dkt. 266) at 1261:16-22 (asserting argument of "failure by Cyntec to prove the share of sales that Cyntec would have made but for Chilisin's sale of the accused products.").

That leaves two issues for the court's analysis: (1) the but-for analysis, and (2) the importation rate issue. On issue (1), Chilisin argues that Cyntec must show that it would have made Chilisin's sales "but for" the alleged infringement, and Chilisin argues that "Cyntec cannot meet this burden because it introduced no evidence that its products were qualified as replacements for all of Chilisin's 310 accused chokes." See Dkt. 285 at 16. Chilisin also argues that "Cyntec's lost profits theory is fatally flawed because Cyntec introduced no evidence at trial that it had gone through a 'design win' process to sell chokes to all of the customers who purchased the accused Chilisin chokes." Id. at 17.

In its opposition, Cyntec argues that "Chilisin's argument is incorrect because it ignores the fact that Cyntec proffered evidence at trial showing that Cyntec was the market incumbent, not Chilisin, and that Chilisin was trying to copy Cyntec products that had already been qualified by brand companies." See Dkt. 297 at 18. Cyntec then cites numerous trial exhibits showing "Chilisin discussing its efforts to 'cross' (meaning copy) Cyntec's patented products." Id. (citing exhibits).

The court agrees that the evidence at trial included many examples of Chilisin discussing efforts to make their products in line with the specifications of Cyntec's products. See, e.g., Trial Ex. 122 ("will mettle same dimensions with Cyntec's . . . we will try to meet theirs as close as possible."); Trial Ex. 1363 (products' "characteristics need to completely match Cyntec characteristics"); Trial Ex. 57 (products "need to be exactly the same (sorry, no room for negotiation because the client prefers Cyntec)".) Given that evidence, there was more than a reasonable basis for the jury to conclude that Cyntec would have made Chilisin's sales but for the alleged infringement. Accordingly, Chilisin's motion is DENIED on this issue.

1    Turning to issue (2) regarding the importation rate, Chilisin argues that "Cyntec

2    gave the jury no reliable evidence regarding importation rates." <u>See</u> Dkt. 285 at 21.

3    Chilisin first challenges the SEC data cited by Cyntec's expert, arguing that it does not

4    break down importation rates on a product-by-product basis. <u>Id.</u>  Chilisin then further

5    challenges data from the Gartner research firm, arguing that it is "irrelevant." <u>Id.</u> at 22.

6    In its opposition, Cyntec first argues that it is required to prove damages only to a

7    "reasonable certainty, not mathematical precision." <u>See</u> Dkt. 297 at 22.  Cyntec then

8    argues that even Chilisin's own witnesses confirmed the reliability of data from the

9    Gartner firm. <u>See</u> Dkt. 297 at 22.  Cyntec argues that '[w]hat Chilisin is doing is

10   challenging the weight that should be placed on the Gartner data," which is "not

11   acceptable at this stage of the proceeding" when the court "may not weigh the evidence

12   or assess credibility." <u>Id.</u>  Cyntec further argues that its damages expert considered the

13   Gartner data, which did provide specific information on types of products, in conjunction

14   with the SEC filings "to confirm the accuracy and reasonableness of the importation

15   information." <u>Id.</u>

16   The court concludes that Chilisin is asking the court to substitute its view for that of

17   the jury here.  The parties presented their competing arguments regarding whether

18   Cyntec had proven damages to a reasonable certainty, and the jury found that the

19   importation data to be sufficiently reliable on which to base a damages award.  There

20   was substantial evidence for the jury's verdict, and it is not the case that the evidence

21   permitted only one reasonable conclusion, which is contrary to the jury's verdict.

22   Accordingly, Chilisin's Rule 50(b) motion is DENIED on this issue.

23        b.    Royalty base and rate

24   Chilisin then argues that "the court should grant judgment as a matter of law on

25   Cyntec's royalty base and rate." <u>See</u> Dkt. 285 at 24.

26   First, Chilisin argues that "the court should limit Cyntec's royalty base" because

27   "over 95% of Cyntec's reasonable royalty damages base came from estimated

28   importation by third parties."  Dkt. 285 at 24.  Chilisin argues that the "importation

percentages are speculative," and thus judgment as a matter of law should be granted to remove those sales from the royalty base.

This argument is the same in substance as the importation-rate argument made in connection with lost-profits damages, and the court rejects it for the same reason. Cyntec did provide evidence regarding importation rates, and the jury accepted that evidence, and the court finds no basis to overturn the jury's verdict on this issue. Thus, Chilisin's Rule 50(b) motion is DENIED as to the royalty base issue.

Next, Chilisin argues that "the court should limit Cyntec's royalty rate." See Dkt. 285 at 25. Chilisin argues that "Cyntec has no valid support" for the 5% royalty rate awarded by the jury. Id.

Chilisin did not raise any issue related to the royalty rate in either of its Rule 50(a) motions. See Trial Tr. vol. 5 (Dkt. 260) at 866-881, vol. 7 (Dkt. 266) at 1260-1263. Thus, the court finds that this issue is waived, and may not be raised on a renewed Rule 50(b) motion, and Chilisin's motion is DENIED as to the royalty rate issue.

        c.     Damages period

Next, Chilisin argues that "the court should grant judgment as a matter of law limiting the damages period." See Dkt. 285 at 26. Chilisin argues that "all damages should start on December 17, 2017, the date Chilisin first received notice of the asserted patents." Id.

Regarding direct sales, Chilisin's argument is based on its earlier argument that "Cyntec's infringement theory for the '037 patent was that Chilisin induced others to import infringing chokes." See Dkt. 285 at 26. However, as discussed above, Chilisin relies on a single quote from Cyntec's counsel that he corrected at the same hearing (in fact, the correction is on the same page of the trial transcript as the initial misstatement). See Trial Tr. vol. 5 (Dkt. 260) at 869. Thus, this argument is rejected for the same reasons discussed above, Chilisin's Rule 50(b) motion is DENIED to the extent it seeks to exclude damages for the '037 patent from before December 17, 2017.

Chilisin's remaining arguments on this issue are arguments that were not raised

during either of its Rule 50(a) motions, and are being raised for the first time on this Rule 50(b) motion.  Specifically, Chilisin argues that damages for direct sales under the '312 patent cannot begin before December 2017 because Cyntec's products were not marked with its patent numbers, and further argues that indirect sales damages should not begin until December 2017.  See Dkt. 285 at 27.

As discussed above, the only damages-related issues raised in Chilisin's Rule 50(a) motions related to (1) importation rates, and (2) the but-for analysis.  Because Chilisin may not raise arguments on this motion that were not raised in its Rule 50(a) motions, Chilisin's motion on these other issues regarding limitation of the damages period is DENIED.

3.      Willfulness

Finally, Chilisin argues that the court should grant judgment as a matter of law of no willful infringement.  Chilisin argues that willful infringement requires "egregious cases of misconduct beyond typical infringement," and argues that the standard is not met here. See Halo Elecs., Inc. v. Pulse Elecs., Inc., 136 S.Ct. 1923, 1935 (2016).

When Chilisin initially moved for judgment as a matter of law on August 27, 2021, the parties appeared to agree that Cyntec's willfulness claim would be limited to the time after December 2017.  Specifically, Cyntec's counsel stated that "[t]he willfulness claim, Your Honor, we would limit to after receipt of the notice letter."  Trial Tr. vol. 5 (Dkt. 260) at 872:13-14; see also id. at 872:20-22 ("And so we believe that willfulness would be proper after the receipt of the letter, and we would be willing to limit our willfulness case to the date period after that.")

Cyntec now argues that Chilisin "withdrew its motion" as a result of the previous exchange, and thus "abandoned its motion on this issue," preventing it from raising the argument on this motion.  See Dkt. 297 at 26.

However, at the August 31 hearing, when Chilisin re-asserted its Rule 50(a) motion, it continued to assert a willfulness argument.  Specifically, Chilisin argued on its 'renewed' Rule 50(a) motion: "Third is the no willfulness, no evidence of any willful,

Appx14

wanton, malicious, bad faith, deliberate, consciously wrong, flagrant, or characteristic of a pirate behavior." Trial Tr. vol. 7 (Dkt. 266) at 1261:7-9.

Because Chilisin continued to assert its willfulness argument even after the parties agreed to limit the temporal scope of Cyntec's willfulness claim, the court concludes that Chilisin has not waived or abandoned its argument on willfulness.

On the merits, Chilisin now argues that willful infringement requires "egregious cases of misconduct beyond typical infringement" and that "there is no evidence that anything egregious happened" in this case. See Dkt. 285 at 27.

Cyntec points to numerous trial exhibits showing that Chilisin intended to copy Cyntec's products, including emails stating that their products "need to completely match Cyntec characteristics" because clients "prefer Cyntec." See Dkt. 297 at 27 (citing trial exhibits). Cyntec argues that the evidence presented at trial was "more than adequate evidence on which the jury could find willful infringement," and the court agrees. That evidence will be discussed more fully below, in the context of Cyntec's motion for permanent injunction and enhanced damages.

As before, Chilisin appears to be asking the court to weigh the evidence differently than the jury did, rather than meeting its burden under Rule 50 to show that the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict. Accordingly, Chilisin's Rule 50(b) motion is DENIED as to willfulness.

For the reasons discussed above, Chilisin's motion for judgment as a matter of law under Rule 50(b) is DENIED in full.

Chilisin's motion for new trial under Rule 59 (Dkt. 286)

A.     Legal standard

Whether to grant a new trial is a matter of the trial court's discretion. City Solutions, Inc. v. Clear Channel Communications, 365 F.3d 835, 843 (9th Cir. 2004). The court may grant a motion for a new trial even if the verdict is supported by substantial evidence, if it concludes that the verdict is contrary to the clear weight of the evidence, is based on evidence which is false, or would result in a miscarriage of justice. Silver Sage

United States District Court
Northern District of California

1    Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d 814, 819 (9th Cir. 2001); see also

2    Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007).  The court may weigh the

3    evidence and may evaluate the credibility of the witnesses, and is not required to view

4    the evidence from the perspective most favorable to the prevailing party.  United States v.

5    Kellington, 217 F.3d 1084, 1095 (9th Cir. 2000).

6         However, where a movant claims that a verdict is against the clear weight of the

7    evidence, doubts about the correctness of the verdict are not sufficient grounds for a new

8    trial.  Landes Constr. Co., Inc. v. Royal Bank of Canada, 833 F.2d 1365, 1372 (9th Cir.

9    1987).  "Courts are not free to reweigh the evidence and set aside the jury verdict merely

10   because the jury could have drawn different inferences or conclusions or because judges

11   feel that other results are more reasonable."  Tennant v. Peoria & Pekin Union Ry. Co.,

12   321 U.S. 29, 35 (1944).  The trial court, after having given full respect to the jury's

13   findings, must have a definite and firm conviction that the jury has made a mistake.

14   Landes Constr. Co., 833 F.2d at 1371-72 (citations omitted).

15   B.    Analysis

16        Chilisin's first argument is that, if the court denies Chilisin's Rule 50(b) motion, it

17   alternatively requests a new trial on each issue.  For the same reasons set forth in the

18   court's denial of Chilisin's Rule 50(b) motion, and for the additional reason that Chilisin

19   has not met its burden to show that the judgment on any issue contradicts the clear

20   weight of the evidence, the court also DENIES Chilisin's Rule 59 motion for a new trial to

21   the extent it is based on the same grounds raised in the Rule 50(b) motion.

22        Chilisin also raises two additional grounds for seeking a new trial: (1) invalidity of

23   the patents-in-suit for anticipation and obviousness, and (2) remittitur as an alternative to

24   a new trial on damages.  See Dkt. 286 at 5.

25        1.    Invalidity

26             a.    Anticipation

27        Regarding invalidity by anticipation, Chilisin first argues that it "established at least

28   a triable case of anticipation by inherency."  See Dkt. 286 at 8.  Chilisin points to the

United States District Court
Northern District of California

United States District Court
Northern District of California

Shafer reference as disclosing "a first powdered iron" and "a second powdered iron" with "differing electrical characteristics . . . to maximize its efficiency." See id. Chilisin further argues that "Cyntec's arguments at trial against Schafer [sic] never foreclosed anticipation or inherency as a matter of law." See Dkt. 286 at 10.

In its opposition, Cyntec argues that Chilisin had the burden to show anticipation by clear and convincing evidence, not just the "mere possibility" of anticipation. See Dkt. 296 at 7-8 (citing ATEN Int'l Co. v. Uniclass Tech. Co., 932 F.3d 1364, 1368 (Fed. Cir. 2019)). Cyntec further argues that an "anticipation by inherency" argument requires the evidence to "make clear that the missing descriptive matter is necessarily present." Dkt. 296 at 8 (emphasis added by Cyntec); see also Allergan, Inc. v. Apotex Inc., 754 F.3d 952, 960-61 (Fed. Cir. 2014); Finnigan Corp. v. Int'l Trade Comm'n, 180 F.3d 1354, 1365 (Fed. Cir. 1999) (inherency "may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient.").

Given the high standard to show anticipation by clear and convincing evidence, the court concludes that Chilisin has not met its burden to show the right to a new trial on anticipation, and thus Chilisin's motion is DENIED as to invalidity by anticipation.

b.      Obviousness

Regarding invalidity by obviousness, Chilisin argues that its expert explained why the Shafer reference, in combination with the Nakamura reference or other references, would have rendered the asserted claims obvious. See Dkt. 286 at 11. Chilisin further argues that its expert "demonstrated a motivation to combine Shafer with Nakamura." Id. at 12.

In its opposition, Cyntec argues that "the evidence demonstrated that there was no motivation to combine the Shafer and Nakamura references," because "the high temperature treatment discussed in Nakamura was for a wholly different reason than the ones discussed" in the patents-in-suit. See Dkt. 296 at 11 (citing Forest Labs., LLC v. Sigmapharm Labs., LLC, 918 F.3d 928, 934 (Fed. Cir. 2019)). Cyntec also argues that

Chilisin's own expert "acknowledged that the central problem that the inventors of the '037 and '312 patents sought to solve was not at issue at all in the Nakamura reference." Dkt. 296 at 12.

As with anticipation, given the high standard of clear and convincing evidence that needs to be met by a party asserting obviousness, the court concludes that Chilisin has not met its burden to show the right to a new trial on obviousness, and thus Chilisin's motion is DENIED as to invalidity by obviousness.

    2.    Remittitur

Chilisin's final argument on this motion is that "the court should order remittitur." See Dkt. 286 at 14. Chilisin explains that this motion is based on the same arguments made in its Rule 50(b) motion related to (1) lost profits, and (2) the royalty rate. Id. The court concludes that Chilisin has not met its burden to show that the jury's verdict on these issues is contrary to the clear weight of the evidence, and thus Chilisin's motion is DENIED.

For the reasons discussed above, Chilisin's motion for a new trial under Rule 59 is DENIED in full.

