No. 2022-1873

# In the United States Court of Appeals for the Federal Circuit

———

CYNTEC COMPANY, LTD.,
PLAINTIFF-APPELLEE

*v.*

CHILISIN ELECTRONICS CORP., CHILISIN AMERICA LTD.,
DEFENDANTS-APPELLANTS

———

*APPEAL FROM THE U.S. DISTRICT COURT FOR THE*
*NORTHERN DISTRICT OF CALIFORNIA*
*HONORABLE PHYLLIS J. HAMILTON, PRESIDING*
*CASE NO. 4:18-CV-00939-PJH*

———

## BRIEF FOR PLAINTIFF-APPELLEE CYNTEC COMPANY, LTD.

———

JAMES C. YOON
CHRISTOPHER D. MAYS
  *Wilson Sonsini*
  *Goodrich & Rosati, PC*
  *650 Page Mill Road*
  *Palo Alto, CA 94304*
  *(650) 493-9300*

STEFFEN N. JOHNSON
PAUL N. HAROLD
G. EDWARD POWELL III
  *Wilson Sonsini*
  *Goodrich & Rosati, PC*
  *1700 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 973-8000*
  *sjohnson@wsgr.com*

*Counsel for Plaintiff-Appellee Cyntec Company, Ltd.*

# PATENT CLAIMS AT ISSUE

## U.S. Patent No. 8,922,312

1. An electronic device, comprising:

   a first magnetic powder;

   a second magnetic powder, wherein the mean particle diameter of the first magnetic powder is larger than the mean particle diameter of the second magnetic powder, the Vicker's Hardness of the first magnetic powder is greater than the Vicker's Hardness of the second magnetic powder by a first hardness difference, and the first magnetic powder mixes with the second magnetic powder; and

   a conducting wire buried in the mixture of the first magnetic powder and the second magnetic powder, wherein the conducting wire comprises an insulating encapsulant and a conducting metal encapsulated by the insulated encapsulant;

   wherein by means of the first hardness difference of the first magnetic powder and the second magnetic powder, the mixture of the first magnetic powder and the second magnetic powder and the conducting wire buried therein are combined to form an integral magnetic body at a temperature lower than the melting point of the insulating encapsulant.

## U.S. Patent No. 9,481,037

1. A method for manufacturing an electronic device, the method comprising:

   providing an insulated conducting wire;

   forming a mixture with the insulated conducting wire buried therein, wherein the mixture comprises: a first magnetic powder and a second magnetic powder, wherein the mean particle diameter of the first magnetic powder is larger than the mean particle diameter of the second magnetic powder, and the Vicker's Hardness of the first magnetic powder is greater than the Vicker's Hardness of the second magnetic powder by a first hardness difference; and

   performing a molding process on the insulated conducting wire and the mixture, wherein by means of the first hardness difference of the first magnetic powder and the second magnetic powder, the mixture and the insulated conducting wire buried therein are combined to form an integral magnetic body at a temperature lower than the melting point of the insulated conducting wire.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 22-1873 |
| **Short Case Caption** | Cyntec Company, Ltd. v. Chilisin Electronics Corp. |
| **Filing Party/Entity** | Cyntec Company, Ltd. |

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/03/2022

Signature: /s/ Steffen N. Johnson

Name: Steffen N. Johnson

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Cyntec Company, Ltd. | | Delta Electronics, Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| Jennifer Liu | Mary Procaccio-Flowers | Neil Desai |
| Albert Shih | Anjuli Nanda | Lucy Yen |
| Michael Nguyen | Jennifer Liu | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

PATENT CLAIMS AT ISSUE ................................................................. i

CERTIFICATE OF INTEREST ............................................................. ii

TABLE OF AUTHORITIES ............................................................... vii

STATEMENT OF RELATED CASES ................................................... xi

INTRODUCTION ................................................................................1

STATEMENT OF ISSUES ...................................................................6

STATEMENT OF THE CASE ...............................................................7

    A.    The parties ...........................................................................7

    B.    Cyntec's patents ..................................................................8

    C.    Chilisin's infringing conduct.............................................10

    D.    Pretrial proceedings..........................................................11

    E.    Trial ..................................................................................13

SUMMARY OF ARGUMENT ...........................................................16

ARGUMENT ....................................................................................18

I.    The jury's infringement verdict should be upheld. .......................18

    A.    The district court's claim construction was correct. ...........18

    B.    The jury's infringement findings were supported by substantial evidence...........................................................................24

        1.    Chilisin waived its non-infringement argument. ....................24

        2.    There is more than sufficient evidence to sustain the jury's verdict........................................................................27

C.    The verdict would have been the same even under Chilisin's claim construction. ...............................................34

II.    The district court correctly granted Cyntec's Rule 50(a) motion on obviousness. ........................................................35

A.    The prior art did not teach or suggest the "by means of" limitation, and Chilisin does not argue otherwise. ..............35

B.    The prior art did not teach or suggest that the larger particle-size powder must be harder. .......................................40

C.    Chilisin did not show motivation to combine with a reasonable expectation of success. ........................................45

D.    Chilisin provided no evidence rebutting Cyntec's strong showing of secondary considerations. ................................48

III.    The jury's damages verdict should be affirmed. ...........50

A.    The district court properly admitted Cyntec's import calculations. ..........................................................51

B.    The district court properly denied Chilisin's motion for judgment as a matter of law on lost profits. ........................58

1.    Chilisin waived its challenges to Cyntec's market share analysis. ....................................................59

2.    Cyntec's market share analysis was sound. ..............60

3.    Chilisin's remaining damages argument fails. ...........63

CONCLUSION .............................................................64

CERTIFICATE OF COMPLIANCE ..................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abbott Labs. v. Syntron Bioresearch, Inc.*,
   334 F.3d 1343 (Fed. Cir. 2003) ..................................................24

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
   805 F.3d 1368 (Fed. Cir. 2015) ..................................................62

*Amado v. Microsoft Corp.*,
   517 F.3d 1353 (Fed. Cir. 2008) ..................................................47

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*,
   580 F.3d 1340 (Fed. Cir. 2009) ..................................................36

*Beachcombers, Int'l, Inc. v. Wildewood Creative Prods. Inc.*,
   31 F.3d 1154 (Fed. Cir. 1994) ...................................................36

*Crocs, Inc. v. Int'l Trade Comm'n*,
   598 F.3d 1294 (Fed. Cir. 2010) ..................................................48

*Del Mar Avionics, Inc. v. Quinton Instrument Co.*,
   836 F.2d 1320 (Fed. Cir. 1987) .............................................52, 56

*E.E.O.C. v. Go Daddy Software, Inc.*,
   581 F.3d 951 (9th Cir. 2009) ................................................ 24-25

*E.I. Dupont de Nemours & Co. v. Synvina C.V.*,
   904 F.3d 996 (Fed. Cir. 2018) ...................................................44

*Forest Labs., LLC v. Sigmapharm Labs., LLC*,
   918 F.3d 928 (Fed. Cir. 2019) ...................................................45

*Harper v. City of Los Angeles*,
   533 F.3d 1010 (9th Cir. 2008) ...................................................27

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010),
   *aff'd*, 564 U.S. 91 (2011)........................................................55

*In re Garnero,*
 412 F.2d 276 (CCPA 1969) ............................................................37

*In re Luck*,
 476 F.2d 650 (CCPA 1973) ...........................................................40

*In re Miller*,
 2022 WL 594417 (Fed. Cir. Feb. 28, 2022) ..................................36

*In re Nordt Dev. Co.*,
 881 F.3d 1371 (Fed. Cir. 2018) ................................................3, 37

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*,
 821 F.3d 1359 (Fed. Cir. 2016) .......................................................4

*Invitrogen Corp. v. Clontech Labs., Inc.*,
 429 F.3d 1052 (Fed. Cir. 2005) ................................................ 42-43

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
 175 F.3d 985 (Fed. Cir. 1999) ..................................................19, 22

*Junker v. Eddings*,
 396 F.3d 1359 (Fed. Cir. 2005) ................................................ 59-60

*Kaneka Corp. v. SKC Kolon PI, Inc.*,
 2015 WL 12696109 (C.D. Cal. Nov. 5, 2015) ...............................58

*Leo Pharm. Prods., Ltd. v. Rea*,
 726 F.3d 1346 (Fed. Cir. 2013) .....................................................48

*Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*,
 755 F.2d 158 (Fed. Cir. 1985) .......................................................36

*Lucent Techs., Inc. v. Gateway, Inc.*,
 580 F.3d 1301 (Fed. Cir. 2009) ................................................50, 55

*MediaTek Inc. v. Freescale Semiconductor, Inc.*,
 2014 WL 2854890 (N.D. Cal. June 20, 2014)................................ 55, 57-58

*Medtronic, Inc. v. Cardiac Pacemakers, Inc.*,
 721 F.2d 1563 (Fed. Cir. 1983) .....................................................40

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
    520 F.3d 1358 (Fed. Cir. 2008) ....................................................48

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
    575 F.2d 1152 (6th Cir. 1978) ....................................................50

*Pavo Sols. LLC v. Kingston Tech. Co.*,
    35 F.4th 1367 (Fed. Cir. 2022) ...................................................50

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...........................................19, 21

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    711 F.3d 1348 (Fed. Cir. 2013) .............................................57-58

*Regents of Univ. of Cal. v. Broad Inst., Inc.*,
    903 F.3d 1286 (Fed. Cir. 2018) ..................................................47

*Rothman v. Target Corp.*,
    556 F.3d 1310 (Fed. Cir. 2009) ....................................................5

*Semiconductor Energy Lab'y Co. v. Chi Mei Optoelectronics Corp.*,
    531 F. Supp. 2d 1084 (N.D. Cal. 2007)........................................58

*Sensonics, Inc. v. Aerosonic Corp.*,
    81 F.3d 1566 (Fed. Cir. 1996) ....................................................56

*Sherwin-Williams Co. v. PPG Indus., Inc.*,
    2021 WL 4987937 (W.D. Pa. Oct. 27, 2021)...............................55

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
    883 F.2d 1573 (Fed. Cir. 1989) ..................................................60

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931)..............................................................52, 57

*Symbol Techs., Inc. v. Opticon, Inc.*,
    935 F.2d 1569 (Fed. Cir. 1991) .......................................33, 54, 61

*TVIIM, LLC v. McAfee, Inc.*,
    851 F.3d 1356 (Fed. Cir. 2017) .............................................27, 34

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
200 F.3d 795 (Fed. Cir. 1999) ................................................................ 20-21

*Wasica Fin. GMBH v. Cont'l Auto. Sys., Inc.*,
853 F.3d 1272 (Fed. Cir. 2017) ....................................................................44

*W. Union Co. v. MoneyGram Payment Sys., Inc.*,
626 F.3d 1361 (Fed. Cir. 2010) ....................................................................26

*Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*,
225 U.S. 604 (1912)....................................................................................56

*York Prods., Inc. v. Cent. Tractor Farm & Family Ctr.*,
99 F.3d 1568 (Fed. Cir. 1996) ......................................................................19

*z4 Techs., Inc. v. Microsoft Corp.*,
507 F.3d 1340 (Fed. Cir. 2007) .............................................................. 32-33

*Zhang v. Am. Gem Seafoods, Inc.*,
339 F.3d 1020 (9th Cir. 2003) ......................................................................25

**Statutes:**

35 U.S.C. § 103 ............................................................................................35

**Other Authorities:**

Fed. R. Civ. P. 50(a)......................................... 2, 6, 12, 14-16, 24-27, 35, 48-49, 59

Fed. R. Civ. P. 50(a)(2)................................................................................59

Fed. R. Civ. P. 50(b) ......................................................................... 24-25, 27

Fed. R. Evid. 705 .........................................................................................32

Impact, Merriam-Webster Dictionary, https://www.merriam-
webster.com/dictionary/impact..................................................................23

Mean, Merriam-Webster Dictionary, https://www.merriam-
webster.com/dictionary/mean................................................................20, 22

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Plaintiff-Appellee Cyntec Company, Ltd. states that no appeal from the same trial court action was previously before this or any other appellate court and that no cases pending in any court or agency will directly affect or be directly affected by this Court's decision in this appeal.