Cyntec's motion for permanent injunction and enhanced damages (Dkt. 288)

A.    Motion for permanent injunction

    1.    Legal standard

A patentee seeking a permanent injunction must make a four-part showing: (1) it suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) the balance of hardships between the plaintiff and defendant shows that a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. eBay v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

    2.    Analysis

Cyntec argues that all four factors weigh in favor of granting an injunction in this case. As an initial matter, Chilisin asks the court to stay resolution of Cyntec's motion

while it attempts to seek production of an alleged agreement with Apple.  See Dkt. 294-6 at 24-26.  Chilisin's attempt to seek discovery on that issue has already been denied, and the court will not stay consideration of Cyntec's motion on that basis.  See Dkt. 304.

                a.     Irreparable harm

On the first factor, Cyntec argues that it has suffered irreparable harm and will continue to do so unless Chilisin is enjoined.  See Dkt. 288-1 at 12.  Cyntec argues that courts have found irreparable harm have considered factors such as (1) whether the patentee and alleged infringer are in direct competition, (2) whether the patentee lost market share due to the competition, (3) whether the patentee was unwilling to license its technology, and (4) whether the alleged infringement affected the patentee's ability to compete in the design win process.  See Dkt. 288-1 at 12-16 (citing Broadcom Corp. v. Emulex Corp., 732 F.3d 1325, 1336 (Fed. Cir. 2013); Douglas Dynamics, LLC v. Buyers Prods. Co., 717 F.3d 1336, 1345 (Fed. Cir. 2013); i4i Ltd. v. Microsoft Corp., 598 F.3d 831, 861 (Fed. Cir. 2010)).

Regarding direct competition, Cyntec cites a number of trial exhibits showing that Chilisin sought to directly compete with Cyntec.  See Dkt. 288-1 at 13-14 (citing, e.g., Trial Ex. 1363 (Chilisin email stating that products "need to completely match Cyntec characteristics"), Trial Ex. 117 (Chilisin stating "we have lowering our cost than their major supplier (Cyntec) in order to get into the business")).

Cyntec also argues that the design win process leads to an "incumbency effect" which compounds the harm to the patentee.  See Dkt. 288-1 at 14-16 (citing Broadcom, 732 F.3d at 1336).

In its opposition, Chilisin first argues that Cyntec's delay in bringing this lawsuit shows a lack of irreparable harm.  See Dkt. 294-6 at 12-14.  As to direct competition, Chilisin argues that "the actual scope of competition is unclear."  Id. at 14.  Chilisin then argues that it "did not engage in predatory pricing" and that "Cyntec's copying evidence is irrelevant."  Id. at 17-18.

In its reply, Cyntec argues that Chilisin has not presented evidence of any delay.  See Dkt. 307 at 3.  Cyntec argues that it sent a demand letter to Chilisin in December

United States District Court
Northern District of California

2017, and then filed suit three months later.  Id.  Cyntec argues that there is no evidence that, prior to that, Cyntec had obtained the accused products and analyzed them for infringement.  Id.

Overall, the court concludes that the first factor weighs in favor of an injunction. Chilisin's arguments do not undermine the extensive evidence at trial that Chilisin did directly compete with Cyntec, including through the design win process.  In particular, the fact that Chilisin designed its products to "completely match Cyntec characteristics" shows that the parties were in competition.  See Trial Ex. 1363; see also Trial Ex. 122 ("will mettle same dimensions with Cyntec's . . . we will try to meet theirs as close as possible."); Trial Ex. 57 (products "need to be exactly the same (sorry, no room for negotiation because the client prefers Cyntec)".)  The court further notes that the Federal Circuit has considered a jury award of lost profit damages to be an implicit finding of direct competition.  See Presidio Components, Inc. v. American Technical Ceramics Corp., 702 F.3d 1351, 1363 (Fed. Cir. 2012).  The court thus concludes that Cyntec has shown that it would suffer irreparable harm in the absence of an injunction.

  b.  Adequacy of monetary damages

As to the second eBay factor, Cyntec argues that monetary damages are inadequate to compensate it for ongoing and future infringement.  See Dkt. 288-1 at 16-18.  Cyntec argues that monetary damages cannot remedy Cyntec's loss of customer goodwill and exclusivity, and that the full extent of Chilisin's infringement "defies valuation."  Id.  In particular, Cyntec focuses on the fact that it has never licensed its patents to any third party, "electing instead to enjoy the exclusivity offered by its patent rights."  Id. at 16 (citing Dkt. 288, Ex. C at 159-60).

In its opposition, Chilisin argues that "the scope of proven harm is limited," and that "Cyntec offers no proof of lost exclusivity or goodwill."  See Dkt. 294-6 at 20-22.

Overall, the court concludes that the second factor weighs in favor of an injunction. In particular, the court notes that Cyntec was unwilling to license patents-in-suit, and Chilisin does not appear to respond to that argument.  The court thus concludes that Cyntec has shown that monetary damages are inadequate to compensate it for Chilisin's

1    infringement.

            c.    Balance of hardships

2          As to the third <u>eBay</u> factor, Cyntec argues that the balance of hardships tips in

3    favor of an injunction.  <u>See</u> Dkt. 288-1 at 18-19.  Cyntec points to trial testimony showing

4    the relative importance of the patented technology to Cyntec's business, as well as

5    testimony showing that Chilisin is a more diversified business.  <u>Id.</u>

6          In its opposition, Chilisin argues that Cyntec is a wholly-owned division of a

7    company that is larger than Chilisin.  <u>See</u> Dkt. 294-6 at 22.  Chilisin also argues that "the

8    parties' settlement history shows a lack of any need for court intervention."  <u>Id.</u> at 23.

9          Overall, the court concludes that the third <u>eBay</u> factor weighs in favor of an

10   injunction.  Cyntec's evidence has shown the hardships that it would face in the absence

11   of an injunction, and Chilisin has not presented evidence that it would suffer harm that

12   would tip the balance of hardships in its favor.  Accordingly, the court concludes that

13   Cyntec has shown that the balance of hardships favors an injunction.

            d.    Public interest

14         As to the fourth <u>eBay</u> factor, Cyntec argues that the public interest favors

15   "upholding Cyntec's patent rights and granting the narrow injunction."  <u>See</u> Dkt. 288-1 at

16   19-20.  Cyntec emphasizes the fact that the proposed injunction is "narrowly tailored,

17   takes effect prospectively, and applies only to Chilisin (and not its customers)."  <u>Id.</u> at 19.

18   Cyntec argues that the limited nature of the proposed injunction ensures that "the

19   products that are already in Chilisin's customers' hands do not need to be destroyed, and

20   customers may continue to use them without any restrictions."  <u>Id.</u>

21         Cyntec further argues that the infringing products are not "goods which require any

22   deferential treatment, such as medical devices or other items that may raise health and

23   safety concerns."  <u>See</u> Dkt. 288-1 at 20.  Cyntec also argues that an injunction would not

24   create any supply chain shortages because Cyntec has the manufacturing capacity to

25   meet any additional demand that would result from an injunction.  <u>Id.</u>

26         In its opposition, Chilisin argues that the public interest would not be served by

27   Cyntec's proposed injunction.  <u>See</u> Dkt. 294-6 at 23-24.  Chilisin first argues that the

28

United States District Court
Northern District of California

United States District Court
Northern District of California

injunction would prevent it from "ensuring that customers who lawfully purchased chokes received necessary information and updates, for example." Id.  Second, Chilisin argues that the proposed injunction contains no express limits on extraterritoriality, and proposes new language regarding activity outside of the United States.  Id. at 24.

In its reply, Cyntec states that it is "willing to confer with Chilisin to reach agreement on a narrow exception allowing the conveyance of safety information." See Dkt. 307 at 9.  As to extraterritoriality, Cyntec argues that its proposed injunction already "specifically covers only infringing activity in the United States."  Id.

Overall, the court concludes that the public interest weighs in favor of an injunction.  As Cyntec points out, the Federal Circuit has held that "the public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions."  See Apple Inc. v. Samsung Elecs. Co. Ltd., 809 F.3d 633, 647 (Fed. Cir. 2015).

Having considered the eBay factors, the court concludes that Cyntec has made a sufficient showing, and its motion for permanent injunction is GRANTED, subject to the following: in its reply, Cyntec represents that it is willing to revise its proposed injunction to create a narrow exception allowing for the conveyance of safety information.  See Dkt. 307 at 9.  The court thus directs Cyntec to submit a proposed revised injunction incorporating such an exception.  Thus, while Cyntec's motion for permanent injunction is granted based on the showing made in the papers, the injunction remains subject to the court's approval of the form of the proposed injunction.  Cyntec shall have **fourteen (14) days** from the date of this order to submit a revised proposed injunction.

B.    Enhanced damages

1.    Legal standard

Courts have the discretion to "increase the damages up to three times the amount found or assessed."  35 U.S.C. § 284.  "The paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances."  Read Corp. v. Portec, Inc., 970 F.2d 816, 826-27 (Fed. Cir. 1992), abrogated in part on other grounds by Markman v. Westview

Instruments, Inc., 517 U.S. 370 (1996). The Read court set forth the following factors for courts to consider when deciding whether to award enhanced damages:

(1) whether the infringer deliberately copied the ideas or design of another,

(2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed,

(3) the infringer's behavior as a party to the litigation,

(4) defendant's size and financial condition,

(5) closeness of the case,

(6) duration of defendant's misconduct,

(7) remedial action by the defendant,

(8) defendant's motivation for harm, and

(9) whether defendant attempted to conceal its misconduct.

Read, 970 F.2d at 826; see also SRI Int'l, Inc. v. Cisco Systems, Inc., 14 F.4th 1323, 1330 (Fed. Cir. 2021) (citing and applying the Read factors).

2.      Analysis

As to factor (1), Cyntec argues that Chilisin deliberately copied its design, pointing to trial exhibits showing that Chilisin sought to "completely match Cyntec characteristics." See Dkt. 288-1 (citing, e.g., Trial Ex. 56, 57, 120, 122, 1363). Chilisin argues that "there has been no copying" because there is no evidence that Chilisin tested the powders in Cyntec's products. See Dkt. 294-6 at 27. Because Chilisin does not meaningfully rebut Cyntec's evidence of copying, the court concludes that the first Read factor weighs in favor of enhanced damages.

As to factor (2), Cyntec argues that Chilisin offered no evidence of any good faith belief of non-infringement or invalidity. See Dkt. 288-1 at 22-23. Cyntec argues that there is no evidence in the record that Chilisin conducted any investigation into Cyntec's concerns. Id. at 22. Chilisin argues that it had a good faith belief of non-infringement and invalidity, pointing to the arguments made in its motion for judgment as a matter of law and motion for a new trial. The court concludes that the second Read factor does not

weigh either for or against enhanced damages.

As to factor (3), Cyntec argues that "Chilisin advanced meritless invalidity defenses that needlessly consumed the court's time and drove up litigation costs." See Dkt. 288-1 at 23-24. Specifically, Cyntec points to Chilisin's indefiniteness defense, which was emphasized in pretrial papers and mentioned in Chilisin's opening statement, but "entirely abandoned" in its trial presentation. Id. Chilisin argues that it "litigated in good faith." See Dkt. 294-6 at 28-29. With regard to indefiniteness, Chilisin argues that "even up through pretrial, the parties were still arguing over the meaning of the 'by means of' limitation" and "[i]ndefiniteness was part of that claim construction dispute." Id. Chilisin contends that "[o]nce the court issued its construction, indefiniteness became moot." Id.

The court concludes that the third Read factor weighs in favor of enhanced damages. Chilisin's argument regarding indefiniteness highlights the unreasonableness of its own conduct. Chilisin argues that "once the court issued its construction, indefiniteness became moot," but even though the court issued its construction in June 2019 and its summary judgment order in September 2020, Chilisin continued to litigate the issue through the start of trial. See, e.g., Dkt. 83, 170. In fact, the court specifically noted that Chilisin had attempted, on multiple occasions, to reopen claim construction. See Dkt. 192. Ahead of a status conference in May 2021, Chilisin filed a case management statement asking for an additional claim construction hearing on the "open claim construction issue" regarding the "by means of" term. See Dkt. 181. At the status conference, the court made clear that there was no "open claim construction issue," as the claims were construed in May 2019, and denied any request to reopen claim construction. See Dkt. 183. The court then directed the parties to submit a proposed jury instruction on the "by means of" term, but rather than submit a jury instruction, "Chilisin submitted a newly-proposed claim construction." See Dkt. 192 at 1. The court stated that "Chilisin's attempt to reopen claim construction is untimely and directly contrary to the court's instructions at the case management conference." Id. at 1-2. Overall, the

court concludes that Chilisin's litigation conduct with regard to indefiniteness and construction of the "by means of" term is sufficient to weigh the third <u>Read</u> factor in favor of enhanced damages.

As to factor (4), Cyntec argues that "Chilisin's size and financial condition are sufficiently large to favor enhanced damages." <u>See</u> Dkt. 288-1 at 24-25. Cyntec argues that Chilisin's own documents show that its annual revenue exceeds $252 million. <u>Id.</u> at 25 (citing Trial Ex. 129). Chilisin's opposition brief does not address this <u>Read</u> factor. The court concludes that the fourth <u>Read</u> factor weighs in favor of enhanced damages.

As to factor (5), Cyntec argues that "this case was not close." Cyntec argues that "the jury ultimately rejected each of Chilisin's non-infringement defenses, found Chilisin to be a willful infringer, and awarded Cyntec the full measure of damages requested." <u>See</u> Dkt. 288-1 at 25. Chilisin argues that this was a close case, pointing to its Rule 50(b) motion for judgment as a matter of law and Rule 59 motion for a new trial. <u>See</u> Dkt. 294-6 at 29. The court concludes that the fifth <u>Read</u> factor weighs in favor of enhanced damages.

As to factors (6) and (7), Cyntec argues that "despite the duration of misconduct, Chilisin has taken no remedial action." <u>See</u> Dkt. 288-1 at 25-26. In particular, Cyntec points to trial exhibits showing that Chilisin continued to copy Cyntec's technology even after learning of Cyntec's patents and continued to sell the infringing products at least through trial. <u>See</u> Trial Ex. 57, A-808. Chilisin argues that it investigated Cyntec's claims after receiving the December 2017 notice letter, and suggests that it did not need to stop selling the accused products because "Chilisin had been selling those products for nearly three years before Cyntec sent its letter." <u>See</u> Dkt. 294-6 at 29-30. Because Cyntec's evidence shows that, even after this suit was filed, Chilisin continued to make their products "exactly the same" as Cyntec's, with "no room for negotiation because the client prefers Cyntec," the court concludes that the sixth and seventh <u>Read</u> factors weigh in favor of enhanced damages. <u>See</u> Trial Ex. 57 at 2.

As to factor (8), Cyntec argues that Chilisin intended to harm Cyntec. <u>See</u> Dkt.

288-1 at 26-27.  Cyntec again points to trial evidence showing that Chilisin deliberately copied Cyntec's products and sought to undercut Cyntec on price.  <u>Id.</u> (citing Trial Ex. 57, 105, 107, 117, 132, 1363).  Chilisin argues that there is no evidence that Chilisin intended to harm Cyntec.  <u>See</u> Dkt. 294-6 at 30.  Based on the evidence cited by Cyntec, the court concludes that the eighth <u>Read</u> factor weighs in favor of enhanced damages.

Cyntec's motion does not address the ninth and final <u>Read</u> factor.

Having considered the <u>Read</u> factors, the court concludes that the totality of the circumstances weigh in favor of enhanced damages.  In particular, as mentioned above, the evidence showing that Chilisin sought to deliberately copy Cyntec's products as closely as possible even well after the filing of this lawsuit.  <u>See, e.g.</u>, Trial Ex. 57. Accordingly, Cyntec's motion for enhanced damages is GRANTED, and the court will multiply all applicable damages by a factor of three.