*/s/ Steffen N. Johnson*
Steffen N. Johnson

## INTRODUCTION

After an eight-day trial, the jury found that Defendants Chilisin Electronics Corp. and Chilisin America Ltd. (together, "Chilisin") willfully infringed Plaintiff Cyntec Company, Ltd.'s ("Cyntec") patents on power chokes used in electronic devices such as mobile phones.  The jury awarded $1.87 million in lost profits and reasonable royalties.  The district court later held that Chilisin's conduct warranted enhanced damages, as the case was not close (Appx25) and "Chilisin did not meaningfully rebut Cyntec's evidence" of willful copying (Appx23).  The court thus trebled the damages and permanently enjoined Chilisin from infringing.

Cyntec's patents disclose products and methods whereby an electronic choke is formed at a temperature lower than the melting point of the choke's insulated wire. Under the asserted claims, the lower formation temperature arises "by means of" a hardness difference between two magnetic powders.  Chilisin's infringement appeal raises the question of how much impact the hardness difference must have on the formation temperature to meet this limitation, and whether the record supports the required impact.  According to Chilisin, the district court misread the "by means of" limitation, and there is insufficient evidence that Chilisin's products infringed under any proper construction.  But Chilisin's appeal is foreclosed by its positions below and critical evidence that, remarkably, it never addresses.

Chilisin failed to offer any construction of the "by means of" limitation during the *Markman* proceedings, and the district court construed that limitation based on its plain and ordinary meaning.  Later, Chilisin urged the court to instruct the jury that the hardness difference must have "an impact on the formation temperature." Although "by means of" is not a technical or scientific term, the court acquiesced— telling the jury to "apply the ordinary meaning of ['by means of'] with the under- standing that the hardness difference has an impact on the temperature, but is not the only potential cause of the lower temperature."  Appx9439.  That instruction was correct, and Chilisin's alternative construction—that "by means of" requires the hardness difference to be "the primary or 'but for' cause of reduced formation tem- perature" (Br. 28)—conflicts with the term's plain meaning.

As the district court held, Chilisin waived the theory that the evidence failed to show infringement—its Rule 50(a) argument was based "on an entirely different premise."  Appx8.  But regardless, substantial evidence shows that the hardness dif- ferences impacted the formation temperature of Chilisin's chokes.  In fact, Chilisin conceded below that the evidence showed that hardness differences "may impact formation temperature."  Appx8; Appx10852; Appx10849.  And if more were needed, Cyntec's expert, Dr. Kohl, testified that the hardness difference had a "direct impact" on formation temperature.  Appx9787.

Quoting a snippet of that testimony, Chilisin calls it "[c]onclusory." Br. 35. But as Kohl elaborated, it was "directly because of this hardness difference [that Chilisin] could avoid that high-temperature step" and "the melting point" of the wires' insulator. Appx9787. As he further explained, "[t]hrough the use of this hardness difference, the strain was not induced in the large particle." Appx9787. Chilisin also discounts Kohl's testimony by asserting that he "never discussed" certain exhibits. Br. 36. But that is false. *E.g.*, Appx9658 (discussing Ex. 6). And this is to say nothing of the myriad other evidence of infringement. As one witness put it, "because the bigger particle is the higher hardness," Chilisin could "do[] [the] molding process without high temperature." Appx9503-9504. And Chilisin's own documents showed that it copied Cyntec's chokes "exactly" (Appx14832) and "completely" (Appx15912).

Chilisin's obviousness appeal is equally unfounded. First, Chilisin's prior art references, Shafer and Nakamura, do not—either explicitly or inherently—disclose or suggest the "by means of" element of the claims. Chilisin says this claim element is "not a limitation for invalidity purposes." Br. 44 n.17. But Chilisin ignores binding precedent holding that where, as here, "[a] process limitation connotes specific structure," "that structure should be considered" in assessing invalidity. *In re Nordt Dev. Co.*, 881 F.3d 1371, 1374 (Fed. Cir. 2018).

3

Second, neither Shafer nor Nakamura discloses powders that must differ in both size and hardness, let alone the claims' innovative requirement that the larger powder be harder. Shafer "doesn't disclose the hardness or the size" of its powders (Appx10636), and Nakamura "does not affirmatively teach that this [harder] alloy must be larger than the [softer] iron powder." Appx10612-10613. As Chilisin's expert admitted, moreover, Nakamura never discusses "a conducting wire being buried inside a magnetic body," much less "high-temperature heat treatments melting [its] insulation" (Appx10577; Appx10576)—the problem Cyntec's patents solved.

Third, Chilisin ignores a required element of its case—a "motivation to combine" the prior art references to arrive at the claimed invention with a "reasonable expectation" of success. *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016). Further, its evidence fails both to show that element and to negate Cyntec's showing of secondary considerations. "'[T]here was no motivation to combine the Shafer and Nakamura references,' because 'the high temperature treatment discussed in Nakamura was for a wholly different reason than the ones discussed'" in Cyntec's patents. Appx17. Likewise, Chilisin has no evidence of a reasonable expectation of success, and Kohl testified that a POSA would not reasonably expect to "achiev[e] what is claimed" by combining the references. *Illumina*, 821 F.3d at 1367. Kohl also provided undisputed testimony on commercial success, long-felt need, and unexpected superior results. Appx10615-10620. Given

Chilisin's failure to make any prima facie showing of obviousness—let alone the "strong" showing required to rebut them (*Rothman v. Target Corp.*, 556 F.3d 1310, 1322 (Fed. Cir. 2009))—the secondary considerations "constitute independent evidence of nonobviousness" (*id.* at 1321).

Finally, the lost profits award should be affirmed. According to Chilisin, the district court abused its discretion in admitting Cyntec's calculations showing the proportion of infringing products sold abroad and imported. But those calculations were conservative, sound, and based on "the best available" data. Appx3962-3963. Chilisin says Cyntec's expert "relied solely on Form 10-K filings" and "annual reports." Br. 51. But as Chilisin's expert admitted (Appx10419-10420), Cyntec's expert also relied on "Gartner" market research—independent, third-party data that Chilisin *itself* uses to estimate the importation of devices with chokes. Appx15037.

Chilisin also says the lost profits award was based on flawed market analysis. Yet Chilisin "waived" this point below (Appx10), and the analysis was sound: "the vast majority of the sales … would have been between Cyntec and Chilisin," so the expert could have used a *less* conservative "two-supplier" approach. Appx9970. Last, Chilisin disputes Cyntec's proof that, but for Chilisin's infringement, it would have made the relevant sales. But there was "more than a reasonable basis" for the verdict, including "many examples" of Chilisin endeavoring to meet "the specifications of Cyntec's products." Appx11.

## STATEMENT OF ISSUES

1.    Whether the jury's infringement finding should be reversed because the district court adopted the plain and ordinary meaning of "by means of" and, if the issue was preserved, whether substantial evidence supports that finding.

2.    Whether the district court properly granted judgment as a matter of law on non-obviousness where the two prior art references were both missing key elements of the claims, there was no reason to combine them, and the evidence of secondary considerations of non-obviousness was unrebutted.

3.    Whether the district court abused its discretion in admitting Cyntec's importation calculations showing the proportion of infringing products sold abroad and imported into the United States, which was based on the best available data from Chilisin and third parties.

4.    Whether the district court properly denied judgment as a matter of law to Chilisin on lost profits damages, where Chilisin failed both to challenge Cyntec's market share analysis in its Rule 50(a) motion and to rebut the extensive evidence that it intentionally copied Cyntec's products.

## STATEMENT OF THE CASE

### A.    The parties

Cyntec is both a leader in the research and development of miniaturized and highly integrated electronic products and one of the world's largest sellers of chokes. A choke, or inductor, is part of an electrical circuit that uses a coiled wire to produce a magnetic field that filters out unwanted signals and regulates voltage.  Appx9650-9652.  Many Cyntec patents cover chokes.  Appx9487; Appx9568-9569.

Cyntec markets high-performance, low-power-consumption small chokes for use in high-tech devices such as smartphones.  Appx9492; Appx9502-9503.  Cyntec earns most of its revenue from these chokes (Appx9489), and annually invests $20-25 million in R&D.  Appx9496-9497.  Cyntec's proprietary chokes are critical to its customers' needs.  Appx9512.

Chilisin is Cyntec's only major competitor for sales of mixed-powder chokes. Appx9508; Appx9513.  Chilisin sells to many of Cyntec's U.S. customers, which require Chilisin to match the specifications of Cyntec's chokes, so they can be used interchangeably.  Appx10237 (Chilisin witness) ("for the most part, we have to meet the characteristics [of Cyntec's chokes]").  As one Chilisin employee admitted in internal correspondence discussing a customer's demands: "[we] need to be exactly the same (sorry, no room for negotiations because the client prefers Cyntec." Appx10240; Appx11.

7

### B.    Cyntec's patents

The jury found that Chilisin willfully infringed Cyntec's '312 and '037 patents. The '312 patent (Appx63-84) claims mixed-powder chokes; the '037 patent (Appx85-107) claims methods of making them. Both relate to chokes made by placing a coiled conducting wire inside a mold, filling the mold with magnetic powders, and adding an adhesive. Appx100 at 1:35-43.

Manufacturers of prior-art molded chokes faced a dilemma. Chokes store energy in a magnetic field. *Id*. at 1:30-32. Fluctuations in the field, which occur naturally when people use their devices, lead to "core loss"—wasted energy that dissipates as heat. *Id*. at 1:32-35; Appx9767; Appx9498-9499. To minimize core loss and improve the devices' efficiency, a highly magnetic metal powder is packed into the choke. Appx9978 ("improved inductor density … increases permeability"). Increasing the powder's magnetic "permeability"—the magnetic field's ability to efficiently penetrate a substance—decreases core loss. Appx104 at 9:29-45, 10:31-39.

Using *one* magnetic powder, however, did not prevent core loss well enough to meet modern devices' performance needs. Appx9502-9503. Molding the choke under high pressures improved the powder's density but introduced "strain"—meaning the chemical bonds deformed as the powders were pressed together, which in turn limited the higher permeability that otherwise accompanies higher density. Appx9571-9573. Heating the choke to high temperatures—"annealing"—reduced

this strain and increased permeability. Appx9769-9770. But effective annealing required temperatures so high that they melted the conducting wire's insulation and "oxidize[d]" other components, risking "short circuit[s]" and making the chokes unreliable. Appx9780-9781; Appx9573-9574; Appx10618-10619 (with annealing, "core loss would drop a lot, improving the choke," "[b]ut the conundrum is you have this vulnerable wire with the vulnerable insulation"). Thus, prior-art molding addressed one problem (reducing strain and increasing permeability) by causing another (melting the conducting wire's insulator, causing adjacent coils to touch and short-circuit). Appx77 at 1:44-47, 2:33-37.