However, there is an issue with the amount of trebled damages sought by Cyntec.

The jury awarded Cyntec $1,552,493 in lost profits and $320,463 in reasonable royalties, for a total damages award of $1,872,596.  <u>See</u> Dkt. 269 at 4.  The amount of the jury's award was the same as that in the summary of damages submitted at trial by Cyntec's damages expert.  <u>See</u> Trial Ex. 1342.  Cyntec's expert's summary was in turn based on calculations of direct sales damages and indirect sales damages.  <u>See</u> Trial Ex. 1300, 1301, 1343, 1344.

Cyntec's direct sales damages calculations for both lost profits and reasonable royalty include damages going back to November 2016.  <u>See</u> Trial Ex. 1300, 1301. However, as discussed above, Cyntec conceded during trial that its willfulness claim is limited to any infringement after Chilisin's receipt of Cyntec's notice letter in December 2017.  <u>See</u> Trial Tr., vol. 5 (Dkt. 260) at 872:13-14 ("The willfulness claim, Your Honor, we would limit to after receipt of the notice letter.").  Thus, to the extent that Cyntec's motion seeks trebling of the entire jury damages award of $1,872,596, including damages from before December 2017, that request goes beyond the scope of Cyntec's willfulness claim.

Accordingly, while Cyntec's motion for enhanced damages is GRANTED, and the court will apply a multiplier of three to a subset of the awarded damages, the court will not apply the multiplier to the entire amount awarded by the jury, given that no enhanced damages are appropriate for the time period before notice to Chilisin in December 2017. Instead, the court has reviewed the damages breakdowns submitted as trial exhibits, and has determined that $1,840,144 represents the amount of damages from 2018 onwards. <u>See</u> Trial Ex. 1342 (citing Trial Ex. 1300, 1301, 1343, 1344).  Applying the multiplier of three to only that amount, then adding back the non-trebled damages, results in a total lost profits damages award of $4,602,671 and a total reasonable royalties award of $950,573, for a total damages award of $5,553,244.  The court therefore revises its prior judgment to reflect a total damages award of $5,553,244.

Motion to seal (Dkt. 294)

Chilisin filed a motion to seal portions of its brief in opposition to Cyntec's motion for permanent injunction and enhanced damages, and to seal three supporting exhibits. <u>See</u> Dkt. 294.  Pursuant to Civil Local Rule 79-5, Cyntec filed a supporting declaration narrowing the request, arguing that only portions of one exhibit should be sealed, but that the remaining exhibits and the opposition brief need not be sealed.  <u>See</u> Dkt. 302.

Because Cyntec does not seek sealing of the information in Chilisin's opposition brief, the motion to seal is DENIED as to that request, and Chilisin shall file an unredacted version of the opposition brief on the public docket.  As to the limited portion of Exhibit H for which Cyntec maintains a claim of confidentiality due to concerns about business competitors having access, the motion to seal is GRANTED.

## CONCLUSION

For the reasons set forth above, Chilisin's Rule 50(b) motion for judgment as a matter of law (Dkt. 285) is DENIED, Chilisin's Rule 59 motion for a new trial (Dkt. 286) is DENIED, Cyntec's motion for permanent injunction and for enhanced damages (Dkt. 288) is GRANTED subject to the court's approval of a revised proposed injunction, and Chilisin's motion to seal (Dkt. 294) is GRANTED in part and DENIED in part.

1       As directed above, Cyntec is to submit a revised version of its proposed injunction

2   within fourteen (14) days of the date of this order.

3       **IT IS SO ORDERED.**

4   Dated:  May 6, 2022

5                                   ____/s/ *Phyllis J. Hamilton*____

6                                   PHYLLIS J. HAMILTON
                                    United States District Judge

1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6
7    CYNTEC COMPANY, LTD.,
8              Plaintiff,                    Case No. 18-cv-00939-PJH
9         v.                                 **AMENDED JUDGMENT FOLLOWING
                                             JURY VERDICT**
10   CHILISIN ELECTRONICS CORP., et al.,
11             Defendants.                   Re: Dkt. No. 277
12
13
14        Having now heard and resolved the parties' post-trial motions in the above-
15   captioned case, the court hereby incorporates the September 24, 2021 judgment
16   following jury verdict (Dkt. 277) enters judgment in favor of the plaintiff.  The court further
17   revises the amount of damages awarded by the jury to reflect its award of enhanced
18   damages, resulting in a total lost profits damages award of $4,602,671, and a total
19   reasonable royalties award of $950,573, for a total damages award of $5,553,244.
20
21
22        **IT IS SO ORDERED.**
23   Dated:  May 6, 2022
24                                       _____/s/ *Phyllis J. Hamilton*_____
25                                       PHYLLIS J. HAMILTON
                                         United States District Judge
26
27
28

**Appx29**

US008922312B2

(12) **United States Patent**
Liao et al.

(10) Patent No.: **US 8,922,312 B2**
(45) **Date of Patent:** **Dec. 30, 2014**

(54) **ELECTRONIC DEVICE AND MANUFACTURING METHOD THEREOF**

(71) Applicants:**Wen-Hsiung Liao**, Hsinchu County (TW); **Roger Hsieh**, Hsinchu County (TW); **Hideo Ikuta**, Hsinchu (TW); **Yueh-Lang Chen**, Hsinchu (TW)

(72) Inventors: **Wen-Hsiung Liao**, Hsinchu County (TW); **Roger Hsieh**, Hsinchu County (TW); **Hideo Ikuta**, Hsinchu (TW); **Yueh-Lang Chen**, Hsinchu (TW)

(73) Assignee: **Cyntec Co., Ltd.**, Hsinchu (TW)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/853,083**

(22) Filed: **Mar. 29, 2013**

(65) **Prior Publication Data**
US 2013/0229251 A1     Sep. 5, 2013

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 12/703,495, filed on Feb. 10, 2010, now Pat. No. 8,518,190.

(30) **Foreign Application Priority Data**

May 15, 2009    (TW) ............................... 98116158 A

(51) **Int. Cl.**
*H01F 27/02*     (2006.01)

(52) **U.S. Cl.**
USPC ........................................... **336/83**

(58) **Field of Classification Search**
USPC ......... 336/83, 90, 96, 233–234; 148/105, 304
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,132,019 B2 * | 11/2006 | Koshiba et al. | ............... 148/304 |
| 2006/0170524 A1 * | 8/2006 | Fujiwara et al. | ................. 336/83 |
| 2008/0100410 A1 * | 5/2008 | Tomita et al. | ................. 336/233 |

* cited by examiner

*Primary Examiner* — Tuyen Nguyen
(74) *Attorney, Agent, or Firm* — Min-Lee Teng; Litron Patent & Trademark Office

(57) **ABSTRACT**

An electronic device comprising a first magnetic powder, a second magnetic powder and a conducting wire buried in the mixture of the first magnetic powder and the second magnetic powder is provided. The conducting wire comprises an insulating encapsulant and a conducting metal encapsulated by the insulating encapsulant. The Vicker's Hardness of the first magnetic powder is greater than the Vicker's Hardness of the second magnetic powder, and the mean particle diameter of the first magnetic powder is larger than the mean particle diameter of the second magnetic powder. By means of the hardness difference of the first magnetic powder and the second magnetic powder, the mixture of the first magnetic powder and the second magnetic powder and the conducting wire buried therein are combined to form an integral magnetic body at the temperature lower than the melting point of the insulating encapsulant.

**22 Claims, 13 Drawing Sheets**



**Appx63**



FIG. 1



FIG. 2A



FIG. 2B



FIG. 2C



FIG. 2D



FIG. 3



FIG. 4



FIG. 5A



FIG. 5B



FIG. 5C



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10A

FIG. 10B



FIG. 11A



FIG. 11B



FIG. 12

US 8,922,312 B2

1

# ELECTRONIC DEVICE AND MANUFACTURING METHOD THEREOF

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation-in-part of U.S. patent application Ser. No. 12/703,495 filed on Feb. 10, 2010, now U.S. Pub. No. 2010/0289609, which claims priority of Taiwan application Ser. No. 98116158 filed on May 15, 2009. The entirety of the above-mentioned patent applications are hereby incorporated by reference herein and made a part of specification.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to an electronic device, and in particular, to an electronic device having a magnetic body made by magnetic powders.

2. Description of Related Art

An electronic device functions as stabilizing current in a circuit and filtering noises. The function of an electronic device is similar with that of a capacitor—they both adjust the stability of current by storing and discharging the electric power in the circuit. While a capacitor stores the electric power in a form of an electric field (electric charge), an electronic device does the same in a form of a magnetic field. There are energy losses in conducting wires and magnetic core (usually called "core loss") when it comes to the application of an electronic device.

In related art, a conducting wire of an electronic device is buried inside a magnetic body. The method of manufacturing this kind of electronic device is to firstly place the conducting wire in a mold, to fill in the mold with iron powder which includes an adhesive and is in the similar size of the particle diameter to cover the conducting wire, and to compress the iron powder into the magnetic body by means of a pressure molding. Then, the adhesive is heated up to be cured. The permeability of the electronic device with its magnetic body made of iron powder will slump in a high frequency above 10 KHz. Therefore, the conventional electronic device cannot be applied in the practice of high frequencies.

Furthermore, an annealing process which is generally performed above 600° C. is necessary to reduce the strains of magnetic powders when more than two magnetic powders of different sizes are mixed to form a magnetic body.

Accordingly, the present invention proposes the structure of the electronic device and its manufacturing method to overcome the above-mentioned problems.

## SUMMARY OF THE INVENTION

One objective of the present invention is to lower the temperature for annealing more than two mixed magnetic powders of different sizes to form an integral magnetic body by using the hardness differences between the magnetic powders.

One embodiment of the present invention discloses an electronic device comprising a first magnetic powder, a second magnetic powder and a conducting wire buried in the mixture of the first magnetic powder and the second magnetic powder. The Vicker's Hardness of the first magnetic powder is greater than the Vicker's Hardness of the second magnetic powder by a first hardness difference, and the mean particle diameter of the first magnetic powder is larger than the mean particle diameter of the second magnetic powder. The con-

2

ducting wire comprises an insulating encapsulant and a conducting metal encapsulated by the insulating encapsulant. By means of the first hardness difference of the first magnetic powder and the second magnetic powder, the mixture of the first magnetic powder and the second magnetic powder and the conducting wire buried therein are combined to form an integral magnetic body at the temperature lower than the melting point of the insulating encapsulant. Preferably, the integral magnetic body is formed at the temperature lower than 300° C. due to the fact that the melting point of the insulating encapsulant of the conducting wire is generally lower than 300° C.

Specifically, optimization of the ratio of the hardness of the first magnetic powder to the hardness of the second magnetic powder and the ratio of the mean particle diameter of the first magnetic powder to the mean particle diameter of the second magnetic powder largely reduces the strains of the mixture of the first magnetic powder and the second magnetic powder during the molding process, and thus the core loss of the electronic device is reduced. In the preferred embodiment, the hardness difference of the first magnetic powder and the second magnetic powder can determine the smaller core loss of the electronic device; in other words, the ratio of the hardness of the first magnetic powder to the hardness of the second magnetic powder has a higher priority than the ratio of the mean particle diameter of the first magnetic powder to the mean particle diameter of the second magnetic powder. Therefore, high temperature is not needed in forming the integral magnetic body. The integral magnetic body is formed at the temperature lower than the melting point of the insulating encapsulant of the conducting wire; otherwise the insulating encapsulant is melted and the conducting metal of the conducting wire will be exposed, which will create short circuits between adjacent portions of the conducting metal of the conducting wire.

Moreover, the integral magnetic body is made of the first magnetic powder, the second magnetic powder and the conducting wire, wherein the mean particle diameter of the first magnetic powder is larger than the mean particle diameter of the second magnetic powder. Therefore, during the molding process, the second magnetic powder is filled in the vacancies among the first magnetic powder such that the density of the mixture of the first magnetic powder and the second magnetic powder is increased so as to improve the permeability of the electronic device.

Another embodiment of the present invention is to provide a method for manufacturing an electronic device, the method comprises the steps of: provide a conducting wire comprising an insulating encapsulant and a conducting metal encapsulated by the insulating encapsulant; form a mixture where the conducting wire is buried therein, wherein the mixture comprises: a first magnetic powder; a second magnetic powder, wherein the Vicker's Hardness of the first magnetic powder is greater than the Vicker's Hardness of the second magnetic powder, and the mean particle diameter of the first magnetic powder is larger than the mean particle diameter of the second magnetic powder; and an adhesive joining the first magnetic powder and the second magnetic powder; and perform a molding process on the conducting wire and the mixture, wherein by means of the hardness difference of the first magnetic powder and the second magnetic powder, the mixture and the conducting wire buried therein are combined to form an integral magnetic body at the temperature lower than the melting point of the insulating encapsulant. Preferably, the integral magnetic body is formed at the temperature lower

US 8,922,312 B2

3

than 300° C. due to the fact that the melting point of the insulating encapsulant of the conducting wire is generally lower than 300° C.

In order to make the aforementioned and other features and advantages of the present invention more comprehensible, several embodiments accompanied with figures are described in detail below.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings are included to provide a further understanding of the invention, and are incorporated in and constitute a part of this specification. The drawings illustrate embodiments of the invention and, together with the description, serve to explain the principles of the invention.

FIG. 1 is a cross-sectional view illustrating an electronic device according to an embodiment of the present invention.

FIGS. 2A-2D are cross-sectional views of a manufacturing process of the electronic device in FIG. 1.

FIG. 3 is a schematic view illustrating an electronic device according to another embodiment of the present invention.

FIG. 4 is a cross-sectional view illustrating an electronic device according to yet another embodiment of the present invention.

FIGS. 5A-5C are cross-sectional views of a manufacturing process of the electronic device in FIG. 4.

FIG. 6 is a schematic view illustrating an electronic device according to a further embodiment of the present invention.

FIG. 7 illustrates variation condition of inductance values of an electronic device in two frequencies when the ratio of a first magnetic powder to a second magnetic powder in a magnetic body changes.

FIG. 8 illustrates variation condition of inductance values of an electronic device in two frequencies when the ratio of a first magnetic powder to a second magnetic powder in a magnetic body changes.

FIG. 9 is a graph showing the changes of inductance values of an electronic device while conducting wires of different thread diameters are adopted.

FIG. 10A illustrates variation condition of density of a magnetic body and inductance values of an electronic device when the ratio of a first magnetic powder to a second magnetic powder in the magnetic body changes.

FIG. 10B illustrates variation condition of density of the magnetic body and permeability of an electronic device when the ratio of the first magnetic powder to the second magnetic powder in the magnetic body changes.

FIG. 11A illustrates variation condition of inductance values of an electronic device when the ratio of a first magnetic powder to a second magnetic powder in the magnetic body changes and also illustrates variation condition of inductance values of the electronic device in two applied frequencies.

FIG. 11B illustrates variation condition of inductance values of an electronic device when the ratio of a first magnetic powder to a second magnetic powder in the magnetic body changes and also illustrates variation condition of inductance values of the electronic device manufactured by two molding pressures.

FIG. 12 illustrates variation condition of inductance values of an electronic device in two frequencies when the ratio of a first magnetic powder to a second magnetic powder in a magnetic body changes.