Cyntec solved that problem. The claimed inventions improve core loss while avoiding high-temperature annealing. Appx9571; Appx9494-9495 ("without using [powders of different sizes and hardnesses], we have to either choose the lower-performance design" or the "high temperature [process]"). The patents employ *two* magnetic powders, where one powder's particles are both larger and harder than the other's. Appx77 at 1:59-67. In experimenting with different powders, Cyntec discovered an "unexpected surprise": "[mixing the] hard, large alloy and small, soft iron, without annealing, same pressure, the core loss was even less." Appx10619-10620; *see* Appx77 at 2:14-21 ("optimization of the ratio of the hardness of the first magnetic powder to the hardness of the second magnetic powder and the ratio of the mean particle diameter of the first magnetic powder to the mean particle diameter of

the second magnetic powder largely reduces the strains … during molding process" and "core loss" is "reduced"). This approach transfers the strain to the smaller, softer powder, where it has less negative effect on permeability. Appx9787.

In short, Cyntec eliminated the need to use annealing exceeding the wire insulation's melting point to lower strain or improve permeability. Appx9495; Appx9501-9502. As the patents explain, the patented choke's "integral magnetic body" is achieved "by means of" the difference in hardness between the two powders, which occurs at a lower formation temperature than the melting point of the choke's insulating wire. Appx77 at 2:2-9. The choke's "integral magnetic body" exhibits high permeability, less core loss, and high reliability—features that could not be achieved together in prior-art chokes. *Id.* at 2:33-47; *see* Appx9787; Appx9792-9793.

### C.    Chilisin's infringing conduct

By 2015, Chilisin began intentionally copying Cyntec's chokes. Appx10230; Appx10644. Chilisin's infringing products included more than 300 mixed-powder chokes designed to compete directly with Cyntec's. Instead of developing its own chokes, Chilisin methodically copied the size, shape, and characteristics of Cyntec's —a process that Chilisin euphemistically referred to as "crossing" Cyntec's designs. Appx10091; Appx15912. Once Chilisin gained a foothold with Cyntec's customers, it sought to replace Cyntec entirely by undercutting its prices—even selling chokes

below cost.  Appx15157; Appx14932.  Chilisin's strategy required Cyntec either to cut prices or lose sales in its core market, while Chilisin treated its competing chokes as loss leaders.  Appx10042; Appx16061.

In 2017, Cyntec notified Chilisin that it was infringing.  Appx16337-16338.  Chilisin kept right on copying Cyntec's chokes, even after Cyntec sued.  Appx14832 (Chilisin employees discussing copying in 2019).

### D.   Pretrial proceedings

Much of the current dispute over infringement and validity centers on the patents' requirement that

> by means of the first hardness difference of the first magnetic powder and the second magnetic powder, the mixture of the first magnetic powder and the second magnetic powder and the conducting wire buried therein are combined to form an integral magnetic body at a temperature lower than the melting point of the insulating encapsulant.

Appx83 at 14:20-26 ('312 patent); *cf.* Appx106 at 13:41-47 ('037 patent).  At claim construction, however, Chilisin offered no construction of this "by means of" limitation, arguing only that it was indefinite.  Br. 14 n.4.  Noting that the claim used non-technical English, Cyntec advocated using its ordinary meaning.  The court agreed, stating that the claim "does not require construction" and deferring any ruling on indefiniteness.  Appx1976.

Chilisin first proposed a construction of "by means of" at summary judgment.  Under this new construction, the hardness difference must "be the reason that a

11

temperature lower than the melting point of the wire is used to form the magnetic body" (Appx2766), or "without the hardness difference, the device cannot be formed at a temperature below the melting point." Appx2768 n.8.

The district court rejected Chilisin's construction, observing that, as Chilisin's expert admitted, a POSA could understand the limitation to require the hardness difference to "'ha[ve] an impact on'" the formation temperature, which "does not foreclose that there might be other impacts." Appx7143; Appx7144 (quoting Bravman Rep. ¶ 83). Quoting "the '312 specification"—which states that strain is reduced by "'optimization of the ratio of the hardness of the first magnetic powder to the hardness of the second magnetic powder *and* the ratio of the mean particle diameter of the first magnetic powder to the mean particle diameter of the second magnetic powder'"—the court noted that "[t]his language indicates that the size difference, in addition to the hardness difference, has an impact on manufacturing temperature." Appx7143 (quoting Appx77 at 2:13-19). The court thus disagreed "that the lower temperature can only be achieved through the hardness difference." Appx7144.[1]

Chilisin also filed a *Daubert* motion to exclude Cyntec's damages expert, Mr. Bryan Van Uden. Appx7161. The court denied the motion, stating that "Van Uden

---

[1] The court also rejected Chilisin's indefiniteness argument (Appx7147), and later granted Cyntec's Rule 50(a) motion on indefiniteness, as Chilisin presented "no testimony" or "[expert] guidance" on indefiniteness (Appx10635-10636).

has cited substantive data to determine the amount of indirect United States sales," including "information concerning Chilisin's sales per customer and per infringing product" and the "percentage of U.S. sales per company compared to their overall sales." Appx7163. As the court found, "Van Uden's opinions rely on data sources that are sufficiently reliable that a jury can determine whether the assumptions made in his calculations were valid." Appx7164-7165.

### E. Trial

At trial, Chilisin pressed an obviousness theory based on Shafer combined with Nakamura. Appx10558; Appx10572. But during cross-examination, Chilisin's expert, Dr. Bravman, admitted that:

- "there is no mention of hardness" or "particle size in the actual text" of Shafer (Appx10557-10558);

- the powders that Shafer discloses do not necessarily differ in hardness or "practice the claim" (Appx10569-10570);

- the hardness of Shafer's powders would "depend[] on the[ir] thermochemical history" (Appx10587), and Shafer does not disclose the treatments (Appx10607); and

- Nakamura's "heat treatment" step was not "to relieve strain caused by the pressure of the molding process," but rather for a different purpose than Shafer's, a reference that Nakamura did not discuss (Appx10574-10575).

After that cross and Dr. Kohl's rebuttal testimony, the district court granted Rule 50(a) judgment on nonobviousness.  Appx10636.

To prove damages, Cyntec's expert (Van Uden) first estimated Chilisin's sales of infringing products that were imported into the country.  Appx9927.  To do so, he relied not only on Chilisin's customers' "SEC filings" or "annual reports"—which reported the overall percentage of each company's sales occurring domestically—but also on "Gartner[ Research]'s data for laptops, PCs, cell phones, and tablets"—"the exact type of products that the accused inductors are used in."  Appx9928-9929.  Van Uden used the Gartner data "as a secondary data source," "to confirm the reasonableness of the other import numbers."  Appx9929.  Contrary to Chilisin's assertion (Br. 54 n.25), the Gartner data included specific importation figures for Amazon, Apple, Google, HTC, LG, and Microsoft.  Appx15759; Appx15819 nn.3-7 (estimates were "corroborated by data from Gartner").  Based on these figures, and Chilisin's overall sales to the customers for which Van Uden could estimate importation percentages with reasonable certainty, Chilisin made $10.27 million in infringing sales.  Appx9932.

For this infringing sales base, Van Uden presented a lost profits theory based on market share—a more "conservative" assumption than the "two-supplier market" to which Cyntec's fact witnesses testified.  Appx9943-9944; Appx9970.  Van Uden calculated Cyntec's market share as 31-39%—meaning Cyntec had lost sales of $3.8

million and, given its 40.2% profit margin, lost profits of $1.55 million. Appx9970-9973. Cyntec also showed $320,000 in reasonable-royalty damages. Appx9997.

The jury found that Chilisin had willfully infringed both patents, awarding $1.87 million in damages, the amount supported by Van Uden's conservative estimate. Appx10811. The district court denied Chilisin's motions for judgment as a matter of law and a new trial, noting that Chilisin waived many arguments by failing to present them at the Rule 50(a) stage. Appx15; Appx18.

In ruling on Cyntec's post-trial motions, the court found that seven of the eight *Read* factors favored enhanced damages. Appx23-26. The court thus trebled the damages incurred after Chilisin began willfully infringing (Appx27), creating a total award of $5.5 million. The court also permanently enjoined Chilisin from further infringing U.S. sales, subject to a sunset term. Appx30-32.

## SUMMARY OF ARGUMENT

I.    The jury's infringement verdict rests on both a correct claim construction and substantial evidence, and should thus be affirmed.

I.A.    Cyntec's patents require that the choke's formation temperature arise "by means of" a hardness difference between two magnetic powders.  The district court correctly adopted the plain and ordinary meaning of "by means of"—a term with no specialized or technical meaning.  At Chilisin's behest, moreover, the court instructed the jury to apply the term's ordinary meaning "with the understanding that the hardness difference has an impact on the temperature, but is not the only potential cause of the lower temperature."  Appx9439.  That instruction was correct, and Chilisin's alternative—that "by means of" requires the hardness difference to be "the primary or 'but for' cause of reduced formation temperature" (Br. 28)—would rewrite the claim.

I.B.    Under either construction, there was substantial evidence showing the impact of the hardness difference, including expert testimony that it had a "direct impact" on formation temperature (Appx9787) and additional testimony that "because the bigger particle is the higher hardness" it was possible to "do[] [the] molding process without high temperature" (Appx9503-9504).

II.    The district court also properly granted Cyntec Rule 50(a) judgment on obviousness, for three independent reasons.  First, as the court found, practicing the

"by means of" limitation reduces strain and core loss—and thus imparts structural characteristics to the claimed chokes, making the limitation relevant to validity. Yet nothing in the prior art remotely suggested this limitation. Second, Chilisin's two prior art references, Shafer and Nakamura, are both missing other key elements of the claims, including the patents' innovative requirement of a larger, harder powder mixed with a smaller, softer powder. Third, a POSA would not have been motivated to combine these references—indeed, Nakamura made no mention of buried wires or heat issues with forming chokes—and Chilisin ignores the "reasonable expectation of success" requirement, an essential element of its case. Particularly given Chilisin's failure to rebut Cyntec's showing of secondary considerations—including long-felt need, commercial success, and Chilisin's blatant copying of Cyntec's chokes—the district court correctly held that the claims were not obvious.

III.    The damages verdict should also be affirmed. The district court did not abuse its discretion in admitting Cyntec's calculations showing the proportion of infringing products sold abroad and imported, and it rightly denied Chilisin's motion for judgment as a matter of law on lost profits. Chilisin "waived" its challenges to Cyntec's market share analysis (Appx10), which in all events was sound. Chilisin also says Cyntec failed to prove it would have made sales but for the infringement, but that conclusion was supported by ample evidence, including unrebutted evidence that Chilisin intentionally copied Cyntec's products.

# ARGUMENT

## I. The jury's infringement verdict should be upheld.

The jury's infringement verdict rests on both a correct claim construction and substantial evidence. As to claim construction, the patents require that the temperature at which the choke is formed arise "by means of" a hardness difference between two magnetic powders. The district court instructed the jury to apply the ordinary meaning of that term—which has no specialized meaning—"with the understanding that the hardness difference has an impact on the temperature, but is not the only potential cause of the lower temperature." Appx9439. That was correct.

Further, substantial evidence supports the jury's infringement finding under that—or any other—construction. Cyntec's infringement expert, Dr. Kohl, testified that the hardness difference had a "direct impact" on formation temperature—"[i]t was directly because of this hardness difference they could avoid that high-temperature step" (Appx9787)—and analyzed internal Chilisin documents reflecting that impact (Appx9762-9770). Moreover, the record includes extensive other testimony that, like the bulk of Kohl's testimony, Chilisin never mentions.

### A. The district court's claim construction was correct.

The district court correctly construed the "by means of" limitation according to its plain meaning. Appx1976. Indeed, when Cyntec advocated that approach at the *Markman* hearing (Appx507-509), Chilisin offered no alternative construction; it argued only that the limitation was indefinite. Appx1138-1142.