DESCRIPTION OF EMBODIMENTS

FIG. 1 is a cross-sectional view illustrating an electronic device according to an embodiment of the present invention.

4

Referring to FIG. 1, an electronic device 100 of the embodiment includes a magnetic body 110 and a conducting wire 120. The magnetic body 100 includes a first magnetic powder 112 and a second magnetic powder 114, and the first magnetic powder 112 is mixed with the second magnetic powder 114, wherein the magnetic body 100 is manufactured by a molding process. The Vicker's Hardness of the first magnetic powder 112 is greater than the Vicker's Hardness of the second magnetic powder 114. The Vicker's Hardness of the first magnetic powder 112 is, for example, larger than or equal to 150. Preferably, the Vicker's Hardness of the first magnetic powder 112 is larger than or equal to 250. The Vicker's Hardness of the second magnetic powder 114 is, for example, smaller than or equal to 100. Preferably, the Vicker's Hardness of the second magnetic powder 114 is smaller than or equal to 80.

The mean particle diameter D1 of the first magnetic powder 112 is greater than the mean particle diameter D2 of the second magnetic powder 114. The mean particle diameter D2 of the second magnetic powder 114 is smaller than or equal to 10 μm.

The mean particle diameter D1 of the first magnetic powder 112 can substantially be 10 μm-40 μm, and the mean particle diameter D2 of the second magnetic powder 114 can substantially be smaller than or equal to 4 μm. The ratio of the mean particle diameter D1 of the first magnetic powder 112 to the mean particle diameter D2 of the second magnetic powder 114 is, for example, greater than 2. Preferably, the ratio of the mean particle diameter D1 to the mean particle diameter D2 is 2.5-10.

The material of the first magnetic powder 112 is, for example, metal alloy, and the metal alloy is such as Fe—Cr—Si alloy, Fe—Ni alloy, amorphous alloy, Fe—Si alloy, or Fe—Al—Si alloy. The material of the second magnetic powder 114 is, for example, iron or ferroalloy. Preferably, the material of the first magnetic powder 112 is, for example, amorphous alloy, and the material of the second magnetic powder 114 is such as iron. The magnetic body 110 further includes an adhesive (not shown), and the adhesive is mixed with the first magnetic powder 112 and the second magnetic powder 114. The first magnetic powder 112 and the second magnetic powder 114 are mutually joined by the adhesive. The material of the adhesive can be thermoset resin, e.g. epoxy resin. The content of the adhesive is 2 wt %-3 wt % of the total weight of the magnetic body 110 and the contents of the first magnetic powder 112 and the second magnetic powder 114 is 98 wt %-97 wt % of the total weight of the magnetic body 110. The weight proportion of the first magnetic powder 112 is 20 wt %-80 wt % and the weight proportion of the second magnetic powder 114 is 80 wt %-20 wt %. That is, the ratio of the weight of the first magnetic powder 112 to the weight of the second magnetic powder 114 can be 0.25-4.

The conducting wire 120 has a buried portion 122 buried in the magnetic body 110 and end portions E1 and E2 extending from two ends of the buried portion 122 and out of the magnetic body 110, wherein the end portions E1 and E2 are adopted to an electric connection with other electric elements (not shown). More specifically, the magnetic body 110 is a rectangular body and end portions E1 and E2 can be extended to a side S3 of the magnetic body 110 along two opposite side walls S1 and S2 of the magnetic body 110. As a result, the electronic device 100 can be electrically connected to other electric elements by surface mounting. The conducting wire 120 can be an enamel wire, and the buried portion 122 can be, for example, a wound coil.

It should be noted that, in the present embodiment, the mean particle diameter and the hardness of the first magnetic powder 112 are both greater than the mean particle diameter

US 8,922,312 B2

5

and the hardness of the second magnetic powder **114**. Therefore, during a molding process, the second magnetic powder **114** is easily filled in spaces among the first magnetic powder **112**, and strains caused by the mutual compression of the second magnetic powder **114** and the first magnetic powder **112** can be reduced. Therefore, the density of compression is increased and the permeability of the electronic device formed can be improved. In addition, it can be avoid using greater molding pressure and high temperature heat treatment so as to improve the density of compression and the permeability.

Moreover, the magnetic body **110** includes the first magnetic powder **112**, which has less core loss than iron powder does. Therefore, compared with electronic devices in the related art, of which iron powder is used as a magnetic body, the electronic device according to the present embodiment provides less core loss and the efficiency of the electronic device is increased. In addition, the cost of material of the magnetic body **110** including the first magnetic powder **112** and the second magnetic powder **114** is lower than that of a magnetic body manufactured with metal alloy.

FIGS. **2**A-**2**D are cross-sectional views of a manufacturing process of the electronic device in FIG. **1**. A detailed manufacturing process of the electronic device **100** in FIG. **1** is described in FIGS. **2**A-**2**D. First, referring to FIG. **2**A, a conducting wire **120** is provided. The conducting wire **120** comprises an insulating encapsulant and a conducting metal encapsulated by the insulating encapsulant. The melting point of the insulating encapsulant is lower than that of the conducting metal. Preferably, the conducting wire **120** can be an enamel wire comprising an enamel material and a conducting metal encapsulated by the enamel material. Next, referring to FIG. **2**B, a mixture M is provided, which includes a first magnetic powder **112**, a second magnetic powder **114** and an adhesive (not shown). Then, referring to FIG. **2**C, a buried portion **122** of the conducting wire **120** is disposed inside a mold cavity (not shown), two end portions E**1** and E**2** of the conducting wire **120** are extended outward the mold cavity, and the mixture M is filled in the mold cavity. After that, a molding process plus subsequent heat-treatment (e.g., annealing) to reduce the strains of the magnetic powder is performed on the mixture M to form an integral magnetic body which covers the buried portion **122**, wherein by means of the hardness difference of the first magnetic powder **112** and the second magnetic powder **114**, the mixture and the conducting wire **120** buried therein are combined to form an integral magnetic body at the temperature lower than the melting point of the insulating encapsulant. Preferably, the integral magnetic body is formed at the temperature lower than 300° C. due to the fact that the melting point of the insulating encapsulant of the conducting wire **120** is generally lower than 300° C. Due to the tolerance and the deviation of the melting point of the insulating material, the melting point of the insulating encapsulant of the conducting wire **120** can rise over 300° C. but less than 600° C. For example, the tolerance and the deviation of the melting point of the insulating material of the conducting wire **120** is less than 400° C., 500° C. or 550° C. In the molding process, for example, a molding pressure is applied to the mixture M so as to compress the first magnetic powder **112**, the second magnetic powder **114** and the adhesive. According to the present embodiment, the molding process performed on the mixture M is a pressure molding process and the pressure applied to the mixture M is such as 6 t/cm²-10 t/cm². In other embodiments, the molding process can also be a cast molding process, an injection molding process, or other suitable molding process. In the present invention, specifically, optimization of

6

the ratio of the hardness of the first magnetic powder **112** to the hardness of the second magnetic powder **114** and the ratio of the mean particle diameter of the first magnetic powder **112** to the mean particle diameter of the second magnetic powder **114** largely reduces the strains of the mixture of the first magnetic powder **112** and the second magnetic powder **114** during the molding process, and thus the core loss of the electronic device is reduced. In the preferred embodiment, the hardness difference of the first magnetic powder **112** and the second magnetic powder **114** can determine the smaller core loss of the electronic device; in other words, the ratio of the hardness of the first magnetic powder **112** to the hardness of the second magnetic powder **114** has a higher priority than the ratio of the mean particle diameter of the first magnetic powder **112** to the mean particle diameter of the second magnetic powder **114**. Therefore, high temperature is not needed in forming the integral magnetic body. In one embodiment, the integral magnetic body is formed at the temperature lower than the melting point of the insulating encapsulant of the conducting wire **120**, otherwise, the conducting metal of the conducting wire **120** is exposed and then short circuits between adjacent portions of the conducting metal of the conducting wire **120** will occur. Next, the adhesive is solidified, for example, by a heating method, and the temperature of the heating is equal to or slightly higher than the solidified temperature of the adhesive, such as lower than 300° C. It should be noted that, the heating temperature adopted in the present embodiment is merely adequate for solidifying the adhesive. Last, referring to FIG. **2**D, two end portions E**1** and E**2** are bended so that two end portions E**1** and E**2** are extended to a side S**3** of the magnetic body **110** respectively along two opposite side walls S**1** and S**2** of the magnetic body **110**.

FIG. **3** is a schematic view illustrating an electronic device according to another embodiment of the present invention. Referring to FIG. **3**, the material of a magnetic body **210** is the same with that of the magnetic body **110** in FIG. **1** and needs not to be described again. The differences between an electronic device **200** of the present embodiment and the electronic device **100** of FIG. **1** lie in that a buried portion **222** can include a plurality of bent structures **222***a* and these bent structures **222***a* are substantially disposed on the same plane.

FIG. **4** is a cross-sectional view illustrating an electronic device according to yet another embodiment of the present invention. Referring to FIG. **4**, the material of a magnetic body **310** is the same with that of the magnetic body **110** in FIG. **1** and needs not to be described again. The differences between an electronic device **300** of the present embodiment and the electronic device **100** of FIG. **1** lie in that a magnetic body **310** of the present embodiment is a drum-like structure and a conducting wire **320** is disposed outside the magnetic body **310**. The magnetic body **310** of the present embodiment includes a center column **312**, a first board-shaped body **314** and a second board-shaped body **316**, wherein two ends **312***a* and **312***b* of the center column **312** connect the first board-shaped body **314** and the second board-shaped body **316** respectively, and the conducting wire **320** winds around the center column **312**. More specifically, a winding space C is formed among the first board-shaped body **314**, the second board-shaped body **316** and the center column **312**. The conducting wire **320** includes two end portions E**1** and E**2** and a winding portion **322** connected between the two end portions E**1** and E**2**. The winding portion **322** is disposed inside the winding space C and winds around the center column **312** while the two end portions E**1** and E**2** extend from inside the winding space C to outside the winding space C and electrically connect other electric elements (not shown). Besides,

US 8,922,312 B2

7 | 8

the winding space C can be filled in with a magnetic material 330 or a resin material (not shown) so that the winding space C is filled in and the winding portion 322 of the conducting wire 320 is covered.

FIGS. 5A-5C are cross-sectional views of a manufacturing process of the electronic device in FIG. 4. A detailed manufacturing process of the electronic device 300 in FIG. 4 is described in FIGS. 5A-5C. First, referring to FIG. 5A, a mixture M is provided. The material of the mixture M here is the same with that of the mixture M in FIG. 2B. Next, referring to FIG. 5B, a molding process is performed on the mixture M to form the magnetic body 310. In the present embodiment, the molding process includes a pressure molding process, a cast molding process, or an injection molding process. During the pressure molding process, the pressure applied to the mixture M is such as $6 \text{ t/cm}^2$-11 $\text{t/cm}^2$. Then, the adhesive (not shown) is solidified by a heating method, and the temperature of the heating is equal to or slightly higher than the solidified temperature of the adhesive, such as lower than $300°$ C. It should be noted that, the heating temperature adopted in the present embodiment is merely adequate for solidifying the adhesive. Last, referring to FIG. 5C, the winding portion 322 of the conducting wire 320 is wound on the magnetic body 310.

FIG. 6 is a schematic view of an electronic device according to another embodiment of the present invention. Referring to FIG. 6, the material of a magnetic body 410 is the same with that of the magnetic body 110 in FIG. 1 and needs not to be described again. In the present embodiment, the magnetic body 410 includes a first surface 412, a second surface 414 opposite to the first surface 412, and a through hole 416 going through the first surface 412 and the second surface 414. A conducting wire 420 is such as a conductive piece and includes two end portions E1 and E2 and a winding portion 422 connected between the two end portions E1 and E2. The winding portion 422 goes through the through hole 416 and the two end portions E1 and E2 extend to a third side 418 of the magnetic body 410 along the first surface 412 and the second surface 414 of the magnetic body 410. The third surface 418 connects the first surface 412 and the second surface 414. The magnetic body 410 can selectively include a slice G going through the third surface 418 and leading to the through hole 416.

The results of electric tests on electronic devices 100 and 300 including different ratios of a first magnetic powder and a second magnetic powder are provided below.

Experiment 1

The structure of an electronic device in Experiment 1 is the same with the structure of the electronic device 100 in FIG. 1. The thread diameter A of the conducting wire 120 is 0.32 mm, the diameter B of the coil is 2.4 mm, the number of turns of the coil is 11.5, and the molding pressure for the magnetic body 110 is 11 $\text{t/cm}^2$. The major ingredient, mean particle diameter, and hardness of a first magnetic powder and a second magnetic powder in Experiment 1 are all listed in Table 1.

TABLE 1

| | Major ingredient | Mean particle diameter (D50) | Hardness (Hv) |
|---|---|---|---|
| First magnetic powder | Fe—Cr—Si | 10 μm | 250 |
| Second magnetic powder | iron | 4 μm | 30~80 |

Based on Table 1, the ratio of D1 to D2 is 2.5. FIG. 7 illustrates variation condition of inductance values of the electronic device in two frequencies (25 KHz and 100 KHz) when the ratio of the first magnetic powder to the second magnetic powder in the magnetic body changes. Referring to FIG. 7, the inductance values of an electronic device with the proportion of 20 wt %-80 wt % of the first magnetic powder are all greater than the inductance values of an electronic device with the proportion of 100 wt % of the first magnetic powder or the second magnetic powder. In preferred conditions, the proportion of the first magnetic powder is 60 wt % and the proportion of the second magnetic powder is 40 wt %. That is, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 1.5. Or, the proportion of the first magnetic powder is 60 wt %-80 wt % and the proportion of the second magnetic powder is 40 wt %-20 wt %, i.e. the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 1.5-4.

Experiment 2

The structure of an electronic device in Experiment 2 is the same with the structure of the electronic device 100 in FIG. 1. The thread diameter A of the conducting wire 120 is 0.32 mm, the diameter B of the coil is 2.4 mm, the number of turns of the coil is 11.5, and the molding pressure for the magnetic body 110 is 11 $\text{t/cm}^2$. The major ingredient, mean particle diameter, and hardness of a first magnetic powder and a second magnetic powder in Experiment 2 are all listed in Table 2.

TABLE 2

| | Major ingredient | Mean particle diameter (D50) | Hardness (Hv) |
|---|---|---|---|
| First magnetic powder | Amorphous alloy | 40 μm | 900~1,000 |
| Second magnetic powder | iron | 4 μm | 30~80 |
| Second magnetic powder | Fe—Cr—Si | 10 μm | 250 |

FIG. 8 illustrates variation condition of inductance values of the electronic device in two frequencies when the ratio of the first magnetic powder to the second magnetic powder in the magnetic body changes. Referring to FIG. 8, the inductance values of the electronic device with the proportion of 20 wt %-80 wt % of the first magnetic powder are all greater than the inductance values of the electronic device with the proportion of 100 wt % of the first magnetic powder or the second magnetic powder when the material of the second magnetic powder is iron and the ratio of D1 to D2 is 10. In preferred conditions, the proportion of the first magnetic powder is 40 wt % and the proportion of the second magnetic powder is 60 wt %. That is, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.67. Or, the proportion of the first magnetic powder is 40 wt %-60 wt % and the proportion of the second magnetic powder is 60 wt %-40 wt %, i.e. the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.67-1.5.