18

At summary judgment, Chilisin asserted that "[t]he 'by means of' limitation … requires the hardness difference *to impact* the formation of an integral magnetic body at a temperature lower than the melting point of the insulating encapsulant." Appx1140-1141 (emphasis added). But at Chilisin's behest (Appx7196), the district court added such language to the jury instructions. It specifically told the jury that the "by means of" limitation was met if "the hardness difference has *an impact* on the temperature, but is not the only potential cause of the lower temperature." Appx9439 (emphasis added). It is undisputed that the "by means of term" is a "product-by-process limitation" that defines the claimed invention's scope. Br. 29-31. The parties and the court below so treated it, and the jury found the limitation met.

The district court correctly adopted the plain and ordinary meaning of the "by means of" limitation. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation omitted). Absent an expressed contrary intention, patentees are presumed to have intended the "ordinary meaning" of claim terms. *York Prods., Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996). "In short, a court must presume that the terms in the claim mean what they say, and, unless otherwise compelled, give full effect to [their] ordinary and accustomed meaning." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). Here, "by means of"

has no special meaning, and a lay jury is perfectly capable of understanding it—especially as clarified by the jury instructions.  Appx9439.

If that were not enough (it is), both sides' experts agreed on the term's plain meaning.  Cyntec's expert, Dr. Kohl, testified that the patents "used the term 'by means of' in a manner consistent with its common understanding—*e.g.*, through the use of."  Appx4577 (citing Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/mean).  Chilisin's expert, Dr. Bravman, wrote that "[t]he 'by means of' language of these claim terms indicates that the claimed hardness difference has *an impact on* the formation of the claimed integral magnetic body."  Appx2973 (emphasis added).  There was no error.

The claims' structure as "comprising" claims confirms the district court's construction.  Appx83 at 14:5 ("An electronic device, comprising: … .") ('312 patent); Appx106 at 13:27-28 ("A method for manufacturing an electronic device, the method comprising: … .") ('037 patent).  The "signal 'comprising'" generally "signif[ies] that the claims do not exclude the presence in the accused apparatus or method of factors in addition to those explicitly recited."  *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 811 (Fed. Cir. 1999).  In *Vivid Technologies*, for example, the patent claimed an x-ray device that used "radiation response when determining whether to highlight an object in color."  *Id.*  Because the specification "mention[ed] no other factors," the defendant contended that the claims were limited

to "radiation response" and did not cover the accused device, which also considered other factors, like "area and mass." *Id.* But as this Court held, the claims' "comprising" language confirmed that they "require[d] only that the color display 'correspond to at least' the preset levels of radiation response," making it "irrelevant to the infringement determination whether other factors" were also considered. *Id.* The Court thus reversed summary judgment of non-infringement, as whether the accused device used radiation response was disputed and no "special circumstance or estoppel … exclude[d] the [use of] additional factor[s]." *Id.* Similarly here, "the signal 'comprising' accommodates additional variables, provided that all of the elements stated in the claim are present." *Id*. at 812. Thus, the hardness difference need not be the sole or primary factor impacting formation temperature.

As the district court recognized, construing "by means of" according to its ordinary meaning finds further support "in the context of the entire patent, including the specification." Appx7143 (quoting *Phillips*, 415 F.3d at 1313). Specifically, the '312 specification states that strain is reduced by "optimization of the ratio of the hardness of the first magnetic powder to the hardness of the second magnetic powder *and* the ratio of the mean particle diameter of the first magnetic powder to the mean particle diameter of the second magnetic powder." Appx77 at 2:13-19 (emphasis added). The specification thus confirms "that the size difference, in addition to the hardness difference, has an impact on manufacturing temperature." Appx7143.

Having convinced the district court to instruct the jury that the hardness difference must have "an impact on the temperature," Chilisin now says the "by means of" limitation requires that hardness be "the primary or 'but for' cause of reduced formation temperature." Br. 28. But that reading rewrites the claim. Chilisin cites no extrinsic source supporting its construction. Br. 28-34. And as the dictionary explains, a "means" is simply "something useful or helpful to a desired end." Mean, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/mean. A means is not necessarily the primary or "but for" cause of reaching an end, and to conclude otherwise reads words such as "primarily" into the claim—in violation of black-letter claim construction law. *Johnson Worldwide Assocs.*, 175 F.3d at 989 ("[M]odifiers will not be added to broad terms standing alone.").

Chilisin offers an analogy about "digging a hole 'by means of a shovel'":

if a claim recited digging a hole "by means of a shovel," the shovel must do at least the majority of the digging. Using a backhoe to dig most of the hole, and a shovel to remove only the final scoop, would not be digging a hole "by means of" a shovel.

Br. 32. Yet this analogy undercuts Chilisin's construction. First, a result can have multiple "but for" causes. Thus, even a shovel that removed only a hole's final scoop would be a "but for" cause of digging the hole—the backhoe did not remove the final scoop, and the hole was not dug but for the use of the shovel. Second, even assuming that "[u]sing a backhoe to dig most of the hole, and a shovel to remove only the final scoop, would not be digging a hole 'by means of' a shovel,'" it does

not follow that to dig a hole by means of a shovel, "the shovel must do at least the majority of the digging." Br. 32. If digging the hole involved "the use of" a shovel (*Merriam-Webster's*), one can fairly say the hole was dug "by means of a shovel."

Chilisin faults the district court for "instructing the jury that infringement could occur even when hardness played a trivial or minor role in reducing formation temperature." Br. 28. But the district court said no such thing. It told the jury that "you can apply the ordinary meaning of [the 'by means of'] term with the understanding that the hardness difference has an impact on the temperature, but is not the only potential cause of the lower temperature." Appx9439. There is no basis to think that a jury would interpret "an impact" to include effects that are "trivial," "minor," or "the smallest" or "most negligible." Br. 25, 28, 33. If anything, "impact" connotes the opposite: "a significant or major effect." Impact, Merriam-Webster, https://www.merriam-webster.com/dictionary/impact.

If doubt remained, Chilisin's own statements below would dispel it. Before trial, Chilisin asked the court to "clarify for the jury that the limitation requires the hardness difference to have *an impact on* the formation temperature." Appx7196 (emphasis added); *see also* Appx7193 ("Alternate proposed construction: 'the hardness difference is a factor that has an impact on the formation temperature of the magnetic body such that the magnetic body is able to be formed at a temperature that is lower than the melting point of the insulating encapsulant'"). The court

acquiesced, telling the jury to apply the term's ordinary meaning "with the understanding that the hardness difference has an impact on the temperature, but is not the only potential cause of the lower temperature."  Appx9439.  Chilisin cannot complain now.  *Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1352 (Fed. Cir. 2003) (party "waived [alleged instructional error] by agreeing to that portion of the adopted construction").

### B.    The jury's infringement findings were supported by substantial evidence.

Chilisin asserts that under either construction of the "by means of" limitation, Cyntec did not prove infringement.  Br. 34-42.  But that argument faces two insurmountable problems.  First, Chilisin waived it by failing to raise it at the Rule 50(a) stage.  Appx6-8.  Second, there was more than substantial evidence—under either construction—of the hardness difference's impact.

### 1.    Chilisin waived its non-infringement argument.

According to Chilisin, under the district court's construction of the "by means of" limitation, there was "legally insufficient evidence that hardness caused a lower formation temperature."  Br. 42.  But "a party cannot properly 'raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion.'"  *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (citation omitted).  As the district court found (Appx6-8), that is the case here.

Chilisin's Rule 50(a) motion argued that "[a]ll of the evidence is that the chokes are formed at room temperature" and that "[t]here can be no infringement" if the chokes are "molded at room temperature." Appx10271-10272. Chilisin struck that same note in closing argument: "All the chokes are molded at room temperature, and, therefore, the hardness difference has no impact on the temperature at which the choke is formed or molded." Appx10698.

But, perhaps realizing that this argument supports infringement—insofar as room temperature is well below the insulating wire's "melting point" (Appx83 at 14:24-26)—Chilisin later switched course. Its Rule 50(b) motion said "[n]othing in Cyntec's evidence show[s] whether it was size, hardness, or something else that led to the formation temperatures used for each accused product." Appx10852; *accord* Br. 36-38. As the district court noted, this "causation argument" is "based on an entirely different premise than [Chilisin's] Rule 50(a) motion." Appx7-8. Thus, Chilisin's "failure to raise [its new argument] prior to the return of the verdict results in a complete waiver, precluding [this Court's] consideration of the merits of the issue." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1028-29 (9th Cir. 2003).

Chilisin's attempts to defeat waiver are unconvincing. First, Chilisin says its Rule 50(a) motion "expressly raised the 'by means of' limitation." Br. 40 (citing Appx10264; Appx10271). But parties must "'raise arguments'" (*Go Daddy*, 581 F.3d at 961), not just "limitation[s]" (Br. 40). And Chilisin's Rule 50(a) argument

was that "[t]here can be no infringement" if the chokes are "molded at room temperature." Appx10271-10272. Chilisin's two transcript citations (Br. 40-41) do not suggest otherwise. *See* Appx10264 ("no infringement for all the accused products based on the fact that there is no evidence that any of the products infringed the 'by means of' limitation"); Appx10271 ("No infringement of any claim that includes the 'by means of' limitation."). Both are simply generic introductory statements prefacing Chilisin's "specific[]" argument about molding chokes at room temperature. Appx10264.

Chilisin's sole authority, *Western Union Co. v. MoneyGram Payment Systems, Inc.*, 626 F.3d 1361, 1367 (Fed. Cir. 2010) (Br. 41), does not help its cause. There, applying Fifth Circuit law, an obviousness argument based on a piece of prior art combined with a keyboard was preserved where the Rule 50(a) motion had "specifically listed [the piece of] prior art." *MoneyGram*, 626 F.3d at 1367. Here, by contrast, nothing in Chilisin's Rule 50(a) motion specifically "alert[ed] the court to [Chilisin's] legal position" or "put [Cyntec] on notice of [Chilisin's] position as to the insufficiency of the evidence." *Id.* (citation omitted).

Second, Chilisin says the district court "misunderstood Chilisin's argument." Br. 41. Not so. Hoping to defeat waiver, Chilisin cites its arguments at "summary judgment" and elsewhere "[a]t trial." Br. 41 (citing Appx2765-2768; Appx10271-

10272).  But those arguments were not part of Chilisin's Rule 50(a) motion—which nowhere contained Chilisin's current infringement theory.  That theory was waived.

### 2. There is more than sufficient evidence to sustain the jury's verdict.

Even assuming Chilisin preserved it, Chilisin's noninfringement theory runs headlong into the record.  Reversal is warranted only if "'the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.'"  *TVIIM, LLC v. McAfee, Inc.*, 851 F.3d 1356, 1362 (Fed. Cir. 2017) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008)).  Chilisin never addresses the key record evidence that compels affirmance.  And once it comes to light, the verdict is plainly sustainable.

First, the district court's Rule 50(b) ruling rests in part on Chilisin's concession.  After trial, Chilisin conceded that "[t]he testimony at trial confirmed that both size *and* hardness differences may impact formation temperature" and that, under the court's construction, Cyntec need only show that hardness has "an effect or impact," even if it is not "the primary or most significant factor."  Appx10852; Appx10849.  As the district court noted, that concession—made in "Chilisin's own motion"—itself supports the verdict.  Appx8.  Yet Chilisin ignores it.  Br. 39-40.

Second, the verdict is supported by testimony from Cyntec's expert, Dr. Kohl.  Citing two words from that testimony, Chilisin brushes off Kohl's conclusion that

hardness had a "direct impact" on formation temperature as "ipse dixit" and "[c]on-clusory." Br. 35, 37, 40. But Kohl's testimony looks quite different in context. Specifically, he explained both why and how the differences in hardness values im-pacted the formation temperature of the infringing chokes:

> Q.   And what impact did the hardness difference between the alloy and iron powder have on the manufacturing temperature of the Chilisin molding chokes?
>
> A.   Well, it had a direct impact. Through the use of this hardness difference, the strain was not induced in the large particle. They did not have to go to a high temperature, above the melting point of the insulator on the wires. It was directly because of this hard-ness difference they could avoid that high-temperature step. So it had a direct impact.