The inductance values of the electronic device with the proportion of 20 wt %-80 wt % of the first magnetic powder are greater than the inductance values of the electronic device with the proportion of 100 wt % of the first magnetic powder and the inductance values of the electronic device with the proportion of 20 wt %-40 wt % of the first magnetic powder are slightly higher than the inductance values of the electronic device with the proportion of 100 wt % of the second magnetic powder when the material of the second magnetic pow-

**9**

der is Fe—Cr—Si alloy and the ratio of D1 to D2 is 4. Therefore, in preferred conditions, the proportion of the first magnetic powder is 20 wt %-40 wt % and the proportion of the second magnetic powder is 80 wt %-60 wt %. That is, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.25-0.67.

Based on the above, it can be known that the smaller the mean particle diameter of the second magnetic powder is, the better effects of the inductance value of the electronic device will be by means of the second magnetic powder of different mean particle diameters and the same first magnetic powder.

The following experiment is conducted with a magnetic body including 40 μm of amorphous alloy of the proportion of 40 wt % and 4 μm of iron powder of the proportion of 60 wt %. The variation condition of core loss is listed in Table 3. The variation condition of efficiency is listed in Table 4. FIG. 9 is a graph showing the changes of inductance values of the electronic device while conducting wires of different thread diameters are adopted. The frequency of the experiment in Table 3 is 300 KHz, and the intensity of the magnetic induction is 30 mT. The applied current in Table 4 is 2 amperes.

TABLE 3

| Material of magnetic body | Molding pressure (t/cm²) | Core loss (mW) |
|---|---|---|
| Iron 100 wt % | 6 | 614.73 |
| Amorphous alloy 100 wt % | 6 | 1010.4 |
| Amorphous alloy 100 wt %, performed with high temperature heat treatment after molding process | 6 | 445.2 |
| Amorphous alloy 40 wt % + Iron 60 wt % | 6 | 424.5 |
| | 11 | 414 |

TABLE 4

| | Molding pressure 11 (t/cm²) | Molding pressure 8.5 (t/cm²) |
|---|---|---|
| Efficiency in frequency of 25 KHz (%) | 76.59 | 77.28 |
| Efficiency in frequency of 300 KHz (%) | 90.18 | 90.09 |

It is known that high-temperature heat-treatment (e.g., annealing) is performed in forming the integral magnetic body to reduce the strains of the magnetic powder. Based on Table 3, 40 μm of amorphous alloy is adopted as the first magnetic powder and 4 μm of iron powder is adopted as the second magnetic powder in the present embodiment. The proportion of the first magnetic powder is 40 wt % and the proportion of the second magnetic powder is 60 wt %. Compared with the core loss resulted when the proportion of iron powder is 100 wt %, the proportion of amorphous alloy is 100 wt %, and the proportion of amorphous alloy (performed with high temperature heat treatment after molding process) is 100 wt %, the core loss resulted in the present embodiment is less. And the greater the molding pressure is, the less the core loss is. As a result, it can be shown that, according to the present embodiment, by adopting first magnetic powder and second magnetic powder of different mean particle diameter and hardness, less core loss can be obtained without the performance of high temperature heat treatment. Therefore, a step of high temperature heat treatment is omitted and a process is simplified. In the present invention, specifically, optimization of the ratio of the hardness of the first magnetic powder **112** to the hardness of the second magnetic powder **114** and the ratio of the mean particle diameter of the first magnetic powder **112**

**10**

to the mean particle diameter of the second magnetic powder **114** largely reduces the strains of the mixture of the first magnetic powder **112** and the second magnetic powder **114** during the molding process, and thus the core loss of the electronic device is reduced. In the preferred embodiment, the hardness difference of the first magnetic powder **112** and the second magnetic powder **114** can determine the smaller core loss of the electronic device; in other words, the ratio of the hardness of the first magnetic powder **112** to the hardness of the second magnetic powder **114** has a higher priority than the ratio of the mean particle diameter of the first magnetic powder **112** to the mean particle diameter of the second magnetic powder **114**. Therefore, high temperature is not needed in forming the integral magnetic body.

In one embodiment, the integral magnetic body is formed at the temperature lower than the melting point of the insulating encapsulant of the conducting wire **120**, otherwise, the conducting metal of the conducting wire **120** is exposed and short circuits between adjacent portions of the conducting metal of the conducting wire **120** will occur. Accordingly, by means of the hardness difference of the first magnetic powder **112** and the second magnetic powder **114**, the mixture and the conducting wire **120** buried therein are combined to form an integral magnetic body at the temperature lower than the melting point of the insulating encapsulant. Preferably, the integral magnetic body is formed at the temperature lower than 300° C. due to the fact that the melting point of the insulating encapsulant of the conducting wire **120** is generally lower than 300° C. Due to the tolerance and the deviation of the melting point of the insulating material, the melting point of the insulating encapsulant of the conducting wire **120** can rise over 300° C. but less than 600° C. For example, the tolerance and the deviation of the melting point of the insulating material of the conducting wire **120** is less than 400° C., 500° C. or 550° C. In addition, the material cost of the magnetic body **110** including the first magnetic powder **112** and the second magnetic powder **114** is lower than that of the magnetic body including the proportion of 100 wt % of the first magnetic powder.

Based on Table 4, in the frequency of 25 KHz, the efficiency of the electronic device of the present embodiment can reach above 76%, and in the frequency of 300 KHz, the efficiency of the electronic device of the present embodiment can reach above 90%. It is clear that the efficiency performance of the electronic device of the present embodiment is excellent. It should be noted that, the efficiency of the electronic device of the molding pressure of 8.5 t/cm² is greater than that of 11 t/cm².

Based on FIG. 9, under the prerequisite of the same coil diameter B and the same number of turns, the smaller the thread diameter of the conducting wire is, the higher the inductance value of the electronic device is. Therefore, the inductance value of the electronic device can be adjusted by the changes of the thread diameter of the conducting wire.

Experiment 3

The structure of an electronic device in Experiment 3 is the same with the structure of the electronic device **100** in FIG. **1**. The thread diameter A of the conducting wire **120** is 0.32 mm, the diameter B of the coil is 2.4 mm, the number of turns of the coil is 13.5, and the molding pressure for the magnetic body **110** is 11 t/cm². The major ingredient, mean particle diameter, and hardness of a first magnetic powder and a second magnetic powder in Experiment 3 are all listed in Table 5.

US 8,922,312 B2

| | 11 | | |
|---|---|---|---|
| | | TABLE 5 | |
| | Major ingredient | Mean particle diameter (D50) | Hardness (Hv) |
| First magnetic powder | Amorphous alloy | 20 μm | 900~1,000 |
| Second magnetic powder | iron | 4 μm | 30~80 |

Based on Table 5, the ratio of D1 to D2 is 5. FIG. 10A illustrates variation condition of density of a magnetic body and inductance values of an electronic device when the ratio of a first magnetic powder to a second magnetic powder in the magnetic body changes. FIG. 10B illustrates variation condition of density of the magnetic body and inductance values of an electronic device when the ratio of the first magnetic powder to the second magnetic powder in the magnetic body changes.

Referring to FIGS. 10A and 10B, the inductance values, the density of the magnetic body, and the permeability of the electronic device with the proportion of 20 wt %-60 wt % of the first magnetic powder are all greater than the inductance values, the density of the magnetic body, and the permeability of the electronic device with the proportion of 100 wt % of the first magnetic powder or the second magnetic powder. Preferably, the proportion of the first magnetic powder is 40 wt % and the proportion of the second magnetic powder is 60 wt %. That is, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.67. Or, the proportion of the first magnetic powder is 40 wt %-60 wt % and the proportion of the second magnetic powder is 60 wt %-40 wt %, i.e. the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.67-1.5.

Table 6 lists the efficiency performance of the electronic device of the present embodiment under the same current (2 amperes), same molding pressure (11 t/cm²), and two frequencies.

TABLE 6

| | Amorphous alloy 20% + iron powder 80% | Amorphous alloy 40% + iron powder 60% |
|---|---|---|
| Efficiency in frequency of 25 KHz (%) | 75.44 | 75.57 |
| Efficiency in frequency of 300 KHz (%) | 90.9 | 90.61 |

Based on Table 6, the efficiency of the electronic device of a proportion of 20 wt %-40 wt % of amorphous alloy and a proportion of 80 wt %-60 wt % of iron powder can reach above 75% in the frequency of 25 KHz and above 90% in the frequency of 300 KHz. It is clear that the efficiency performance of the electronic device of the present embodiment is excellent.

Experiment 4

The structure of an electronic device in Experiment 4 is the same with the structure of the electronic device 300 in FIG. 4. The thread diameter A of the conducting wire 320 is 0.32 mm, the diameter B of the coil is 2.4 mm, the number of turns of the coil is 11.5, and the molding pressure for the magnetic body 310 is 8 or 11 t/cm². The major ingredient, mean particle diameter, and hardness of a first magnetic powder and a second magnetic powder in Experiment 4 are all listed in Table 7.

| | 12 | | |
|---|---|---|---|
| | | TABLE 7 | |
| | Major ingredient | Mean particle diameter (D50) | Hardness (Hv) |
| First magnetic powder | Fe—Cr—Si | 10 μm | 250 |
| Second magnetic powder | iron | 4 μm | 30~80 |

Based on Table 7, the ratio of D1 to D2 is 2.5. FIG. 11A illustrates variation condition of inductance values of an electronic device when the ratio of a first magnetic powder to a second magnetic powder in the magnetic body changes and also illustrates variation condition of inductance values of the electronic device in two applied frequencies. FIG. 11B illustrates variation condition of permeability of the electronic device when the ratio of the first magnetic powder to the second magnetic powder in the magnetic body changes and also illustrates variation condition of permeability of the electronic device manufactured by two molding pressures.

Based on FIG. 11A, the inductance values of the electronic device with the proportion of 20 wt %-80 wt % of the first magnetic powder are all greater than the inductance values of an electronic device with the proportion of 100 wt % of the first magnetic powder or the second magnetic powder. Preferably, the proportion of the first magnetic powder is 60 wt % and the proportion of the second magnetic powder is 40 wt %. That is, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 1.5. Or, the proportion of the first magnetic powder is 60 wt %-80 wt % and the proportion of the second magnetic powder is 40 wt %-20 wt %, i.e. the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 1.5-4. In addition, based on FIG. 11B, when the molding pressure is higher, the permeability of the electronic device is greater. Therefore, the permeability of the electronic device can be adjusted by the changes of the molding pressure.

Experiment 5

The structure of an electronic device in Experiment 5 is the same with the structure of the electronic device 300 in FIG. 4. The thread diameter A of the conducting wire 320 is 0.32 mm, the diameter B of the coil is 2.4 mm, the number of turns of the coil is 11.5, and the molding pressure for the magnetic body 310 is 11 t/cm². The major ingredient, mean particle diameter, and hardness of a first magnetic powder and a second magnetic powder in Experiment 5 are all listed in Table 8.

TABLE 8

| | Major ingredient | Mean particle diameter (D50) | Hardness (Hv) |
|---|---|---|---|
| First magnetic powder | Amorphous alloy | 40 μm | 900~1,000 |
| Second magnetic powder | iron | 4 μm | 30~80 |
| Second magnetic powder | Fe—Cr—Si | 10 μm | 250 |

Referring to FIG. 12, the inductance values of the electronic device with the proportion of 20 wt %-80 wt % of the first magnetic powder are all greater than the inductance values of the electronic device with the proportion of 100 wt % of the first magnetic powder or the second magnetic powder when the material of the second magnetic powder is iron and the ratio of D1 to D2 is 10. Preferably, the proportion of the first magnetic powder is 40 wt % and the proportion of the second magnetic powder is 60 wt %. That is, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.67. Or, the proportion of the first

US 8,922,312 B2

13

magnetic powder is 40 wt %-60 wt % and the proportion of the second magnetic powder is 60 wt %-40 wt %, i.e. the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.67-1.5.

The inductance values of the electronic device with the proportion of 20 wt %-80 wt % of the first magnetic powder are greater than the inductance values of the electronic device with the proportion of 100 wt % of the first magnetic powder and the inductance values of the electronic device with the proportion of 20 wt %-40 wt % of the first magnetic powder are slightly higher than the inductance values of the electronic device with the proportion of 100 wt % of the second magnetic powder when the material of the second magnetic powder is Fe—Cr—Si alloy and the ratio of D1 to D2 is 4. Therefore, in preferred conditions, the proportion of the first magnetic powder is 20 wt %-40 wt % and the proportion of the second magnetic powder is 80 wt %-60 wt %. That is, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.25-0.67.

Based on the above, it can be known that the smaller the mean particle diameter of the second magnetic powder is, the better effects of the inductance value of the electronic device will be by means of the second magnetic powder of different mean particle diameters and the same first magnetic powder.

In summary, the present invention at least has the following advantages:

1. The magnetic body is made of magnetic powder of different mean particle diameter in the present invention. Therefore, during the molding process, magnetic powder of small mean particle diameter is filled in the space among magnetic powder of large mean particle diameter such that the density of compression is increased so as to improve the permeability of the electronic device.

2. The magnetic body is made of magnetic powder of different hardness in the present invention and magnetic powder of small mean particle diameter is filled in the space among magnetic powder of large mean particle diameter. The hardness difference of the first magnetic powder and the second magnetic powder can determine the smaller core loss of the electronic device. Therefore, the molding pressure required in the molding process and the strains of magnetic powder caused during the molding process are largely reduced such that the core loss of the electronic device of the present invention is further decreased. In addition, the present invention can avoid performing a high temperature heat treatment applied to the electronic device for releasing the strains of the magnetic powder, the problem of oxidation of the conducting wire for being unable to stand the high temperature and short circuits between adjacent portions of the conducting metal of the conducting wire.

3. The first magnetic powder and the second magnetic powder are adopted to manufacturing the magnetic body in the present invention. Therefore, compared with prior art, in which iron powder is adopted to manufacture a magnetic body, the permeability and corresponding inductance value of the electronic device of the present invention is higher when in high frequency (25 KHz or 100 KHz).

4. The first magnetic powder of metal alloy powder and the second magnetic powder are adopted in the present invention, and the material cost thereof is lower than that of a magnetic body completely manufactured with metal alloy powder.

Although the present invention has been described with reference to the above embodiments, it will be apparent to one of the ordinary skill in the art that modifications to the described embodiment may be made without departing from

14

the spirit of the invention. Accordingly, the scope of the invention will be defined by the attached claims not by the above detailed descriptions.

What is claimed is:

1. An electronic device, comprising:

a first magnetic powder;

a second magnetic powder, wherein the mean particle diameter of the first magnetic powder is larger than the mean particle diameter of the second magnetic powder, the Vicker's Hardness of the first magnetic powder is greater than the Vicker's Hardness of the second magnetic powder by a first hardness difference, and the first magnetic powder mixes with the second magnetic powder; and

a conducting wire buried in the mixture of the first magnetic powder and the second magnetic powder, wherein the conducting wire comprises an insulating encapsulant and a conducting metal encapsulated by the insulating encapsulant;

wherein by means of the first hardness difference of the first magnetic powder and the second magnetic powder, the mixture of the first magnetic powder and the second magnetic powder and the conducting wire buried therein are combined to form an integral magnetic body at a temperature lower than the melting point of the insulating encapsulant.