Appx9787; *see also* Appx9792-9793 (the specification "shows this rather remarka-ble effect of if you have this hardness difference, you get to avoid the strain in the material" and "you can avoid using the high-temperature anneal to get a choke which is of the performance described in the specification"). This testimony was quoted in full in Cyntec's post-trial brief (Appx14194) and cited by the district court (Appx8). Yet Chilisin mentions only the "direct impact" phrase. Br. 37, 40. If anything is "conclusory," it is Chilisin's brief.

Dr. Kohl's testimony was far from *ipse dixit*. He specifically explained why the hardness difference directly impacted the formation temperature of Chilisin's chokes: it reduces strain in the large particle and renders high-temperature treatment unnecessary. Appx9787. Without the hardness difference, Chilisin's chokes would

not perform as industry demands—at least not without high-temperature annealing, which can melt the wire's insulation, and which Chilisin admittedly does not use. Appx9769-9770 (explaining annealing); Appx9780-9781 (explaining the "potential negative consequences for high-temperature annealing"); Appx10206 (Chilisin's "molding step [is] performed" at "[r]oom temperature.").

Kohl further explained—and it is now undisputed—that Chilisin's chokes met every other claim limitation and the desired result of the "by means of" clause. Most importantly, Chilisin's chokes had the required hardness difference, but were made without high-temperature treatment. Appx9784-9787 (discussing Appx14579-14633; Appx14720-14792; Appx15921-15931). As Kohl and his exhibits showed, the hardness difference directly impacted Chilisin's manufacturing temperature.

Chilisin's criticism of those exhibits is unconvincing. Br. 34-37. Exhibit 50 was "a Chilisin specification" describing one of its chokes. Br. 34. Kohl explained at length how this document showed that Chilisin's choke could meet performance goals "without high-temperature annealing." Appx9762-9770. Chilisin declares that Kohl "never discussed" other exhibits (Br. 36), but that is false. *E.g.*, Appx9658 (discussing Ex. 6); Appx9895 (discussing Ex. 34); Appx9685 (discussing Ex. 39); Appx9673 (discussing Ex. 40); Appx9676 (discussing Ex. 42). Like Exhibit 50, these exhibits described the accused products and informed Kohl's opinion that the hardness difference had a direct impact on Chilisin's manufacturing temperature.

Third, Dr. Kohl's analysis was backed by extensive experimental data showing that the infringing products' magnetic bodies were formed at a lower temperature due to their combination of a harder, larger powder with a smaller, softer powder. As inventor Yueh-Lang Chen testified, the patents and invention disclosure detailed test data showing that the powders' size and hardness differences avoided the need for high-temperature annealing. Appx9577-9582 (describing data disclosed at Appx10980-10982); Appx80-82 at 8:1-39, 11:12-15, 11:64-12:7 (specification's detailing experiments); Appx103-105 at 7:44-8:7, 10:27-31, 11:12-25 (same); Appx75 (Figure 11A); Appx 98 (same); Appx82 (Table 7); Appx105 (same).

Chilisin declares that "the patents do not describe the accused products." Br. 38. But as shown by comparing Cyntec's Invention Disclosure Statement and Figure 11A (Table 7) of the patent with Chilisin's product specification, the inventors tested the same type of "Fe-Cr-Si" alloy and "iron" powder combination that Chilisin uses in its accused products:

**Invention Disclosure Statement (Appx10980) (Exhibit 302):**



**Figure 11A (Appx75, Appx98)**



**Chilisin's Specification (Appx10890) (Exhibit 50):**



Relying on these experimental data and Chilisin's product specification, Dr. Kohl concluded that "the impact [of the hardness difference] is that through the use of this hardness difference, they can eliminate this high-temperature annealing in order to get a quality choke." Appx10623; *see* Appx9691 ("for all of the accused chokes, the particle size of the alloy powder, the hard one, is larger than the softer, smaller iron carbonyl powder"); Appx9795-9797 (discussing Ex. 50); Appx9887-9891 (discussing Ex. 50, Figure 5A, and patents' experiments); Appx10618-10620 (discussing patents' experimental data); Appx10622-10625 (summarizing evidence and data). Thus, extensive documentary evidence and testimony show how experiments determined that the size and hardness differences between the Fe-Cr-Si alloy powder and iron powder in Chilisin's products avoid the need for high-temperature annealing, satisfying the "by means of" limitation.

Chilisin says certain exhibits did not discuss the hardness difference or formation temperature. Br. 34, 36-37. But it "is no longer disputed" that "there is a difference in hardness between the powders in the accused products." Br. 40. Likewise, it is undisputed that Chilisin's "molding step [is] performed" at "[r]oom temperature." Appx10206. Thus, neither element remains at issue.[2]

_____

[2] As discussed, Kohl's testimony was not conclusory. But Chilisin's lone authority for the proposition that "[c]onclusory expert testimony" is "not sufficient to carry a party's burden of proof" (Br. 37 (citing *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1355 (Fed. Cir. 2007)) involved "obviousness"—which is subject to the clear-and-convincing standard, not the preponderance standard governing infringement.

Fourth, Chilisin ignores the testimony of Mr. Dan Wu, who further explained how the hardness difference affected the chokes' formation temperature. "[H]igh reliability," Wu stated, was "important" to chokes, and a "high temperature annealing" step "will reduce your reliability" because "[the wire's] insulating layer cannot withstand … the high temperature" and may "short circuit." Appx9492-9493. In the patented "mixing powder technology," "because the bigger particle is the higher hardness and the smaller particle is … lower hardness," chokes can be made at a "high density" "without [a] high temperature" treatment,' resulting in "higher permeability, lower core loss, and the better reliability." Appx9503-9504. In short, Chilisin falsely asserts that "Cyntec has no evidence hardness differences in the accused products impacted their formation temperature." Br. 3.

Finally, damning undisputed evidence showed that Chilisin "intended to copy Cyntec's products." Appx15 ("numerous trial exhibits show[ed]" this); Appx23-26 ("Chilisin does not meaningfully rebut Cyntec's evidence of copying"). In one typical internal email, a Chilisin employee wrote that its chokes had to be "exactly the same" as Cyntec's, with "no room for negotiation because the client prefers Cyntec."

---

*z4 Techs.*, 507 F.3d at 1355. "[T]estimony on the ultimate issue of infringement is permissible in patent cases," and even "opinion testimony without factual foundation" can "present a prima facie case of infringement." *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1575-76 (Fed. Cir. 1991). Federal Rule of Evidence 705 permits such summary expert testimony to avoid potentially unnecessary "lengthy testimony on complex technical issues." *Id.* at 1576.

Appx14832.  Another employee wrote that "the samples [*sic*] characteristics need to completely match Cyntec characteristics."  Appx15912.  That Chilisin had to copy Cyntec's chokes "exactly" and "completely" confirms that the hardness difference matters.  And contrary to Chilisin's suggestion (Br. 36-37), its intentional copying confirms the relevance and probative force of Cyntec's "internal documents."

In sum, Chilisin cannot carry its heavy burden of proving that "the evidence, construed in the light most favorable to [Cyntec], permits only one reasonable conclusion," one "contrary to the jury's verdict."  *TVIIM*, 851 F.3d at 1362.  Rather, more than "substantial evidence"—"relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (*id*.)—supports the verdict.

## C. The verdict would have been the same even under Chilisin's claim construction.

Even assuming that Chilisin preserved its current claim construction, the judgment should still be affirmed.

Kohl's testimony, together with the other evidence discussed above, shows that Chilisin's construction of the "by means of" of limitation is met.  *Supra* 27-34.  As he explained, the hardness difference "had a direct impact"; it was "[t]hrough the use of this hardness difference" that "the strain was not induced" and Chilisin "did not have to go to a high temperature, above the melting point of the insulator on the wires"; and "[i]t was directly because of this hardness difference that they could avoid that high-temperature step."  Appx9787.  Chilisin says "[t]he 'by means of'

34

limitation in the '312 patent can be expressed in many different ways," but "[r]egard-less of the articulation, … the formation temperature must arise because of the hard-ness difference between the two powders." Br. 32.  In explaining that Chilisin could achieve the infringing formation temperature "directly because of this hardness dif-ference," Kohl's testimony satisfies Chilisin's own standard.  Perhaps that is why they never mention the specifics of his testimony.[3]

## II.    The district court correctly granted Cyntec's Rule 50(a) motion on obvi-ousness.

This Court should also affirm the district court's grant of Cyntec's Rule 50(a) motion on obviousness.  For three independent reasons, no reasonable juror could have found obviousness by clear and convincing evidence.

### A.    The prior art did not teach or suggest the "by means of" limita-tion, and Chilisin does not argue otherwise.

Chilisin says the combination of Shafer and Nakamura supports a prima facie case of obviousness.  Br. 43.  But this argument suffers from a fundamental threshold defect—those references do not teach or suggest the "by means of" limitation.

Congress required defendants to prove that "the claimed invention *as a whole* would have been obvious."  35 U.S.C. § 103 (emphasis added).  Thus, it is

---

[3]  Even if Chilisin were correct, that would at most warrant a remand, not "reversal." Br. 38.  Reversal would reward Chilisin for its ever-changing claim construction, while punishing Cyntec, which lacked clear notice of Chilisin's position.  Moreover, reversal would be warranted only if no reasonable jury could find for Cyntec, and this record easily creates a factual dispute for jury resolution, warranting affirmance.

"elementary that the claimed invention must be considered as a *whole* in deciding the question of obviousness" (*Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 164 (Fed. Cir. 1985)), and that "all claim limitations must be taught or suggested by the prior art to establish obviousness" (*In re Miller*, 2022 WL 594417, *4 (Fed. Cir. Feb. 28, 2022)). *See also Beachcombers, Int'l, Inc. v. Wildewood Creative Prods., Inc.*, 31 F.3d 1154, 1163 (Fed. Cir. 1994) (reversing the denial of JMOL on obviousness upon finding "no evidence that the prior art discloses or suggests [one] limitation"). Yet Chilisin nowhere suggests that the prior art taught or suggested the "by means of" limitation.

Rather, Chilisin says the "by means of" limitation does not count—that it "is not a limitation for invalidity purposes." Br. 44 n.17. In support, Chilisin invokes the rule that product-by-process claims can be obvious if the product of the process is obvious over a prior-art product. Br. 30-31 n.11 (citing *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1369-70 (Fed. Cir. 2009)). But process elements in product-by-process claims may not be ignored in analyzing validity where, as here, they impart particular structural limitations to the claimed product. Further, claim 1 of the '037 patent claims the method itself, not a product-by-process. Chilisin's unsupported assertion that both patents should be interpreted the same way (Br. 33 n.12) is untenable.

According to Chilisin, when a product-by-process claim is evaluated for va-

lidity, "claim scope is generally based on the product itself, not the process." *Nordt*,

881 F.3d at 1374.  But Chilisin ignores an important exception to that princpile:  "If

the process limitation connotes specific structure and may be considered a structural

limitation, … that structure should be considered."  *Id.* (citing *In re Garnero*, 412

F.2d 276, 279 (CCPA 1969)).  Where a limitation "is structural," therefore, it is "af-

forded weight when assessing patentability," and "[t]he correct inquiry is whether

the product defined in the claim is patentably distinguishable over [the prior art] in

view of the structural limitation defined by the limitation."  *Id*. at 1375 (internal

quotations omitted); *see id*. ("injection molded" was structural; terms like "'inter-

mixed,' 'ground in place,' 'press fitted,' 'etched,' and 'welded'" have all been con-

strued "as structural, rather than process, limitations").  That is the situation here.