2. The electronic device according to claim 1, wherein the Vicker's Hardness of the first magnetic powder is greater than or equal to 150, and the Vicker's Hardness of the second magnetic powder is smaller than or equal to 100.

3. The electronic device according to claim 1, wherein the Vicker's Hardness of the first magnetic powder is greater than or equal to 250, and the Vicker's Hardness of the second magnetic powder is smaller than or equal to 80.

4. The electronic device according to claim 1, wherein the mean particle diameter of the first magnetic powder is substantially 10 μm to 40 μm.

5. The electronic device according to claim 1, wherein the mean particle diameter of the second magnetic powder is smaller than or equal to 10 μm.

6. The electronic device according to claim 1, wherein the mean particle diameter of the second magnetic powder is smaller than or equal to 4 μm.

7. The electronic device according to claim 1, wherein the ratio of the mean particle diameter of the first magnetic powder to the mean particle diameter of the second magnetic powder is larger than 2.

8. The electronic device according to claim 1, wherein the ratio of the mean particle diameter of the first magnetic powder to the mean particle diameter of the second magnetic powder is 2.5-10.

9. The electronic device according to claim 1, wherein a material of the first magnetic powder comprises metal alloy.

10. The electronic device according to claim 1, wherein a material of the first magnetic powder comprises Fe—Cr—Si alloy, Fe—Ni alloy, amorphous alloy, Fe—Si alloy, or Fe—Al—Si alloy.

11. The electronic device according to claim 1, wherein a material of the second magnetic powder comprises iron or ferroalloy.

12. The electronic device according to claim 1, wherein a material of the first magnetic powder comprises amorphous alloy, and a material of the second magnetic powder comprises iron.

13. The electronic device according to claim 1, wherein the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.25-4.

15

**14**. The electronic device according to claim **1**, wherein when a material of the first magnetic powder comprises amorphous alloy and a material of the second magnetic powder comprises iron, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.67-1.5.

**15**. The electronic device according to claim **1**, wherein when a material of the first magnetic powder comprises Fe—Cr—Si alloy and a material of the second magnetic powder comprises iron, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 1.5-4.

**16**. The electronic device according to claim **1**, further comprising an adhesive joining the first magnetic powder and the second magnetic powder.

**17**. The electronic device according to claim **16**, wherein a material of the adhesive is thermoset resin.

**18**. The electronic device according to claim **1**, wherein the conducting wire has a winding shape.

16

**19**. The electronic device according to claim **1**, wherein the integral magnetic body is manufactured by a molding process, and the molding pressure of the molding process is 6 $t/cm^2$-11 $t/cm^2$.

**20**. The electronic device according to claim **1**, wherein the integral magnetic body is formed at the temperature lower than 300 ° C.

**21**. The electronic device according to claim **4**, wherein a material of the first magnetic powder comprises amorphous alloy, and a material of the second magnetic powder comprises iron.

**22**. The electronic device according to claim **4**, wherein when a material of the first magnetic powder comprises Fe—Cr—Si alloy and a material of the second magnetic powder comprises iron, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 1.5-4.

\*   \*   \*   \*   \*

US009481037B2

(12) **United States Patent**
Liao et al.

(10) Patent No.: **US 9,481,037 B2**
(45) Date of Patent: **Nov. 1, 2016**

(54) **ELECTRONIC DEVICE AND MANUFACTURING METHOD THEREOF**

(71) Applicant: **CYNTEC CO., LTD.**, Hsinchu (TW)

(72) Inventors: **Wen-Hsiung Liao**, Hsinchu County (TW); **Roger Hsieh**, Hsinchu County (TW); **Hideo Ikuta**, Kyoto (JP); **Yueh-Lang Chen**, Hsinchu (TW)

(73) Assignee: **CYNTEC Co., Ltd.**, Hsinchu (TW)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 14 days.

(21) Appl. No.: **14/507,849**

(22) Filed: **Oct. 7, 2014**

(65) **Prior Publication Data**

US 2015/0023829 A1    Jan. 22, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 14/294,164, filed on Jun. 3, 2014, which is a continuation of application No. 13/561,266, filed on Jul. 30, 2012, now Pat. No. 8,771,436, which is a continuation of application No. 12/703,495, filed on Feb. 10, 2010, now Pat. No. 8,518,190.

(30) **Foreign Application Priority Data**

May 15, 2009    (TW) ................................ 98116158 A

(51) **Int. Cl.**
| | |
|---|---|
| *B22F 3/12* | (2006.01) |
| *H01F 27/24* | (2006.01) |
| *H01F 17/04* | (2006.01) |
| *H01F 27/255* | (2006.01) |
| *H01F 41/02* | (2006.01) |
| *H01F 27/28* | (2006.01) |
| *H05K 1/18* | (2006.01) |
| *B22F 5/00* | (2006.01) |
| *B22F 7/08* | (2006.01) |
| *H01F 1/22* | (2006.01) |
| *H01F 27/29* | (2006.01) |

(52) **U.S. Cl.**
CPC . *B22F 3/12* (2013.01); *B22F 5/00* (2013.01); *B22F 7/08* (2013.01); *H01F 1/22* (2013.01); *H01F 17/04* (2013.01); *H01F 27/24* (2013.01); *H01F 27/255* (2013.01); *H01F 27/2823* (2013.01); *H01F 41/0246* (2013.01); *H05K 1/18* (2013.01); *H01F 27/292* (2013.01); *H01F 2017/048* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,903,641 B2 * 6/2005 Kondo .................. B22F 1/0059
29/602.1

(Continued)

*Primary Examiner* — George Wyszomierski
*Assistant Examiner* — Ngoclan T Mai
(74) *Attorney, Agent, or Firm* — Min-Lee Teng; Litron Patent & Trademark Office

(57) **ABSTRACT**

A method for manufacturing an electronic device, the method comprising: providing a conducting wire; forming a mixture with the conducting wire buried therein, wherein the mixture comprises: a first magnetic powder and a second magnetic powder, wherein the mean particle diameter of the first magnetic powder is larger than the mean particle diameter of the second magnetic powder, and the Vicker's Hardness of the first magnetic powder is greater than the Vicker's Hardness of the second magnetic powder by a first hardness difference; and performing a molding process on the conducting wire and the mixture, wherein by means of the first hardness difference of the first magnetic powder and the second magnetic powder, the mixture and the conducting wire buried therein are combined to form an integral magnetic body at a temperature lower than the melting point of the conducting wire.

**20 Claims, 13 Drawing Sheets**



**US 9,481,037 B2**

Page 2

(56)         **References Cited**

U.S. PATENT DOCUMENTS

7,767,035 B2 *   8/2010  Sato .................... H01F 1/14791
                                                  148/105
2004/0086708 A1 *  5/2004  Verma .................. H01F 1/1475
                                                  428/329

2004/0174239 A1 *   9/2004  Shibata .................. H01F 17/04
                                                  336/83
2006/0279395 A1 *  12/2006  Lee ........................... H01F 1/26
                                                  336/221
2009/0051475 A1 *   2/2009  Hsueh .................... H01F 17/04
                                                  336/83

* cited by examiner



FIG. 1

120



FIG. 2A



FIG. 2B



FIG. 2C



FIG. 2D



FIG. 3



FIG. 4



FIG. 5A

FIG. 5B



FIG. 5C



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10A



FIG. 10B



FIG. 11A



FIG. 11B



FIG. 12

US 9,481,037 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# ELECTRONIC DEVICE AND MANUFACTURING METHOD THEREOF

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. patent application. Ser. No. 14/294,164 filed on Jun. 3, 2014, which is a continuation of U.S. patent application Ser. No. 13/561,266 filed on Jul. 30, 2012, now U.S. Pat. No. 8,771,436, which is a continuation of U.S. patent application Ser. No. 12/703, 495 filed on Feb. 10, 2010, now U.S. Pat. No. 8,518,190, which claims priority of Taiwan application Ser. No. 98116158 filed on May 15, 2009. The entirety of the above-mentioned patent applications are hereby incorporated by reference herein and made a part of specification.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to a magnetic element and a method for manufacturing the same. More particularly, the present invention relates to an electronic device and a method for manufacturing the same.

### 2. Description of Related Art

An electronic device functions as stabilizing current in a circuit and filtering noises. The function of an electronic device is similar with that of a capacitor—they both adjust the stability of current by storing and discharging the electric power in the circuit. While a capacitor stores the electric power in a form of an electric field (electric charge), an electronic device does the same in a form of a magnetic field. There are energy losses in wires and magnetic core (usually called "core loss") when it comes to the application of an electronic device. In related art, a wire of an electronic device is buried inside a magnetic body. The method of manufacturing this kind of electronic device is to firstly place the wire in a mold, to fill in the mold with iron powder which includes an adhesive and is in the similar size of the particle diameter to cover the wire, and to compress the iron powder into the magnetic body by means of a pressure molding. Then, the adhesive is heated up to be cured. The permeability of the electronic device with its magnetic body made of iron powder will slump in a high frequency above 10 KHz. Therefore, the conventional electronic device cannot be applied in the practice of high frequencies.

## SUMMARY OF THE INVENTION

The present invention provides an electronic device. A magnetic body thereof includes a plurality of kinds of magnetic powder with different hardness and different mean particle diameters to improve the permeability of the electronic device.

The present invention provides a method of manufacturing an electronic device, and the method adopts a plurality of kinds of magnetic powder with different hardness and different mean particle diameters to manufacture a magnetic body so as to improve the permeability of the electronic device. The present invention relates to an electronic device including a magnetic body and a wire. The magnetic body includes a first magnetic powder and a second magnetic powder, wherein the Vicker's Hardness of the first magnetic powder is greater than the Vicker's Hardness of the second magnetic powder, the mean particle diameter of the first magnetic powder is larger than the mean particle diameter of the second magnetic powder, and the first magnetic powder

mixes with the second magnetic powder. According to an embodiment of the present invention, the Vicker's Hardness of the first magnetic powder is greater than or equal to 150 and the Vicker's Hardness of the second magnetic powder is smaller than or equal to 100. According to an embodiment of the present invention, the Vicker's Hardness of the first magnetic powder is greater than or equal to 250 and the Vicker's Hardness of the second magnetic powder is smaller than or equal to 80. According to an embodiment of the present invention, the mean particle diameter of the first magnetic powder is substantially 10 μm to 40 μm. According to an embodiment of the present invention, the mean particle diameter of the second magnetic powder is smaller than or equal to 10 μm. According to an embodiment of the present invention, the mean particle diameter of the second magnetic powder is smaller than or equal to 4 μm.

According to an embodiment of the present invention, the ratio of the mean particle diameter of the first magnetic powder to the mean particle diameter of the second magnetic powder is larger than 2. According to an embodiment of the present invention, the ratio of the mean particle diameter of the first magnetic powder to the mean particle diameter of the second magnetic powder is 2.5-10. According to an embodiment of the present invention, the material of the first magnetic powder includes metal alloy. According to an embodiment of the present invention, the material of the first magnetic powder includes Fe—Cr—Si alloy, Fe—Ni alloy, amorphous alloy, Fe—Si alloy, or Fe—Al—Si alloy. According to an embodiment of the present invention, the material of the second magnetic powder includes iron or ferroalloy. According to an embodiment of the present invention, the material of the first magnetic powder includes amorphous alloy, and the material of the second magnetic powder includes iron.

According to an embodiment of the present invention, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.25-4.

According to an embodiment of the present invention, when the material of the first magnetic powder includes amorphous alloy and the material of the second magnetic powder includes iron, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.67-1.5. According to an embodiment of the present invention, when the material of the first magnetic powder includes Fe—Cr—Si alloy and the material of the second magnetic powder includes iron, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 1.5-4. According to an embodiment of the present invention, a wire includes a buried part buried in the magnetic body or a winding part winding on the magnetic body.

According to an embodiment of the present invention, the magnetic body is manufactured by a molding process, and the molding pressure of the molding process is 6 t/cm$^2$-11 t/cm$^2$. The present invention provides an electronic device, comprising: a magnetic body, comprising: a first magnetic powder; and a second magnetic powder, wherein the Vicker's Hardness of the first magnetic powder is greater than the Vicker's Hardness of the second magnetic powder, the mean particle diameter of the first magnetic powder is larger than the mean particle diameter of the second magnetic powder, and the first magnetic powder mixes with the second magnetic powder; an adhesive, joining the first magnetic powder and the second magnetic powder; and a wire.

According to an embodiment of the present invention, the content of the adhesive is 2 wt %-3 wt % of the total weight of the magnetic body.

3

According to an embodiment of the present invention, a material of the adhesive is thermoset resin.

Based on the above, the magnetic body is made of magnetic powder of different mean particle diameters in the present invention. Therefore, during the molding process, magnetic powder of small mean particle diameter is filled in the space among magnetic powder of large mean particle diameter such that the density of compression is increased so as to improve the permeability of the electronic device. Moreover, the magnetic body is made of magnetic powder of different hardness in the present invention. Therefore, the strains of magnetic powder caused during the molding process are largely reduced and the core loss of the electronic device of the present invention is further decreased. In addition, the present invention does not require performing a high temperature heat treatment to the electronic device for releasing the strains of the magnetic powder so that the present invention can avoid a problem of oxidation of the wire for being unable to stand the high temperature. In order to make the aforementioned and other features and advantages of the present invention more comprehensible, several embodiments accompanied with figures are described in detail below.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings are included to provide a further understanding of the invention, and are incorporated in and constitute a part of this specification. The drawings illustrate embodiments of the invention and, together with the description, serve to explain the principles of the invention.

FIG. **1** is a cross-sectional view illustrating an electronic device according to an embodiment of the present invention.

FIGS. **2**A-**2**D are cross-sectional views of a manufacturing process of the electronic device in FIG. **1**.

FIG. **3** is a schematic view illustrating an electronic device according to another embodiment of the present invention.

FIG. **4** is a cross-sectional view illustrating an electronic device according to yet another embodiment of the present invention.

FIGS. **5**A-**5**C are cross-sectional views of a manufacturing process of the electronic device in FIG. **4**.

FIG. **6** is a schematic view illustrating an electronic device according to a further embodiment of the present invention.

FIG. **7** illustrates variation condition of inductance values of an electronic device in two frequencies when the ratio of a first magnetic powder to a second magnetic powder in a magnetic body changes.

FIG. **8** illustrates variation condition of inductance values of an electronic device in two frequencies when the ratio of a first magnetic powder to a second magnetic powder in a magnetic body changes.

FIG. **9** is a graph showing the changes of inductance values of an electronic device while wires of different thread diameters are adopted.

FIG. **10**A illustrates variation condition of density of a magnetic body and inductance values of an electronic device when the ratio of a first magnetic powder to a second magnetic powder in the magnetic body changes.

FIG. **10**B illustrates variation condition of density of the magnetic body and permeability of an electronic device when the ratio of the first magnetic powder to the second magnetic powder in the magnetic body changes.

4

FIG. **11**A illustrates variation condition of inductance values of an electronic device when the ratio of a first magnetic powder to a second magnetic powder in the magnetic body changes and also illustrates variation condition of inductance values of the electronic device in two applied frequencies.