As noted, claim 1 of the '312 patent recites a choke comprising two magnetic

powders of different sizes and hardnesses "[w]herein *by means of* the first hardness

difference of the first magnetic powder and the second magnetic powder, *the mixture*

*of the first magnetic powder and the second magnetic powder and the conducting*

*wire buried therein are combined to form an integral magnetic body at a*

*temperature lower than the melting point of the insulating encapsulant*."  The claim

itself thus calls for combining the magnetic powders and conducting wire to form

"an integral magnetic body" at a temperature "lower than the melting point" of the embedded wire's insulation.

In rejecting Chilisin's indefiniteness argument, the district court described the structural features that arise from practicing the limitation and distinguish the product from the prior art. Appx7147. The patented choke, which is molded at "low or no heat" by means of the claimed hardness difference, differs from one molded at the same temperature "without regard to the hardness difference" because the patented choke is molded "*without any corresponding strain and core loss*." *Id*. Strain is a structural feature: it reflects the deformation of molecular bonds under high pressure. Appx9769-9770 ("If you have core loss and you performed a high-pressure molding, these extremely high pressures, you distort the … material. You cause strain in it"; "the bonds" are "unfavorabl[y] configur[ed]."). Core loss is a measurable physical property, reflecting the choke's structural characteristics. Appx15466 ("Hysteresis Loss + Eddy Current Loss = Core Loss"); Appx15470 (noting the contribution of a "[s]tructure factor" and other physical properties to hysteresis loss and eddy current loss, and thus core loss).

Fact testimony from multiple witnesses, like the experiments in the patents, conclusively demonstrated that practicing the "by means of" step imparts to chokes these distinct structural features—lower strain, lower core loss, and higher permeability. Appx9498-9499 ("because the bigger particle with the higher hardness, when

38

we are doing the molding process … the core loss would be smaller"); Appx9503-9504 ("Because of … our mixing powder technology … we can have higher permeability, lower core loss"); Appx9787 ("the hardness difference" "had a direct impact" because "strain was not induced in the large particle"); Appx81 at 9:12-62 (without heat treatment, the patented choke improves core loss); Appx82 at 11:17-33 (the patented choke improves permeability).

Dr. Kohl likewise testified to the specific structural features of chokes that are formed by the claimed process, noting that the process achieves a formation temperature for the integral magnetic body lower than the melting point of the embedded wire's insulation, and that it does so by means of the hardness difference between a larger, harder powder and a smaller, softer powder, mixed within the choke's body. Appx9787; Appx9792-9793. It was "[t]hrough the use of this hardness difference" that "strain was not induced" and "directly because of this hardness difference that they could avoid th[e] high-temperature step." Appx9787. The hardness difference permits the powders to pack together more densely and reduces strain on the magnetic body, so a lower temperature treatment is all that is needed to form a functional choke with the desired performance characteristics. *Id*.

Because the process element produces structural differences from the prior art, this is not a case of "an old product made by a new process" (Br. 47); it is a case where the "process limitations distinguish the *product* over the prior art" and "must

be given the same consideration as traditional product characteristics." *In re Luck*, 476 F.2d 650, 653 (CCPA 1973). Such "consideration" means that each limitation—not just the final product—must be considered in analyzing obviousness. *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1567 (Fed. Cir. 1983) ("In determining obviousness … claims must be considered in their entirety.").

Chilisin presents no argument, and cites no evidence, that the prior art suggested forming chokes at a lower formation temperature by means of a hardness difference between two powders. Dr. Bravman stated only that the "by means of" term should be considered "written out of the description." Appx10517. That *legal* argument is foreclosed by precedent. This Court may affirm on that basis alone.

## B.    The prior art did not teach or suggest that the larger particle-size powder must be harder.

But there is more. As Chilisin admits (Br. 11), the asserted claims require the first magnetic powder to be "both larger" and "harder" than the second. Appx83. Neither Shafer nor Nakamura suggests such a limitation. Specifically, no combination of powders that either reference teaches includes one powder that must be both larger and harder than the other—either inherently or expressly. Appx10612-10613; *see* Appx11408-11416 (Shafer); Appx11347-11356 (Nakamura). Indeed, Chilisin admits that Nakamura's size ranges "overlap" with the disclosed ranges—and thus do not require either powder to be larger or smaller than the other. Br. 47 n.20. And

Chilisin's other evidence confirms that nothing in the prior art discloses the claimed relationship.

The evidence conclusively established that Shafer does not disclose or suggest that the larger powder must be harder. Shafer mentions Ancorsteel 1000 and carbonyl iron powders; but as Chilisin admits, it "does not expressly teach the size or hardness of its two iron powders." Br. 18. Dr. Bravman initially claimed that Ancorsteel 1000 was inherently both larger and harder than carbonyl iron. Appx10510. But as he admitted on cross, the Vicker's hardness of Ancorsteel 1000 could be as low as 80, making it softer than carbonyl iron's hardness (95):

> Q.    [T]he data sheet for Ancorsteel 1000C indicates that the hardness for Ancorsteel 1000C could be as low as, for example, 80 on the Vicker's Hardness Scale, couldn't it, sir?
>
> A.    Yes. I said there are typically ranges of these materials.
>
> Q.    So you agree that at least 80 is softer than 95; correct?
>
> A.    Yes.
>
> Q.    So even if you use 95, Ancorsteel 1000C could be softer than carbonyl iron; correct?
>
> A.    80 is less than 95.
>
> Q.    And if Ancorsteel 1000C, which you admit could be as low as 80, is softer than the carbonyl iron, this would not practice the claim; correct?
>
> A.    If that was the case. …

Appx10569-10570. Bravman also testified that whether a particular sample of iron powder is harder or softer than a particular iron alloy powder "depends on the

thermochemical history of each [material]." Appx10587. Since Shafer did not disclose or suggest particular thermochemical treatments for its powders, as Kohl testified without rebuttal (Appx10607-10608), there is no reason to think a POSA reading Shafer would conclude that she should use an especially hard sample of Ancorsteel 1000 and an especially soft sample of carbonyl.

As the district court found, "combin[ing]" Shafer "with Nakamura" likewise "does not render the patent obvious." Appx10636. First, as Dr. Kohl testified, Nakamura "did not relate to molding chokes" (Appx10615); and as Dr. Bravman admitted, Nakamura contains "no reference to a conducting wire being buried inside a magnetic body" (Appx10577). Chilisin thus relies on Nakamura for *one* point—its description of the mixture of iron and an iron alloy (Fe-Si-B)—which, according to Chilisin, discloses the claimed relationship between size and hardness. Br. 46-47. But as Chilisin effectively admits (Br. 47 n.20), Nakamura's size ranges permit the larger powder to be softer. And nothing in Chilisin's "state of the art" references (Br. 44-45) would connect the dots for a POSA: Like Nakamura, three of them "did not relate to molding chokes," and Chilisin did not suggest that any of them was "part of an obviousness combination" for any claim element. Appx10615.

Chilisin offers attorney argument that the ranges disclosed in Nakamura show that the "mean particle sizes" of the two powders would practice the limitation. *Id*. But "[u]nsubstantiated attorney argument regarding the meaning of technical

evidence is no substitute for competent, substantiated expert testimony." *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005). And as Kohl explained, Nakamura discloses "ranges," *not* mean particle diameters within those ranges, and "[s]o as long as the particles are within those two ranges, Nakamura's perfectly happy." Appx10612; *see also id.* ("Nakamura does not affirmatively teach that this alloy [the first powder] must be larger than the iron [second] powder.").

Moreover, Chilisin's own evidence confirms that finding the mean particle diameter is not as simple as looking to the middle of the range. For instance, Chilisin cited an experiment where an Ancorsteel 1000 sample "was sieved into eleven separate size fractions" with mean particle sizes ranging from 224 to 27 microns. Appx11508. Knowing that a powder sample is Ancorsteel 1000 thus provides little information regarding where in the range of possible mean particle sizes the sample mean falls. Chilisin provides no reason, let alone clear and convincing evidence, why the mean particle diameter of Nakamura's powders should be considered more predictable, such that Nakamura would teach that the alloy's mean particle diameter must be larger than the iron powder. In sum, Chilisin cannot show that Nakamura discloses the claimed relationship between size and hardness.

Moreover, the ranges of powder sizes and hardnesses disclosed in the prior art (Br. 43) did not *require* the powders from within those ranges to practice the claimed relationship between size and hardness. Chilisin has never suggested (nor could it)

43

that disclosing mixed magnetic powders with known sizes and hardnesses discloses every relationship between size and hardness that might exist between two powders, and its argument contravenes the "well established" rule "that disclosure of a genus in the prior art is not necessarily a disclosure of every species that is a member of that genus." *Wasica Fin. GMBH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1285 (Fed. Cir. 2017). In short, Chilisin's genus-based argument regarding size and hardness ranges does not show that the specific claim requirement that the larger particle be harder was obvious.

This Court's decisions on overlapping ranges (Br. 47 n.20) are likewise inapposite. The asserted claims do not simply concern values within a previously disclosed range. Rather, they disclose a required relationship between size and hardness not taught by the prior art. Moreover, the presumption that Chilisin invokes applies only "in the absence of evidence indicating that there is something special or critical about the claimed range." *E.I. Dupont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1008 (Fed. Cir. 2018). Here, as shown by the experiments disclosed in the patent (Appx81-83 at 9:44-64, 11:1-16, 11:34-55, 12:44-63, 13:5-15) and the inventor's testimony (Appx9580-9582), the novel requirement that the larger particle be harder identifies a "special" and "critical" subset of pairs of powders with properties in any ranges disclosed by the prior art. *Synvina*, 904 F.3d at 1008. Kohl testified without rebuttal that using a "hard, large alloy and small, soft iron"

produced an "unexpected surprise": "the performance came out without annealing even better than … with annealing." Appx10619-10620. This was because using particles that differ in both hardness and size had a "direct impact," such that "the strain was not induced in the large particle" and the manufacturer "did not have to go to a high temperature, above the melting point." Appx9787.

To establish a prima facie case of obviousness, Chilisin had to show that the prior art taught or suggested every claim limitation. Cyntec's claims require a larger, harder powder, mixed with a smaller, softer powder. No reasonable jury could have found that the prior art taught or suggested this limitation. Thus, Chilisin's prima facie case was deficient as a matter of law.

### C. Chilisin did not show motivation to combine with a reasonable expectation of success.

Affirmance is independently warranted because Chilisin cannot show that a POSA would have been motivated to combine Nakamura and Shafer to arrive at the claimed invention with a reasonable expectation of success. "An invention is not obvious simply because all of the claimed limitations were known in the prior art at the time of the invention. Instead, [the question is] 'whether there is a reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the references'" with "'a reasonable likelihood of success.'" *Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 934 (Fed. Cir. 2019) (citation

omitted). Here, a POSA would not look to Nakamura to improve Shafer in a way that could be reasonably expected to arrive successfully at the claimed invention.