FIG. **11**B illustrates variation condition of inductance values of an electronic device when the ratio of a first magnetic powder to a second magnetic powder in the magnetic body changes and also illustrates variation condition of inductance values of the electronic device manufactured by two molding pressures.

FIG. **12** illustrates variation condition of inductance values of an electronic device in two frequencies when the ratio of a first magnetic powder to a second magnetic powder in a magnetic body changes.

DESCRIPTION OF EMBODIMENTS

FIG. **1** is a cross-sectional view illustrating an electronic device according to an embodiment of the present invention. Referring to FIG. **1**, an electronic device **100** of the embodiment includes a magnetic body **110** and a wire **120**. The magnetic body **100** includes a first magnetic powder **112** and a second magnetic powder **114**, and the first magnetic powder **112** is mixed with the second magnetic powder **114**, wherein the magnetic body **100** is manufactured by a molding process. The Vicker's Hardness of the first magnetic powder **112** is greater than the Vicker's Hardness of the second magnetic powder **114**. The Vicker's Hardness of the first magnetic powder **112** is, for example, larger than or equal to 150. Preferably, the Vicker's Hardness of the first magnetic powder **112** is larger than or equal to 250. The Vicker's Hardness of the second magnetic powder **114** is, for example, smaller than or equal to 100. Preferably, the Vicker's Hardness of the second magnetic powder **114** is smaller than or equal to 80.

The mean particle diameter D1 of the first magnetic powder **112** is greater than the mean particle diameter D2 of the second magnetic powder **114**. The mean particle diameter D2 of the second magnetic powder **114** is smaller than or equal to 10 μm.

The mean particle diameter D1 of the first magnetic powder **112** can substantially be 10 μm-40 μm, and the mean particle diameter D2 of the second magnetic powder **114** can substantially be smaller than or equal to 4 μm. The ratio of the mean particle diameter D1 of the first magnetic powder **112** to the mean particle diameter D2 of the second magnetic powder **114** is, for example, greater than 2. Preferably, the ratio of the mean particle diameter D1 to the mean particle diameter D2 is 2.5-10.

The material of the first magnetic powder **112** is, for example, metal alloy, and the metal alloy is such as Fe—Cr—Si alloy, Fe—Ni alloy, amorphous alloy, Fe—Si alloy, or Fe—Al—Si alloy. The material of the second magnetic powder **114** is, for example, iron or ferroalloy. Preferably, the material of the first magnetic powder **112** is, for example, amorphous alloy, and the material of the second magnetic powder **114** is such as iron. The magnetic body **110** further includes an adhesive (not shown), and the adhesive is mixed with the first magnetic powder **112** and the second magnetic powder **114**. The first magnetic powder **112** and the second magnetic powder **114** are mutually joined by the adhesive. The material of the adhesive can be thermoset resin, e.g. epoxy resin. The content of the adhesive is 2 wt %-3 wt % of the total weight of the magnetic body **110** and the contents of the first magnetic powder **112** and the second magnetic

US 9,481,037 B2

5

powder **114** is 98 wt %-97 wt % of the total weight of the magnetic body **110**. The weight proportion of the first magnetic powder **112** is 20 wt %-80 wt % and the weight proportion of the second magnetic powder **114** is 80 wt %-20 wt %. That is, the ratio of the weight of the first magnetic powder **112** to the weight of the second magnetic powder **114** can be 0.25-4.

The wire **120** has a buried portion **122** buried in the magnetic body **110** and end portions E1 and E2 extending from two ends of the buried portion **122** and out of the magnetic body **110**, wherein the end portions E1 and E2 are adopted to an electric connection with other electric elements (not shown). More specifically, the magnetic body **110** is a rectangular body and end portions E1 and E2 can be extended to a side S3 of the magnetic body **110** along two opposite side walls S1 and S2 of the magnetic body **110**. As a result, the electronic device **100** can be electrically connected to other electric elements by surface mounting. The wire **120** is such as a copper wire and the buried portion **122** is, for example, a wound coil.

It should be noted that, in the present embodiment, the mean particle diameter and the hardness of the first magnetic powder **112** are both greater than the mean particle diameter and the hardness of the second magnetic powder **114**. Therefore, during a molding process, the second magnetic powder **114** is easily filled in spaces among the first magnetic powder **112**, and strains caused by the mutual compression of the second magnetic powder **114** and the first magnetic powder **112** can be reduced. Therefore, the density of compression is increased and the permeability of the electronic device formed can be improved. In addition, it can be avoid using greater molding pressure and high temperature heat treatment so as to improve the density of compression and the permeability.

Moreover, the magnetic body **110** includes the first magnetic powder **112**, which has less core loss than iron powder does. Therefore, compared with electronic devices in the related art, of which iron powder is used as a magnetic body, the electronic device according to the present embodiment provides less core loss and the efficiency of the electronic device is increased. In addition, the cost of material of the magnetic body **110** including the first magnetic powder **112** and the second magnetic powder **114** is lower than that of a magnetic body manufactured with metal alloy.

FIGS. **2**A-**2**D are cross-sectional views of a manufacturing process of the electronic device in FIG. **1**. A detailed manufacturing process of the electronic device **100** in FIG. **1** is described in FIGS. **2**A-**2**D. First, referring to FIG. **2**A, a wire **120** is provided. Next, referring to FIG. **2**B, a mixture M is provided, which includes a first magnetic powder **112**, a second magnetic powder **114** and an adhesive (not shown). Then, referring to FIG. **2**C, a buried portion **122** of the wire **120** is disposed inside a mold cavity (not shown), two end portions E1 and E2 of the wire **120** are extended outward the mold cavity, and the mixture M is filled in the mold cavity. After that, a molding process is performed on the mixture M to form a magnetic body **110** which covers the buried portion **122**. In the molding process, for example, a molding pressure is applied to the mixture M so as to compress the first magnetic powder **112**, the second magnetic powder **114** and the adhesive. According to the present embodiment, the molding process performed on the mixture M is a pressure molding process and the pressure applied to the mixture M is such as 6 t/cm$^2$-10 t/cm$^2$. In other embodiments, the molding process can also be a cast molding process, an injection molding process, or other suitable molding process. Next, the adhesive is solidified, for example, by a

6

heating method, and the temperature of the heating is equal to or slightly higher than the solidified temperature of the adhesive, such as lower than 300° C. It should be noted that, the heating temperature adopted in the present embodiment is merely adequate for solidifying the adhesive. Last, referring to FIG. **2**D, two end portions E1 and E2 are bended so that two end portions E1 and E2 are extended to a side S3 of the magnetic body **110** respectively along two opposite side walls S1 and S2 of the magnetic body **110**.

FIG. **3** is a schematic view illustrating an electronic device according to another embodiment of the present invention. Referring to FIG. **3**, the material of a magnetic body **210** is the same with that of the magnetic body **110** in FIG. **1** and needs not to be described again. The differences between an electronic device **200** of the present embodiment and the electronic device **100** of FIG. **1** lie in that a buried portion **222** can include a plurality of bent structures **222***a* and these bent structures **222***a* are substantially disposed on the same plane.

FIG. **4** is a cross-sectional view illustrating an electronic device according to yet another embodiment of the present invention. Referring to FIG. **4**, the material of a magnetic body **310** is the same with that of the magnetic body **110** in FIG. **1** and needs not to be described again. The differences between an electronic device **300** of the present embodiment and the electronic device **100** of FIG. **1** lie in that a magnetic body **310** of the present embodiment is a drum-like structure and a wire **320** is disposed outside the magnetic body **310**. The magnetic body **310** of the present embodiment includes a center column **312**, a first board-shaped body **314** and a second board-shaped body **316**, wherein two ends **312***a* and **312***b* of the center column **312** connect the first board-shaped body **314** and the second board-shaped body **316** respectively, and the wire **320** winds around the center column **312**. More specifically, a winding space C is formed among the first board-shaped body **314**, the second board-shaped body **316** and the center column **312**. The wire **320** includes two end portions E1 and E2 and a winding portion **322** connected between the two end portions E1 and E2. The winding portion **322** is disposed inside the winding space C and winds around the center column **312** while the two end portions E1 and E2 extend from inside the winding space C to outside the winding space C and electrically connect other electric elements (not shown). Besides, the winding space C can be filled in with a magnetic material **330** or a resin material (not shown) so that the winding space C is filled in and the winding portion **322** of the wire **320** is covered.

FIGS. **5**A-**5**C are cross-sectional views of a manufacturing process of the electronic device in FIG. **4**. A detailed manufacturing process of the electronic device **300** in FIG. **4** is described in FIGS. **5**A-**5**C. First, referring to FIG. **5**A, a mixture M is provided. The material of the mixture M here is the same with that of the mixture M in FIG. **2**B. Next, referring to FIG. **5**B, a molding process is performed on the mixture M to form the magnetic body **310**. In the present embodiment, the molding process includes a pressure molding process, a cast molding process, or an injection molding process. During the pressure molding process, the pressure applied to the mixture M is such as 6 t/cm$^2$-11 t/cm$^2$. Then, the adhesive (not shown) is solidified by a heating method, and the temperature of the heating is equal to or slightly higher than the solidified temperature of the adhesive, such as lower than 300° C. It should be noted that, the heating temperature adopted in the present embodiment is merely adequate for solidifying the adhesive. Last, referring to FIG. **5**C, the winding portion **322** of the wire **320** is wound on the magnetic body **310**.

**Appx102**

US 9,481,037 B2

7

FIG. **6** is a schematic view of an electronic device according to another embodiment of the present invention. Referring to FIG. **6**, the material of a magnetic body **410** is the same with that of the magnetic body **110** in FIG. **1** and needs not to be described again. In the present embodiment, the magnetic body **410** includes a first surface **412**, a second surface **414** opposite to the first surface **412**, and a through hole **416** going through the first surface **412** and the second surface **414**. A wire **420** is such as a conductive piece and includes two end portions E1 and E2 and a winding portion **422** connected between the two end portions E1 and E2. The winding portion **422** goes through the through hole **416** and the two end portions E1 and E2 extend to a third side **418** of the magnetic body **410** along the first surface **412** and the second surface **414** of the magnetic body **410**. The third surface **418** connects the first surface **412** and the second surface **414**. The magnetic body **410** can selectively include a slice G going through the third surface **418** and leading to the through hole **416**.

The results of electric tests on electronic devices **100** and **300** including different ratios of a first magnetic powder and a second magnetic powder are provided below.

Experiment 1

The structure of an electronic device in Experiment 1 is the same with the structure of the electronic device **100** in FIG. **1**. The thread diameter A of the wire **120** is 0.32 mm, the diameter B of the coil is 2.4 mm, the number of turns of the coil is 11.5, and the molding pressure for the magnetic body **110** is 11 t/cm². The major ingredient, mean particle diameter, and hardness of a first magnetic powder and a second magnetic powder in Experiment 1 are all listed in Table 1.

TABLE 1

|  | Major ingredient | Mean particle diameter (D50) | Hardness (Hv) |
|---|---|---|---|
| First magnetic powder | Fe—Cr—Si | 10 µm | 250 |
| Second magnetic powder | iron | 4 µm | 30-80 |

Based on Table 1, the ratio of D1 to D2 is 2.5. FIG. **7** illustrates variation condition of inductance values of the electronic device in two frequencies (25 KHz and 100 KHz) when the ratio of the first magnetic powder to the second magnetic powder in the magnetic body changes. Referring to FIG. **7**, the inductance values of an electronic device with the proportion of 20 wt %-80 wt % of the first magnetic powder are all greater than the inductance values of an electronic device with the proportion of 100 wt % of the first magnetic powder or the second magnetic powder. In preferred conditions, the proportion of the first magnetic powder is 60 wt % and the proportion of the second magnetic powder is 40 wt %. That is, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 1.5. Or, the proportion of the first magnetic powder is 60 wt %-80 wt % and the proportion of the second magnetic powder is 40 wt %-20 wt %, i.e. the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 1.5-4.

Experiment 2

The structure of an electronic device in Experiment 2 is the same with the structure of the electronic device **100** in

8

FIG. **1**. The thread diameter A of the wire **120** is 0.32 mm, the diameter B of the coil is 2.4 mm, the number of turns of the coil is 11.5, and the molding pressure for the magnetic body **110** is 11 t/cm². The major ingredient, mean particle diameter, and hardness of a first magnetic powder and a second magnetic powder in Experiment 2 are all listed in Table 2.

TABLE 2

|  | Major ingredient | Mean particle diameter (D50) | Hardness (Hv) |
|---|---|---|---|
| First magnetic powder | Amorphous alloy | 40 µm | 900~1,000 |
| Second magnetic powder | iron | 4 µm | 30~80 |
| Second magnetic powder | Fe—Cr—Si | 10 µm | 250 |

FIG. **8** illustrates variation condition of inductance values of the electronic device in two frequencies when the ratio of the first magnetic powder to the second magnetic powder in the magnetic body changes. Referring to FIG. **8**, the inductance values of the electronic device with the proportion of 20 wt %-80 wt % of the first magnetic powder are all greater than the inductance values of the electronic device with the proportion of 100 wt % of the first magnetic powder or the second magnetic powder when the material of the second magnetic powder is iron and the ratio of D1 to D2 is 10. In preferred conditions, the proportion of the first magnetic powder is 40 wt % and the proportion of the second magnetic powder is 60 wt %. That is, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.67. Or, the proportion of the first magnetic powder is 40 wt %-60 wt % and the proportion of the second magnetic powder is 60 wt %-40 wt %, i.e. the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.67-1.5.

The inductance values of the electronic device with the proportion of 20 wt %-80 wt % of the first magnetic powder are greater than the inductance values of the electronic device with the proportion of 100 wt % of the first magnetic powder and the inductance values of the electronic device with the proportion of 20 wt %-40 wt % of the first magnetic powder are slightly higher than the inductance values of the electronic device with the proportion of 100 wt % of the second magnetic powder when the material of the second magnetic powder is Fe—Cr—Si alloy and the ratio of D1 to D2 is 4. Therefore, in preferred conditions, the proportion of the first magnetic powder is 20 wt %-40 wt % and the proportion of the second magnetic powder is 80 wt %-60 wt %. That is, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.25-0.67.

Based on the above, it can be known that the smaller the mean particle diameter of the second magnetic powder is, the better effects of the inductance value of the electronic device will be by means of the second magnetic powder of different mean particle diameters and the same first magnetic powder.

The following experiment is conducted with a magnetic body including 40 µm of amorphous alloy of the proportion of 40 wt % and 4 µm of iron powder of the proportion of 60 wt %. The variation condition of core loss is listed in Table 3. The variation condition of efficiency is listed in Table 4. FIG. **9** is a graph showing the changes of inductance values of the electronic device while wires of different thread

US 9,481,037 B2

| 9 | 10 |

diameters are adopted. The frequency of the experiment in Table 3 is 300 KHz, and the intensity of the magnetic induction is 30 mT. The applied current in Table 4 is 2 amperes.