Chilisin's argument that it showed motivation to combine (Br. 44-45) ignores substantial differences between the references. Although Nakamura superficially addressed a prior art heat treatment step, this step did not even occur while molding a choke—only while weighing out the powders, as Figure 2 (Appx11355) shows:



Dr. Bravman admitted that Nakamura's heat treatment step occurs for different reasons than in the prior art, and that Nakamura does not address the strain-related problems that Cyntec solved. Appx10574 (admitting that Nakamura's "heat treatment occurs before the material is weighed," "before binder or resin is added," and "before pressure is applied to the magnetic material during the forming step");

Appx10575 ("Q. Nakamura was about weighing out starting powder without having to heat treat it at high temperature; correct?  A. That's one aspect of it."); Appx10578 (it "is correct" that "there's no discussion in Nakamura about using a high-temperature heat treatment to relieve the strain caused by the pressure of the forming process"); Appx10576 (admitting that "there is no discussion in Nakamura about high-temperature heat treatments melting the insulation of wires" or "high-temperature heat treatments causing short circuits").  A POSA looking to improve Shafer's choke by forming an integral magnetic body under heat conditions would not look to Nakamura, as nothing there indicates that its powders would affect formation temperature. Indeed, Nakamura *does not even address molding chokes*.  Appx10615.

Nor can Chilisin show a reasonable expectation of success.  Indeed, Chilisin omits this element of its prima facie burden.  Br. 26.  But "[a]n obviousness determination requires finding … a reasonable expectation of success." *Regents of Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1291 (Fed. Cir. 2018).  Chilisin's forfeiture of this argument thus provides independent grounds to affirm.  *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360 (Fed. Cir. 2008) (issues "within the scope of the judgment appealed from," but "not raised by the appellant in its opening brief" are "necessarily waived").

Moreover, none of Chilisin's evidence indicates that a POSA would have reasonably expected to arrive successfully at the claimed invention, including the "by

means of" step, by combining Nakamura and Shafer: neither reference indicated that the larger powder must be harder, or that "by means of" a hardness difference, chokes that perform better than annealed chokes may be formed at low temperatures. *Supra* at 35-45. In fact, throughout trial, Chilisin said the opposite in arguing indefiniteness—that the prior art and the patent specification gave a POSA "no way to determine the claimed impact that a hardness difference has on formation temperature," and thus no ability to practice the "by means of" limitation. Appx2766; *accord* Appx10629-10630 (Rule 50(a) argument). Chilisin's failure to show reasonable expectation of success dooms its obviousness challenge.

### D.    Chilisin provided no evidence rebutting Cyntec's strong showing of secondary considerations.

Finally, Cyntec's proof of secondary considerations of non-obviousness went unrebutted. Appx10615-10620. Objective indicia of non-obviousness "play a critical role in the obviousness analysis" (*Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1358 (Fed. Cir. 2013)); they are "not just a cumulative or confirmatory part of the obviousness calculus but constitute[] independent evidence of nonobviousness." *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008). In fact, they "can be the most probative evidence of non-obviousness" (*Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1310 (Fed. Cir. 2010)), as they "are crucial in avoiding the trap of hindsight when reviewing, what otherwise seems like, a combination of known elements" (*Leo Pharm.*, 726 F.3d at 1358).

48

Here, Chilisin never rebutted Cyntec's showing of secondary considerations, including long-felt need, commercial success, and unexpected results. Appx10616 (commercial success) ("the mixed-powder technology allowed Cyntec to secure certain design wins, particularly Qualcomm and Apple"); Appx10617-10618 (long felt need) ("[t]here's been enormous pressure to shrink all the components" of modern electronics and "many studies … to address the problem of having to anneal things"); Appx10619-10620 (unexpected results) ("if you took this mixture of the hard alloy —hard, large alloy and small, soft iron, without annealing, same pressure, the core loss was even less than when you annealed just the hard one"). Nor did Chilisin substantively rebut the extensive proof that it outright copied Cyntec's chokes. *Supra* at 10-11, 33-34. Thus, there was ample, unrebutted, "independent evidence of nonobviousness" to warrant granting Cyntec's Rule 50(a) motion.

\* \* \*

Chilisin utterly failed to make a clear and convincing showing that the asserted claims are obvious. Chilisin provided *no* evidence that the "by means of" limitation was obvious. Nor did Chilisin convincingly show that the prior art disclosed the claimed relationship between sizes and hardnesses; that a POSA would be motivated to combine Shafer and Nakamura; or that a POSA who did so would have a reasonable expectation of success. Finally, Chilisin did not dispute Cyntec's strong showing of secondary considerations. No reasonable juror could disagree.

### III.    The jury's damages verdict should be affirmed.

Chilisin's damages case is equally unconvincing.  Applying *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc*., 575 F.2d 1152 (6th Cir. 1978), Cyntec's damages expert, Van Uden, explained why Cyntec was entitled to lost profits. Appx9939-9944; Appx9966-9973.  Chilisin's expert, Richard Bero, did not dispute Van Uden's testimony on the first three *Panduit* factors.  Appx10408-10409.  On the fourth, he disputed only the *amount* of Cyntec's lost profits, not whether Cyntec would "have made some of the[] sales." Appx10382.  Yet Bero offered no lost profits calculation (Appx10406), and the jury rejected his criticisms of Van Uden, finding that Cyntec proved lost profits "with reasonable certainty."  Appx10747 (jury instructions).  That verdict should be affirmed.

"A district court's decision concerning the methodology for calculating damages" is "review[ed] for an abuse of discretion." *Pavo Sols. LLC v. Kingston Tech. Co.*, 35 F.4th 1367, 1378 (Fed. Cir. 2022) (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1310 (Fed. Cir. 2009)).  "A jury's damages award must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Id*. (citation omitted). Denial of judgment as a matter of law is reviewed "de novo." *Id*.

**A.    The district court properly admitted Cyntec's import calculations.**

1.    According to Chilisin, because Van Uden estimated certain information regarding accused products initially sold outside of the country and then imported, his opinions were speculative.  Br. 50-54.  Not so.  As detailed in his report, Van Uden's estimates of indirect sales of the accused products were based on well-reasoned, customer-by-customer analysis of reliable company-specific and industry data commonly relied upon by experts.  *See* Appx3930-3936 (supply chain analysis); Appx3961-3964 (lost profits for indirect U.S. sales analysis); Appx3947 (market segment analysis); Appx3974-3975 (damages charts); Appx3977 (chart for indirect sales); Appx3983-4005 (charts showing customer-by-customer sales for design code and non-design code customers); Appx4090-4124 (charts showing company-by-company geographic sales distribution).  His calculations were in fact conservative, consisting only of sales for which he could reasonably ascertain the "end customer" and "geographic sales data."  Appx3963.[4]

The district court did not abuse its discretion in admitting Van Uden's importation calculations.  Because Chilisin provided no specific data on either "the amount or proportion of its products sold outside the United States that are then imported," Van Uden used "the best available information" to arrive at a reasonable estimate.

---

[4] Van Uden's geographic sales numbers themselves underestimated the imported products.  Appx4187; Appx4190.

Appx3962-3963. The law requires no more. Under longstanding precedent, it is "'enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.'" *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1327 (Fed. Cir. 1987) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)).

Specifically, Van Uden first confirmed that Chilisin directed its efforts toward end products sold by U.S.-based companies and the U.S. market—the largest relevant market. Appx4162-4178 (Chilisin made 1146 shipments of product samples to U.S. customers between 2015 and January 2020); Appx3931; Appx3936 (both citing Appx4162-4178). He then identified accused products sold abroad for use in end-user devices—*e.g.*, "gaming platforms, PCs, laptops, servers, mobile devices, and automotive products"—imported and sold to U.S. customers. Appx3962-3963.

Next, Van Uden analyzed Chilisin's customer base to determine the volume and associated revenues of Chilisin's accused products used in consumer electronics. Appx3963. Such sales were divided into (1) sales to customers with designated design codes (*e.g.*, Apple, Microsoft, and Qualcomm), and (2) sales to customers without such codes (*e.g.*, Foxconn, LG, and Quanta). Appx3963; Appx3983-4006. All these companies are primarily or exclusively involved in designing, manufacturing, or selling consumer electronics. Appx4120-4124 (describing customers and known product lines).

For companies with available geographic sales information, Van Uden located information—including, where available, audited financial statements and data from respected professional third-party data suppliers such as Gartner—providing a "geographic breakdown of sales." Appx3963. Comparing sales made to the United States with sales made elsewhere, he was able to determine a U.S. importation rate for each company. Appx3963; Appx4090-4124. For some companies, U.S. sales were more than 50% of global sales, one as high as 68.3%. Appx3963; Appx4090-4124. But if Van Uden could not locate reliable geographic breakdown data specific to the company, he excluded sales to that company from damages. Appx3963.

Finally, Van Uden multiplied revenues of Chilisin's accused products sold to an identified customer abroad by the U.S. importation rate of that customer, resulting in estimates of indirect sales to U.S. customers. Appx3963-3964; Appx3974-3975; Appx3977; Appx3981; Appx3983-4006; Appx4090-4124. Applying this approach, he conservatively estimated Chilisin's revenue from infringing products sold indirectly to this country. Appx3963-3964; Appx3983. This methodology used the most accurate and specific data available, providing a reasonably certain estimate of the revenue associated with Chilisin's accused products sold outside the country and later imported by Chilisin's customers. That is all that is required. And although the law permits any reasonable damages methodology, neither Chilisin nor its expert suggested any better methodology, given the available data.

2.    Chilisin's criticisms of that methodology are unfounded.  First, Chilisin asserts that "[f]or all but one of the 27 customers in Cyntec's but-for market, [Van Uden] relied solely on Form 10-K filings with the [SEC] and annual reports."  Br. 51, 54 n.25.  False.  Van Uden also relied on third-party sources including market research reports by Gartner, a reputable market research firm routinely used by experts.  Appx11273 (listing "Gartner Market Share" reports as sources); Appx9929 (Van Uden testifying that "I use it both in litigation matters, as well as I use it a number of times in non-litigation licensing assignments, where we are trying to estimate the size of various markets").  Chilisin's damage expert, Bero, acknowledged that he "d[id]n't have a basis to dispute the [data's] reliability"—that Gartner is "a known company, entity, that provides different market analyses," and that "I can't say I haven't" relied on Gartner data.  Appx10419-10420.  Indeed, he admitted that Chilisin *itself* "rel[ies] on Gartner" data in estimating shipments of mobile devices, notebooks, tables, and phones that may incorporate chokes.  Appx10422-10423; Appx15037 (Chilisin presentation) ("Source: Gartner"); Appx10088 (Chilisin marketing manager) ("You don't need an MBA to know that source [Gartner]").  And even if Chilisin were portraying Van Uden's testimony fairly (it is not), the "factual foundation" for his opinions was unnecessary to establish Cyntec's damages case.  *Symbol Techs.*, 935 F.2d at 1576.

Having relied on the same sources as Van Uden, Chilisin cannot insist that an "estimation" of "how many accused products were imported into the United States" is "impossible" without "discovery from customers." Br. 4. There is no "rigid requirement that damages in all circumstances be limited to specific instances of infringement proven with direct evidence." *Lucent*, 580 F.3d at 1334. And even where the data are "certainly imperfect, and more (or different) data might have resulted in a 'better' or more 'accurate' estimate in the absolute sense, it is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011). Thus, courts have approved the use of similar damages calculations. *E.g.*, *Sherwin-Williams Co. v. PPG Indus., Inc.*, 2021 WL 4987937, *6 (W.D. Pa. Oct. 27, 2021) (approving "attempt[] to estimate the indirect infringement by combining [Defendant's] estimates about its sales to two Ball facilities in Europe with publicly available information about the number of Red Bull cans imported" without obtaining "actual sales records from Red Bull or Ball"); *MediaTek Inc. v. Freescale Semiconductor, Inc.*, 2014 WL 2854890, *5 (N.D. Cal. June 20, 2014) (approving estimate of U.S. sales based on "publicly available industry data" and "estimates from a third party analyst").

Second, Chilisin says the U.S. sales data in the 10-K filings and annual reports were not specific to "choke-containing products" and included "irrelevant products."