TABLE 3

| Material of magnetic body | Molding pressure (t/cm₂) | Core loss (mW) |
|---|---|---|
| Iron 100 wt % | 6 | 614.73 |
| Amorphous alloy 100 wt % | 6 | 1010.4 |
| Amorphous alloy 100 wt %, performed with high temperature heat treatment after molding process | 6 | 445.2 |
| Amorphous alloy 40 wt % + Iron 60 wt % | 6 | 424.5 |
| | 11 | 414 |

TABLE 4

| | Molding pressure 11(t/cm₂) | Molding pressure 8.5(t/cm₂) |
|---|---|---|
| Efficiency in frequency of 25 KHz (%) | 76.59 | 77.28 |
| Efficiency in frequency of 300 KHz (%) | 90.18 | 90.09 |

Based on Table 3, 40 μm of amorphous alloy is adopted as the first magnetic powder and 4 μm of iron powder is adopted as the second magnetic powder in the present embodiment. The proportion of the first magnetic powder is 40 wt % and the proportion of the second magnetic powder is 60 wt %. Compared with the core loss resulted when the proportion of iron powder is 100 wt %, the proportion of amorphous alloy is 100 wt %, and the proportion of amorphous alloy (performed with high temperature heat treatment after molding process) is 100 wt %, the core loss resulted in the present embodiment is less. And the greater the molding pressure is, the less the core loss is. As a result, it can be shown that, according to the present embodiment, by adopting first magnetic powder and second magnetic powder of different mean particle diameter and hardness, less core loss can be obtained without the performance of high temperature heat treatment. Therefore, a step of high temperature heat treatment is omitted and a process is simplified. In addition, the material cost of the magnetic body 110 including the first magnetic powder 112 and the second magnetic powder 114 is lower than that of the magnetic body including the proportion of 100 wt % of the first magnetic powder.

Based on Table 4, in the frequency of 25 KHz, the efficiency of the electronic device of the present embodiment can reach above 76%, and in the frequency of 300 KHz, the efficiency of the electronic device of the present embodiment can reach above 90%. It is clear that the efficiency performance of the electronic device of the present embodiment is excellent. It should be noted that, the efficiency of the electronic device of the molding pressure of 8.5 t/cm² is greater than that of 11 t/cm².

Based on FIG. 9, under the prerequisite of the same coil diameter B and the same number of turns, the smaller the thread diameter of the wire is, the higher the inductance value of the electronic device is. Therefore, the inductance value of the electronic device can be adjusted by the changes of the thread diameter of the wire.

Experiment 3

The structure of an electronic device in Experiment 3 is the same with the structure of the electronic device 100 in FIG. 1. The thread diameter A of the wire 120 is 0.32 mm, the diameter B of the coil is 2.4 mm, the number of turns of the coil is 13.5, and the molding pressure for the magnetic body 110 is 11 t/cm². The major ingredient, mean particle diameter, and hardness of a first magnetic powder and a second magnetic powder in Experiment 3 are all listed in Table 5.

TABLE 5

| | Major ingredient | Mean particle diameter (D50) | Hardness (Hv) |
|---|---|---|---|
| First magnetic powder | Amorphous alloy | 20 μm | 900~1,000 |
| Second magnetic powder | iron | 4 μm | 30~80 |

Based on Table 5, the ratio of D1 to D2 is 5. FIG. 10A illustrates variation condition of density of a magnetic body and inductance values of an electronic device when the ratio of a first magnetic powder to a second magnetic powder in the magnetic body changes. FIG. 10B illustrates variation condition of density of the magnetic body and permeability of an electronic device when the ratio of the first magnetic powder to the second magnetic powder in the magnetic body changes.

Referring to FIGS. 10A and 10B, the inductance values, the density of the magnetic body, and the permeability of the electronic device with the proportion of 20 wt %-60 wt % of the first magnetic powder are all greater than the inductance values, the density of the magnetic body, and the permeability of the electronic device with the proportion of 100 wt % of the first magnetic powder or the second magnetic powder. Preferably, the proportion of the first magnetic powder is 40 wt % and the proportion of the second magnetic powder is 60 wt %. That is, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.67. Or, the proportion of the first magnetic powder is 40 wt %-60 wt % and the proportion of the second magnetic powder is 60 wt %-40 wt %, i.e. the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.67-1.5.

Table 6 lists the efficiency performance of the electronic device of the present embodiment under the same current (2 amperes), same molding pressure (11 t/cm²), and two frequencies.

TABLE 6

| | Amorphous alloy 20% + iron powder 80% | Amorphous alloy 40% + iron powder 60% |
|---|---|---|
| Efficiency in frequency of 25 KHz (%) | 75.44 | 75.57 |
| Efficiency in frequency of 300 KHz (%) | 90.9 | 90.61 |

Based on Table 6, the efficiency of the electronic device of a proportion of 20 wt %-40 wt % of amorphous alloy and a proportion of 80 wt %-60 wt % of iron powder can reach above 75% in the frequency of 25 KHz and above 90% in

US 9,481,037 B2

11

12

the frequency of 300 KHz. It is clear that the efficiency performance of the electronic device of the present embodiment is excellent.

### Experiment 4

The structure of an electronic device in Experiment 4 is the same with the structure of the electronic device **300** in FIG. **4**. The thread diameter A of the wire **320** is 0.32 mm, the diameter B of the coil is 2.4 mm, the number of turns of the coil is 11.5, and the molding pressure for the magnetic body **310** is 8 or 11 t/cm². The major ingredient, mean particle diameter, and hardness of a first magnetic powder and a second magnetic powder in Experiment 4 are all listed in Table 7.

TABLE 7

| | Major ingredient | Mean particle diameter | Hardness Hv |
|---|---|---|---|
| First magnetic powder | Fe—Cr—Si | 10 μm | 250 |
| Second magnetic powder | iron | 4 μm | 30~80 |

Based on Table 7, the ratio of D1 to D2 is 2.5. FIG. **11A** illustrates variation condition of inductance values of an electronic device when the ratio of a first magnetic powder to a second magnetic powder in the magnetic body changes and also illustrates variation condition of inductance values of the electronic device in two applied frequencies. FIG. **11B** illustrates variation condition of permeability of the electronic device when the ratio of the first magnetic powder to the second magnetic powder in the magnetic body changes and also illustrates variation condition of permeability of the electronic device manufactured by two molding pressures.

Based on FIG. **11A**, the inductance values of the electronic device with the proportion of 20 wt %-80 wt % of the first magnetic powder are all greater than the inductance values of an electronic device with the proportion of 100 wt % of the first magnetic powder or the second magnetic powder. Preferably, the proportion of the first magnetic powder is 60 wt % and the proportion of the second magnetic powder is 40 wt %. That is, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 1.5. Or, the proportion of the first magnetic powder is 60 wt %-80 wt % and the proportion of the second magnetic powder is 40 wt %-20 wt %, i.e. the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 1.5-4. In addition, based on FIG. **11B**, when the molding pressure is higher, the permeability of the electronic device is greater. Therefore, the permeability of the electronic device can be adjusted by the changes of the molding pressure.

### Experiment 5

The structure of an electronic device in Experiment 5 is the same with the structure of the electronic device **300** in FIG. **4**. The thread diameter A of the wire **320** is 0.32 mm, the diameter B of the coil is 2.4 mm, the number of turns of the coil is 11.5, and the molding pressure for the magnetic body **310** is 11 t/cm². The major ingredient, mean particle diameter, and hardness of a first magnetic powder and a second magnetic powder in Experiment 5 are all listed in Table 8.

TABLE 8

| | Major ingredient | Mean particle diameter (D50) | Hardness (Hv) |
|---|---|---|---|
| First magnetic powder | Amorphous alloy | 40 μm | 900~1,000 |
| Second magnetic powder | iron | 4 μm | 30~80 |
| Second magnetic powder | Fe—Cr—Si | 10 μm | 250 |

Referring to FIG. **12**, the inductance values of the electronic device with the proportion of 20 wt %-80 wt % of the first magnetic powder are all greater than the inductance values of the electronic device with the proportion of 100 wt % of the first magnetic powder or the second magnetic powder when the material of the second magnetic powder is iron and the ratio of D1 to D2 is 10. Preferably, the proportion of the first magnetic powder is 40 wt % and the proportion of the second magnetic powder is 60 wt %. That is, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.67. Or, the proportion of the first magnetic powder is 40 wt %-60 wt % and the proportion of the second magnetic powder is 60 wt %-40 wt %, i.e. the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.67-1.5.

The inductance values of the electronic device with the proportion of 20 wt %-80 wt % of the first magnetic powder are greater than the inductance values of the electronic device with the proportion of 100 wt % of the first magnetic powder and the inductance values of the electronic device with the proportion of 20 wt %-40 wt % of the first magnetic powder are slightly higher than the inductance values of the electronic device with the proportion of 100 wt % of the second magnetic powder when the material of the second magnetic powder is Fe—Cr—Si alloy and the ratio of D1 to D2 is 4. Therefore, in preferred conditions, the proportion of the first magnetic powder is 20 wt %-40 wt % and the proportion of the second magnetic powder is 80 wt %-60 wt %. That is, the ratio of the weight of the first magnetic powder to the weight of the second magnetic powder is 0.25-0.67.

Based on the above, it can be known that the smaller the mean particle diameter of the second magnetic powder is, the better effects of the inductance value of the electronic device will be by means of the second magnetic powder of different mean particle diameters and the same first magnetic powder.

In summary, the present invention at least has the following advantages:

1. The magnetic body is made of magnetic powder of different mean particle diameter in the present invention. Therefore, during the molding process, magnetic powder of small mean particle diameter is filled in the space among magnetic powder of large mean particle diameter such that the density of compression is increased so as to improve the permeability of the electronic device.

2. The magnetic body is made of magnetic powder of different hardness in the present invention and magnetic powder of small mean particle diameter is filled in the space among magnetic powder of large mean particle diameter. Therefore, the molding pressure required in the molding process and the strains of magnetic powder caused during the molding process are largely reduced such that the core loss of the electronic device of the present invention is further decreased. In addition, the present invention can

US 9,481,037 B2

13

14

avoid performing a high temperature heat treatment to the electronic device for releasing the strains of the magnetic powder and can avoid the problem of oxidation of the wire for being unable to stand the high temperature.

3. The first magnetic powder and the second magnetic powder are adopted to manufacturing the magnetic body in the present invention. Therefore, compared with prior art, in which iron powder is adopted to manufacture a magnetic body, the permeability and corresponding inductance value of the electronic device of the present invention is higher when in high frequency (25 KHz or 100 KHz).

4. The first magnetic powder of metal alloy powder and the second magnetic powder are adopted in the present invention, and the material cost thereof is lower than that of a magnetic body completely manufactured with metal alloy powder.

Although the present invention has been described with reference to the above embodiments, it will be apparent to one of the ordinary skill in the art that modifications to the described embodiment may be made without departing from the spirit of the invention. Accordingly, the scope of the invention will be defined by the attached claims not by the above detailed descriptions.

What is claimed is:

1. A method for manufacturing an electronic device, the method comprising:

providing an insulated conducting wire;

forming a mixture with the insulated conducting wire buried therein, wherein the mixture comprises: a first magnetic powder and a second magnetic powder, wherein the mean particle diameter of the first magnetic powder is larger than the mean particle diameter of the second magnetic powder, and the Vicker's Hardness of the first magnetic powder is greater than the Vicker's Hardness of the second magnetic powder by a first hardness difference; and

performing a molding process on the insulated conducting wire and the mixture, wherein by means of the first hardness difference of the first magnetic powder and the second magnetic powder, the mixture and the insulated conducting wire buried therein are combined to form an integral magnetic body at a temperature lower than the melting point of the insulated conducting wire.

2. The method according to claim 1, wherein the molding process is performed at the temperature lower than 300° C.

3. The method according to claim 1, wherein performing the molding process comprises applying a molding pressure to the mixture, wherein molding pressure of the molding process is 6 t/cm² -11 t/cm².

4. The method according to claim 1, wherein the mixture further comprises an adhesive joining the first magnetic powder and the second magnetic powder.

5. The method according to claim 4, wherein a material of the adhesive is thermoset resin.

6. The method according to claim 1, wherein the Vicker's Hardness of the first magnetic powder is greater than or equal to 150, and the Vicker's Hardness of the second magnetic powder is smaller than or equal to 100.

7. The method according to claim 1, wherein the Vicker's Hardness of the first magnetic powder is greater than or equal to 250, and the Vicker's Hardness of the second magnetic powder is smaller than or equal to 80.

8. The method according to claim 1, wherein the mean particle diameter of the second magnetic powder is smaller than or equal to 10 μm.

9. The method according to claim 1, wherein the ratio of the mean particle diameter of the first magnetic powder to the mean particle diameter of the second magnetic powder is larger than 2.

10. The method according to claim 1, wherein the ratio of the mean particle diameter of the first magnetic powder to the mean particle diameter of the second magnetic powder is 2.5-10.

11. The method according to claim 1, wherein a material of the first magnetic powder comprises metal alloy.

12. The method according to claim 1, wherein a material of the first magnetic powder comprises Fe—Cr—Si alloy, Fe—Ni alloy, amorphous alloy, Fe—Si alloy, or Fe—Al—Si alloy.

13. The method according to claim 1, wherein a material of the second magnetic powder comprises iron or ferroalloy.

14. The method according to claim 1, wherein a material of the first magnetic powder comprises amorphous alloy and a material of the second magnetic powder comprises iron.

15. The method according to claim 1, wherein the insulated conducting wire has a winding shape.

16. A method for manufacturing an electronic device, the method comprising:

providing an insulated conducting wire;

forming a mixture with the insulated conducting wire buried therein, wherein the mixture comprises: a first magnetic powder and a second magnetic powder, wherein the mean particle diameter of the first magnetic powder is larger than the mean particle diameter of the second magnetic powder, and the first magnetic powder and the second magnetic powder have a first Vicker's Hardness difference therebetween; and

performing a molding process on the insulated conducting wire and the mixture, wherein by means of the first Vicker's Hardness difference of the first magnetic powder and the second magnetic powder, the mixture and the insulated conducting wire buried therein are combined to form an integral magnetic body at a temperature lower than the melting point of the insulated conducting wire.

17. The method according to claim 16, wherein the molding process is performed at the temperature lower than 300° C.

18. The method according to claim 16, wherein performing the molding process comprises applying a molding pressure to the mixture, wherein molding pressure of the molding process is 6 t/cm² -11 t/cm².

19. The method according to claim 16, wherein the mixture further comprises an adhesive joining the first magnetic powder and the second magnetic powder.

20. A method for manufacturing an electronic device, the method comprising:

providing a conducting wire;

forming a mixture with the conducting wire buried therein, wherein the mixture comprises: a first magnetic powder and a second magnetic powder, wherein the mean particle diameter of the second magnetic powder is smaller than or equal to 4 μm, the mean particle diameter of the first magnetic powder is larger than the mean particle diameter of the second magnetic powder, and the Vicker's Hardness of the first magnetic powder is greater than the Vicker's Hardness of the second magnetic powder by a first hardness difference; and

US 9,481,037 B2

**15**

performing a molding process on the conducting wire and the mixture, wherein by means of the first hardness difference of the first magnetic powder and the second magnetic powder, the mixture and the conducting wire buried therein are combined to form an integral magnetic body at a temperature lower than the melting point of the conducting wire.

*   *   *   *   *

**16**

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32.

   __X__    The brief contains 12,591 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b), or

   _____    The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   __X__    The brief has been prepared in a proportionally spaced typeface using Microsoft Word in a 14 point Times New Roman font or

   _____    The brief has been prepared in a monospaced typeface using _____ _____in a ___ characters per inch_____ font.

Dated: August 5, 2022

*/s/ Jonathan Lamberson*_____
*Attorney for Appellants*