Br. 51. False again. The Gartner data that Van Uden used—and which Chilisin largely ignores—were specific to choke-containing products (Appx9928-9929); the data showed the percentage of laptops, PCs, cell phones, and tablets imported by Apple (Chilisin's largest customer for the accused products), Microsoft, Amazon, Google, LG, and HTC (Appx15759-15760). Van Uden used those more specific "Gartner Market Share" data to corroborate the 10-K filings and annual reports. Appx11273. Apple's public filings, for example, indicated that 37.7% of 2020 revenue was from U.S. sales; Van Uden "corroborated" this percentage with "data from Gartner which indicate[d] that 34.5% of Apple's unit shipments of PCs, phones, and ultramobiles were shipped to the U.S. during 2016-2020." Appx11273.

Third, Chilisin says no party "knows exactly which third-party products contain accused chokes, or how many accused chokes those products contain." Br. 52. That argument supports *affirmance*. When "the evidence available from the infringer is inadequate, damages may be estimated on the best available evidence" and courts may "resolv[e] doubt[s] against the infringer," who "bears the risk when precise calculation is not possible." *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1572 (Fed. Cir. 1996) (citing *Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 620 (1912)). Determining damages "is not an exact science, and 'the amount need not be proven with unerring precision.'" *Del Mar*, 836 F.2d at 1327 (citation omitted). Again, it is "'enough if the evidence show the extent of

the damages as a matter of just and reasonable inference, although the result be only approximate.'" *Id.* (quoting *Story Parchment*, 282 U.S. at 563). Here, it is undisputed that Van Uden used the best available data—data that Chilisin itself uses in estimating shipments of specific products containing chokes. Appx10422-10423; Appx15037.

*Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, 711 F.3d 1348 (Fed. Cir. 2013), is not "directly on point." Br. 52-53. The plaintiff's expert there relied on Samsung's worldwide phone sales to estimate sales of the defendant's accused circuits, which were used in Samsung's and other companies' phone chargers. 711 F.3d at 1372. The expert's opinions were excluded because (1) the source of his data was "unclear" and appeared to be a single "unauthenticated hearsay" document "from the Internet"; (2) he assumed without evidence that all "phones shipped with a charger"; and (3) he assumed that every "charger[] incorporated an infringing power circuit"—when evidence showed that chargers also used the plaintiff's circuits. *Id.* at 1373-74.

Nothing like that happened here. First, Van Uden used financial statements from Chilisin's original device manufacturers or brand customers, or third-party data reflecting geographic breakdowns of their sales. Neither Chilisin nor its expert has alleged that the financial statements or third-party data are unreliable. Rather, these documents are commonly found reliable by damages experts. *E.g.*, *MediaTek Inc.*

*v. Freescale Semiconductor, Inc.*, 2014 WL 2854890, *5 (N.D. Cal. June 20, 2014) (approving reliance on "publicly available industry data" and "estimates from a third party analyst" to estimate U.S. sales); *Semiconductor Energy Lab'y Co. v. Chi Mei Optoelectronics Corp.*, 531 F. Supp. 2d 1084, 1112 (N.D. Cal. 2007) (approving use of "public filings" to estimate importation of infringing products) ; *Kaneka Corp. v. SKC Kolon PI, Inc.*, 2015 WL 12696109, *5 (C.D. Cal. Nov. 5, 2015) (approving reliance on "a subscription database that is relied upon by many multinational companies" to estimate U.S. imports). Second, unlike the expert in *Power Integrations* (711 F.3d at 1374), Van Uden did not begin his analysis with the end product (*e.g.*, laptops or phones), or assume that every such product contained an accused choke. Instead, he estimated the portion of accused chokes that are imported by starting with Chilisin's actual sales data, and then applying reliable data showing importation rates for products sold by Chilisin's customers incorporating the infringing chokes. As the foregoing authorities confirm, the district court did not abuse its discretion in admitting these calculations.

## B.    The district court properly denied Chilisin's motion for judgment as a matter of law on lost profits.

Chilisin's last gasp is its claim that it should have been granted judgment as a matter of law on lost profits, first because Cyntec's market share analysis is allegedly flawed (Br. 54-59), and second because Cyntec allegedly lacks substantial evidence of but-for sales (Br. 60-61). But as the district court found, Chilisin waived these

challenges. Appx10. And in any case, Cyntec's market share analysis and proof of but-for sales were sound.

### 1.     Chilisin waived its challenges to Cyntec's market share analysis.

This Court need not reach the merits of Chilisin's challenges to Cyntec's market share analysis, because Chilisin's Rule 50(a) motion never raised it. Appx10274-10275. Chilisin's sole Rule 50(a) damages argument involved how many "accused products manufactured [abroad]" were imported. Appx10. Granted, after the close of evidence, Chilisin tried to "renew" its Rule 50(a) motion by adding a new issue: "no lost profits, failure by Cyntec to prove the share of sales that Cyntec would have made but for Chilisin's sale of the accused products." Appx10737-10739. But that was too late. And even then, Chilisin offered no analysis, evidence, or support for its one-sentence "motion." Cyntec objected that it was procedurally improper and untimely, and the court agreed (Appx10739), ruling that any "challeng[e] [to] Cyntec's market share analysis" was waived. Appx10.

Noting that it made *other* causation arguments (Appx10-11), Chilisin says the district court should have heard its challenges to Cyntec's market share analysis too (Br. 60). Not so. Rule 50(a) motions "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). Chilisin's motion "had to be sufficiently specific" to inform others of "exactly what [Chilisin] alleged to be deficient," legally or factually, in Cyntec's case. *Junker v.*

*Eddings*, 396 F.3d 1359, 1363 (Fed. Cir. 2005). But as the district court found (Appx10-11), Chilisin's motion was neither specific nor "plain." Br. 59.

### 2.    Cyntec's market share analysis was sound.

Even if Chilisin had preserved its market share arguments, they would not warrant disturbing the verdict. Cyntec's analysis was sound.

First, without citing authority, Chilisin complains that Cyntec did not conduct its market share analysis on a customer-by-customer basis. Br. 55-56. But lost profits may be calculated using "[Cyntec's competitors'] shares of the market on top of its own." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989). Market share by definition is not based on customer-by-customer analysis, but refers to a company's percentage of sales in a given market (here, Cyntec's share of the mixed-powder molded choke market). That is just what Van Uden estimated. Appx9970-9971 (using "market share approach" to "be conservative"); Appx15451-15490 (presentation summarizing Cyntec products); Appx15497-15527 (presentation reflecting Cyntec market share); Appx15569-15575 (then-Chilisin president describing "the leading players in this field" as "Chilisin," "Semco and Cyntec"); Appx15769-15770 (charts summarizing market share by application and revenue by part number).

Second, Chilisin complains that Dan Wu did not testify about the market share data for certain market share segments or time periods. Br. 56-57, 58-59. In reality,

Wu explained that Cyntec calculates the "TAM," or total available market, by iden-tifying the number of chokes used in a device (say, a smartphone), identifying "how many smartphones sell" worldwide, and then multiplying the number of chokes by the worldwide sales.  Appx9507.  Cyntec then divides its "sale[s]" of chokes for each device by the TAM, to derive its market share.  This market share is precisely what Van Uden relied on, and such methodology is consistent with industry practice.  But again, and in any event, the "factual foundation" for Van Uden's opinions was un-necessary to establish a "prima facie case."  *Symbol Techs.*, 935 F.2d at 1576.  Chilisin cites no contrary authority.

Van Uden's testimony was more than sufficient.  Relying on both Cyntec's market share estimates and discussions with Wu (Appx15769-15770; Appx15807-15808), he calculated Cyntec's market shares from 2016 through 2021 in the five key product segments (Appx9970; *see also* Appx15769-15770; Appx15807-15808), Chilisin chose not to cross-examine Van Uden regarding product segments, market share numbers, or the relevance of market share data from other periods.  Appx9998-10034.  Moreover, the evidence showed that Cyntec and Chilisin frequently compete head-to-head, and Van Uden conservatively estimated Cyntec's market share in each segment.  Appx9970-9971; Appx15769-15770.  Indeed, Chilisin offered no evi-dence to rebut Cyntec's market share information, provided by Wu.

Third, Chilisin complains that Van Uden did not tie the accused products' sales to the product segments for each customer. Br. 57-58. But again, Chilisin cites no authority requiring customer-by-customer calculations. Van Uden calculated weighted market shares based on the various uses of the accused products, which tied the relevant product segments to the accused choke sales for an even more precise estimate of Cyntec's effective market share. Appx9982-9984 (testimony about use of "patented technology" in many "product application[s]"); Appx15384-15405 (Chilisin "Application Guide" showing choke use); Appx15769-15770 (chart summarizing market share "by Application"). "This Court has repeatedly approved similar adjusted market share analyses for estimating lost profits." *Akamai Techs., Inc. v. Limelight Networks, Inc*., 805 F.3d 1368, 1380 (Fed. Cir. 2015).

Chilisin says the data underlying the weighted market shares included "all Chilisin's products" and "customers." Br. 58. Not so. Van Uden's data excluded products for Ralec, Ferroxcube, and Maglayers, which make up the Chilisin Group (Appx16198; Appx16204); and, if anything, he understated Cyntec's market share, as Chilisin and Cyntec are "the primary competitors … for the accused products"— others were "one-off" competitors. Appx9943-9944 (there were "one-off instances" of "other competitors being in the marketplace"; "as a result of that, I conservatively decided to use a market share-type approach"); Appx9969-9970 (similar); Appx10032 (Van Uden's market share analysis would "understate the calculation if

there was really direct head-to-head competition between just the two parties"). In-deed, Chilisin's former president identified the three "leading players" as "Chilisin," "Semco and Cyntec."   Appx15572; Appx9938 (Van Uden discussing this); Appx9971 (same).  Thus, Van Uden's analysis was not speculative, but directly tied to the facts.

### 3.    Chilisin's remaining damages argument fails.

Chilisin devotes just one paragraph to the only JMOL damages argument that it preserved—namely, that Cyntec failed to prove that it would have made sales but for the infringement.  Br. 60.  It is easy to see why.  As the district court explained, the evidence "included many examples of Chilisin discussing efforts to make their products in line with the specifications of Cyntec's products."  Appx11; *see* Appx14970-14976 ("will mettle same dimensions with Cyntec's"; "we will try to meet theirs as close as possible"); Appx15907-15920 (products' "characteristics need to completely match Cyntec characteristics"); Appx14830-14833 (products "need to be exactly the same (sorry, no room for negotiation because the client pre-fers Cyntec).").  "Chilisin d[id] not meaningfully rebut [this] evidence."  Appx23. And together with Van Uden's thorough analysis, this damning evidence provided "more than a reasonable basis for the jury to conclude that Cyntec would have made Chilisin's sales but for the alleged infringement."  Appx11.

63

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

/s/ Steffen N. Johnson

JAMES C. YOON
CHRISTOPHER D. MAYS
  *Wilson Sonsini*
  *Goodrich & Rosati, PC*
  *650 Page Mill Road*
  *Palo Alto, CA 94304*
  *(650) 493-9300*

STEFFEN N. JOHNSON
PAUL N. HAROLD
G. EDWARD POWELL III
  *Wilson Sonsini*
  *Goodrich & Rosati, PC*
  *1700 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 973-8000*
  *sjohnson@wsgr.com*

*Counsel for Plaintiff-Appellee Cyntec Company, Ltd.*

DATED: OCTOBER 3, 2022

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32 because it contains 13,996 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14 point Times New Roman font.

DATED: OCTOBER 3, 2022                    */s/  Steffen N. Johnson*
                                         Steffen N. Johnson